Daniel J. Wadley (Utah State Bar No. 10358)
wadleyd@sec.gov
Thomas M. Melton (Utah State Bar No. 4999)
meltont@sec.gov
Cheryl M. Mori (Utah State Bar No. 8887)
moric@sec.gov
Attorneys for Plaintiff
Securities & Exchange Commission
15 West South Temple, Suite 1800
Salt Lake City, Utah 84101
Telephone:  801-524-5796
Facsimile: 801-524-5262

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>PLAINTIFF,<br><br>v.<br><br>PCS EDVENTURES!.COM, INC., an Idaho Corporation, ANTHONY A. MAHER, an individual, and SHANNON M. STITH, an individual,<br><br>DEFENDANTS. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **AMENDED COMPLAINT**<br><br>Case No: 1:10-cv-00433<br><br>Judge B. Lynn Winmill |

Plaintiff, Securities and Exchange Commission (the "Commission"), for its Complaint against Defendants alleges as follows:

### INTRODUCTION

1.      This matter involves the issuance of materially false and misleading press releases and the filing of materially false and misleading reports with the Commission by PCS Edventures!.com, Inc. ("PCS") and its officers, Chief Executive Officer Anthony A. Maher, and Chief Financial Officer Shannon M. Stith.

2.      PCS is an Idaho corporation headquartered in Boise, Idaho.  PCS develops and markets educational learning labs and curricula and related software and technology.  For the fiscal year ended March 31, 2007, PCS reported total assets of $1,361,296, total revenues of $1,998,683, and an operating loss of $1,983,050.  PCS's stock is quoted on the OTC Bulletin Board.

3.      On March 28, 2007, PCS announced a purported sale to its Middle East distributor, Global Techniques a/k/a PCS Middle East ("PCS Middle East").  The press release stated that PCS had entered into a license agreement with PCS Middle East for a fixed license fee of $7.15 million.  The announcement was materially false and misleading, because PCS Middle East did not have the ability to pay $7.15 million without first obtaining a contract and receiving funds from the Kingdom of Saudi Arabia ("Saudi Arabia").  PCS Middle East did not, however, have a contract with Saudi Arabia.  PCS officers knew there was no contract with Saudi Arabia.

4.      On March 29, 2007, PCS filed a Form 8-K with the Commission.  The Form 8-K announced the purported $7.15 million license agreement and stated that full payment would be received by PCS no later than May 15, 2007.

5.      During May 2007 through August 2007, PCS issued additional press releases and filed a Form 8-K/A and a Form 10-KSB, all of which contained materially false and misleading representations or omissions related to the purported license agreement.

6.      The false and misleading information regarding the purported license agreement and $7.15 million in revenue caused the price and trading volume of PCS's stock to be artificially inflated.

**JURISDICTION AND VENUE**

7.      This Court has subject matter jurisdiction by authority of Sections 21 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. §§ 78u and 78aa].

8.      Defendants, directly or indirectly, singly and in concert, have made use of the means and instrumentalities of interstate commerce and the mails in connection with the transactions, acts, practices, and courses of business constituting violations herein.

9.      Venue for this action is proper in the District of Idaho under Section 27 of the Exchange Act [15 U.S.C. § 78aa] because certain of the transactions, acts, practices, and courses of business alleged in this Complaint took place in this district and because Defendants reside in and transact business in this district.

10.      Defendants, unless restrained and enjoined by this Court, will continue to engage in the transactions, acts, practices, and course of business alleged herein and in transactions, acts, practices, and courses of business of similar purport and object.

## DEFENDANTS

11.      **PCS Edventures!.com, Inc.** ("PCS") was formed in the mid-1980s and was incorporated in Idaho in 1994.  PCS's common stock has been registered pursuant to Section 12(g) of the Exchange Act since May 11, 2001.

12.      **Anthony A. Maher** ("Maher"), age 62, served as Chairman of the Board, President, and Chief Executive Officer ("CEO") of PCS since 1989.  Since March 2010, Maher has served as Chairman of the Board and Chief Executive Officer.  Maher holds a B.A. in Political Science.

13.      **Shannon M. Stith** ("Stith") (previously Shannon Wilson), age 30, joined PCS as Assistant Chief Financial Officer in August 2005.  Stith served as Vice President and Chief Financial Officer ("CFO") of PCS from September 1, 2006 to January 11, 2008, when she ended her employment with PCS.  Currently, Stith works for Boise Cascade Holdings, LLC, a public company.  She holds a Bachelor of Business Administration in Finance and an M.B.A. and has been a licensed CPA in Idaho since September 17, 2009.

**BACKGROUND:**
**GLOBAL TECHNIQUES A/K/A PCS MIDDLE EAST ACTS**
**AS A DISTRIBUTOR FOR PCS IN THE MIDDLE EAST**

14.      In 2002, PCS became acquainted with Dr. Mohammed Yasser Refai ("Refai"), the owner and manager of Global Techniques, an Egyptian entity in the business of information technology consulting.  Over the next few years, Refai acted as a distributor of PCS products in the Middle East.  PCS worked with Refai, attempting to develop projects in Egypt and other countries in the Middle East.

15.      From at least April 2003, Refai led PCS to believe that he was on the verge of completing various orders in the Middle East, but no substantial orders materialized.

16.      In or around mid-2005, Refai formed PCS Middle East, an Egyptian entity, for purposes of developing business for PCS throughout the Middle East.  Refai and PCS began using the name PCS Middle East interchangeably with Global Techniques and have treated the two entities as one (hereafter referred to as "PCS Middle East").

17.      In or around November 2005, Refai represented to PCS that he would be obtaining a large contract from the Egyptian government to provide it with PCS products.  Refai indicated that he would soon be receiving an "official letter" regarding the contract.  This purported contract was repeatedly delayed and, ultimately, never materialized.

**PCS MIDDLE EAST PURSUES POTENTIAL CONTRACT**
**WITH THE KINGDOM OF SAUDI ARABIA**

18.      In mid-2005, Refai informed PCS that PCS could potentially obtain contracts for hundreds of millions of dollars from the Saudi Arabian government under an educational reform initiative in that country.

19.      In mid-2006, Refai informed PCS that PCS Middle East was very close to securing and finalizing a large contract with the Saudi Arabian government.  From August 2006 through the end of 2006, Refai repeatedly told PCS that a contract would be forthcoming.

20.      In or around December 2006, Refai informed PCS that PCS had been selected as a provider for the educational initiative in Saudi Arabia and that a contract would be finalized by

the end of 2006.  Refai indicated that such a contract could be in the amount of hundreds of millions of dollars, but specific terms were not provided or determined.

21.     From December 2006 through March 2007, Refai continued to represent that an official order and contract with Saudi Arabia were imminent and close to being finalized and signed by the King of Saudi Arabia.  During this time, Refai repeatedly told PCS that he expected the order and contract within days or weeks, but, as had been the case in the past, Refai continually postponed the expected contract date.

22.     By March 31, 2007, Refai and PCS Middle East had not received an official order or a contract with Saudi Arabia.  PCS and its officers knew there was no order or contract between PCS Middle East and Saudi Arabia.

23.     Prior to March 31, 2007, PCS and its officers never saw a draft contract and were never given any specific terms to be included in a contract with Saudi Arabia.

24.     Prior to March 31, 2007, PCS had no definitive evidence, other than Refai's assurances, that Saudi Arabia intended to enter into a contract with PCS Middle East or purchase any products from PCS or PCS Middle East.

### PCS FACES PRESSURE TO MEET EBITDA REQUIREMENTS BY FISCAL YEAR-END

25.     In the fiscal year ended March 31, 2007, PCS faced considerable pressure to meet certain EBITDA (earnings before interest, taxes, depreciation and amortization) requirements imposed by an outstanding $1 million convertible note (the "Note") held by Barron Partners LP ("Barron Partners").

26.     According to terms of the Note, if PCS did not reach EBITDA of $4.5 million for the fiscal year ended March 31, 2007, the number of shares of stock into which the Note was convertible would be increased *pro rata* by the percentage decline in EBITDA.

27.     According to terms of the Note, Barron Partners would be eligible for up to five million additional shares of stock if the EBITDA goal was not met by the end of the fiscal year, March 31, 2007.

28.     In December 2006, Maher expressed concerns to PCS's Board of Directors about meeting the EBITDA goal by March 31, 2007.  Maher indicated that absent obtaining a contract with Saudi Arabia, PCS had no way to earn and record enough revenue to meet the EBITDA goal.

29.     During the first few months of 2007, PCS and its officers discussed the need to record revenue for the anticipated contract with Saudi Arabia before March 31, 2007, in order to meet the EBITDA requirement imposed by the Note.  PCS and its officers discussed that the only way to meet the EBITDA goal was to record revenue from the anticipated contract with Saudi Arabia.

### PCS RECORDS REVENUE FOR PURPORTED $7.15 MILLION LICENSE AGREEMENT WITH PCS MIDDLE EAST

30.     During March 2007, PCS discussed internally and with its outside auditor whether it could recognize revenue from the anticipated contract with Saudi Arabia before PCS's fiscal year end on March 31, 2007.

31.     In or around March 2007, Stith, PCS's Chief Financial Officer, completed research and determined that under Generally Accepted Accounting Principles ("GAAP"), PCS could properly recognize revenue from the anticipated contract if four conditions were met.  Stith outlined the four conditions in a March 3, 2007 e-mail to Maher:

  i.     Persuasive evidence of an arrangement exists (a contract);

  ii.    Delivery has occurred (curriculum sent to Refai)

  iii.   Vendor's fee is fixed or determinable (fixed fee amount in contract); and

  iv.    Collectability is probable.

32.     PCS officers knew that collecting funds for a contract with Saudi Arabia was uncertain.  Stith stated in her March 3, 2007 e-mail to Maher, "because of the ME [Middle East] we need to have collection prior to recognition given the turmoil in the ME and uncertainty of collection."  Stith concluded that PCS should not record any revenue until payment for the

anticipated contract was actually received by PCS.  Maher did not disagree with Stith's conclusion at this time.

33.     In or around March 2007, Refai represented to PCS that if and when PCS Middle East finalized a contract with Saudi Arabia, the Saudi Arabian government would provide an advance payment to PCS Middle East to fulfill the contract.  Refai represented that PCS Middle East would then be able to pay PCS a major portion of the advance payment.

34.     In March 2007, terms of the anticipated contract with Saudi Arabia had not been determined.  At this time, PCS decided to structure a transaction in which PCS would charge PCS Middle East a fixed fee for a license to allow PCS Middle East to sell PCS products to Saudi Arabia.  PCS determined that structuring a transaction in this manner would allow PCS to record the fixed license fee as revenue if it met the four conditions for recording revenue according to GAAP.

35.     On March 7, 2007, Stith sent an e-mail to PCS's outside auditor outlining a proposed procedure and steps required for structuring the transaction and recording revenue from the anticipated contract.  Stith noted that "the fixed fee for the license is in the process of being negotiated" and that PCS "will not be booking revenue until funds are received."

36.     At some time in March 2007, PCS determined that it would charge PCS Middle East $7.15 million as the fixed license fee.  PCS determined that if it was able to record the $7.15 million license fee as revenue by March 31, 2007, it would meet the EBITDA goal required under the Note.  This would allow PCS to avoid the penalty imposed by the Note if PCS were not able to reach the EBITDA goal.

37.     In March 2007, PCS Middle East did not have resources to pay $7.15 million to PCS without first obtaining a contract and an advance payment from the Saudi Arabian government.  PCS and its officers knew that PCS Middle East could not pay the required fee under the license agreement unless and until it obtained a contract and received advance funds from Saudi Arabia.

38.     On or about March 8, 2007, Maher e-mailed a license agreement to Refai.  Maher stated in the e-mail, "As we have discussed, this agreement provides us the opportunity to 'book' revenue prior to the end of our fiscal year which is March 31."  Maher also stated, "If the KSA [Kingdom of Saudi Arabia] contract does not happen for one reason or another[,] this license agreement does not become effective.  Again, it is for us to book revenue ahead of the larger contract, assuming that happens.  We do not expect payment until we know we have a contract with the Saudi's [sic] and you have the cash advance from them."

39.     PCS intended that the license agreement would only be effective if and when PCS Middle East obtained a contract with Saudi Arabia.  Further, PCS informed Refai that PCS Middle East would not be bound by the license agreement unless and until PCS Middle East received funds from Saudi Arabia.  Thus, the purported license agreement with PCS Middle East was not an enforceable contract.

40.     On March 26, 2007, Stith sent an e-mail to Maher informing him that PCS should not record revenue for the purported license agreement because two of the four GAAP requirements to record revenue had not been completed, namely:  (1) there was no contract with Saudi Arabia, and (2) PCS had not collected funds for the purported license agreement.  Stith also noted that if the amount were recorded in PCS's books (internal financial records), PCS would be obligated to release information about the $7.15 million in revenue through a Form 8-K and a press release.  Stith stated in the e-mail, "Since we do not have any contract with MoE [the Saudi Arabian Ministry of Education] or reason to believe that Refai could pay us the $7.15M if he doesn't obtain 2 above, I am not comfortable booking this as revenue. … I say no booking of revenue until we have contracts."

41.     In spite of Stith's warnings, PCS recorded $7.15 million as revenue in its internal financial records for the purported license agreement.

42.     On or about March 26, 2007, PCS executed a "License Agreement for Educational Curriculum and Content" with PCS Middle East.  The license agreement was signed by Maher and Refai on behalf of PCS and PCS Middle East, respectively.

43.     On or about March 26, 2007, PCS Middle East provided to PCS a purchase order in the amount of $7,150,000 for a license to sell PCS products to Saudi Arabia.

44.     On or about March 28, 2007, PCS generated an invoice to Global Techniques-PCS Middle East for $7,150,000.  At or about the same time, the $7,150,000 invoice was posted to PCS's general ledger as revenue, and thereby was recorded in PCS's internal financial records within the fiscal year ended March 31, 2007.

45.     At the time PCS recorded the $7.15 million as revenue, PCS Middle East had not received a contract or official order from Saudi Arabia.  PCS and its officers were aware there was no contract or official order from Saudi Arabia and knew that two of the four requirements for recording revenue according to GAAP were not met.  In spite of this knowledge, Maher and Stith either participated in or had knowledge of the recording of $7.15 million as revenue in PCS's financial records.

## PCS AVOIDS EBITDA PENALTY UNDER BARRON PARTNERS NOTE

46.     On or around March 31, 2007, Maher informed Barron Partners that it or PCS Middle East had received a contract with Saudi Arabia and that PCS would meet its EBITDA goal under the Note.  Because PCS represented it had reached its EBITDA goal, Barron Partners did not seek a penalty according to the Note's terms.

47.     In April 2007, Barron Partners sold the Note to a third party, Burlingame Asset Management, LLC ("Burlingame").  Burlingame later agreed to eliminate the EBITDA requirement and penalty under the Note.

## PCS ISSUES A FALSE AND MISLEADING PUBLIC ANNOUNCEMENT AND FORM 8-K REGARDING THE PURPORTED $7.15 MILLION LICENSE AGREEMENT

48.     On or about March 28, 2007, Maher drafted a press release regarding the purported license agreement with PCS Middle East.  Stith reviewed the press release and caused it to be published on March 28, 2007.  The heading of the press release stated, "PCS EDVENTURES! ANNOUNCES SALE TO PCS MIDDLE EAST."   The press release

announced "the signing of a License Agreement for Educational Curriculum and Content with PCS Middle East, its sales and distribution partner in the Middle East" for a fixed license fee in the amount of $7,150.000.

49.     On March 29, 2007, PCS filed a Form 8-K with the Commission announcing the purported $7.15 million license agreement.  The March 28, 2007 press release, which was drafted and prepared by Maher, was attached to the Form 8-K as an exhibit.  Stith signed the Form 8-K as Vice President and Chief Financial Officer.  The Form 8-K further stated that PCS Middle East agreed to pay the full $7.15 million in a single sum payment no later than May 15, 2007.

50.     At the time PCS issued the press release and filed the Form 8-K, PCS Middle East did not have a contract with Saudi Arabia.  PCS, Maher, and Stith knew that PCS Middle East did not have a contract with Saudi Arabia and knew that PCS Middle East could not pay under the purported license agreement without first obtaining a contract and advance funds from Saudi Arabia.

51.     The press release and Form 8-K were materially false and misleading because the purported license agreement with PCS Middle East was not valid or effective and ostensibly was contingent on PCS Middle East receiving a contract and funds from Saudi Arabia.  In addition, even if PCS Middle East obtained a contract with Saudi Arabia, PCS, Maher, and Stith knew there was uncertainty about actually receiving funds from Saudi Arabia.

**STOCK PRICE AND TRADING VOLUME ARE ARTIFICIALLY INFLATED**

52.     The public announcement of the purported license agreement caused PCS's stock price to be artificially inflated.  From January 1 to March 27, 2007, the highest closing price for PCS's stock had been $.70 per share on March 13, 2007.  On the day of the March 28, 2007 press release, PCS's stock price closed at $0.93 per share, a 43% increase over the previous day's close of $0.65 per share.

53.     The public announcement of the purported license agreement caused trading volume in PCS stock to be artificially inflated.  Prior to the press release, the highest trading volume for the period of January 1 to March 27, 2007 had been 333,900, which occurred on February 7, 2007.  Trading volume on the day of the March 28, 2007 announcement was 962,300, 188% above the previous high trading volume during 2007.

54.     Over the next few weeks, while the materially false and misleading information about the purported license agreement remained public, PCS's stock price continued to rise.  On April 11, 2007, PCS stock closed at $2.03 per share on volume of 666,500 shares.  On April 19, 2007, the stock price reached a high of $3.34 (a 400% increase over the $.65 per share price prior to the press release), and trading volume was 1,319,700 shares.

55.     Trading volume reached a high of 2,429,800 shares (at a closing price of $2.10) on April 25, 2007, a 628% increase above the trading volume for any day that year prior to the announcement.

### EXTERNAL AUDITORS REQUIRE REVERSAL OF $7.15 MILLION REVENUE FOR PURPORTED LICENSE AGREEMENT

56.     In April 2007, PCS's outside auditor, HJ & Associates, LLC ("HJ"), began work on the audit of PCS's financial statements for the year ended March 31, 2007.  As part of this audit, PCS provided to HJ a Consolidated Balance Sheet, Consolidated Income Statement, and a Trial Balance as of March 31, 2007.  The income statement included the purported license fee amount of $7,150,000 as revenue for the period, and the same amount was included in PCS's accounts receivable on the balance sheet.

57.     Because the $7.15 million transaction was so significant for PCS, especially in relation to past reporting periods, HJ raised questions regarding the purported license agreement and recording of revenue at the start of the audit.  HJ requested additional information and documentation to substantiate the revenue.

58.     HJ specifically questioned whether the invoiced amount was collectible, a requirement under GAAP, for recognizing revenue.  HJ agreed to delay completion of the audit

to give PCS an opportunity to show receipt of funds, which would assist in demonstrating the receivable was collectible.

59.     PCS never collected any funds under the purported license agreement and was unable to provide substantiation sufficient to satisfy HJ that PCS could properly recognize revenue under the purported license agreement.  HJ informed PCS that it would not opine or issue an opinion on PCS's financial statements unless the transaction was reversed.

60.     Prior to the end of the audit in late June, PCS reversed the $7.15 million revenue entry.

61.     Neither Maher nor Stith disclosed to HJ that there was no contract with Saudi Arabia and that payment for the purported license agreement was contingent on PCS Middle East first obtaining a contract and funds from Saudi Arabia.

### PCS ISSUES ADDITIONAL FALSE AND MISLEADING PUBLIC ANNOUNCEMENTS AND FILINGS

62.     As of May 15, 2007, the previously announced date for receipt of payment for the purported license agreement, PCS Middle East still had not received an order or a contract from Saudi Arabia.  In turn, PCS had not received any payment from PCS Middle East for the purported license agreement.

63.     On May 17, 2007, PCS filed an amended Form 8-K ("Form 8-K/A") with the Commission, stating that payment under the purported license agreement had not been received by May 15, 2007, as previously announced.  Maher signed the Form 8-K/A as Chairman and Chief Executive Officer.

64.     On June 28, 2007, PCS issued a press release announcing that it had elected to postpone recognition of the purported $7.15 million license revenue because of delays in Saudi Arabia, which "resulted in a postponement in payment to PCS Middle East, thereby causing delays in payments to PCS Edventures! by PCS Middle East."   Maher was quoted in the press release as saying, "Our decision does not suggest that any projects in Saudi Arabia that were the

12

subject of the original invoice are not going forward, but it means that such projects will likely commence later than our initial expectations."

65.     On June 29, 2007, PCS filed its Form 10-KSB for the fiscal year ended March 31, 2007 ("Form 10-KSB") with the Commission.  The license revenue of $7.15 million was not included in PCS's audited financial statements in the Form 10-KSB.  The Form 10-KSB reiterated that PCS had a material contract with PCS Middle East for a fixed license fee to sell its product in Saudi Arabia, but stated that delays had been experienced and funds had yet to be received.  Maher and Stith participated in drafting and filing the Form 10-KSB.

66.     Maher signed and certified the Form 10-KSB pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, as President and CEO of PCS.  Stith certified the Form 10-KSB pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, as Vice President and Chief Financial Officer of PCS.

67.     The Form 8-K/A, the June 28, 2007 press release, and the Form 10-KSB were materially false and misleading, because they failed to disclose that PCS Middle East never had a contract with Saudi Arabia and that PCS Middle East was unable to pay under the license agreement without first obtaining a contract and advance payment from Saudi Arabia.  PCS, Maher, and Stith knew that there was no contract with Saudi Arabia, but failed to disclose this information.

68.     On August 15, 2007, PCS issued a press release regarding the purported contract with Saudi Arabia.  The press release finally disclosed that no current contract existed, nor was a contract likely to exist in the near future.  The press release also disclosed that PCS had requested documentation from Refai demonstrating PCS Middle East's involvement with the educational initiative in Saudi Arabia, but Refai never provided any such documentation.

69.     Prior to the press release on August 15, 2007, the facts that there was no contract with Saudi Arabia and that there was no valid contract with PCS Middle East were withheld from the public and the investment community.  PCS and its officers, Maher and Stith, were fully aware of this information during the entire relevant period.

70.     To date, neither PCS nor PCS Middle East has received an official order or a material contract from Saudi Arabia, as previously announced in March 2007.

## FIRST CAUSE OF ACTION
## FRAUD IN CONNECTION WITH THE PURCHASE
## AND SALE OF SECURITIES
**Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]**

71.     The Commission realleges and incorporates by reference the allegations contained in Paragraphs 1 though 70, above.

72.     Defendants, and each of them, by engaging in conduct described in Paragraphs 1 though 70, above, directly or indirectly, in connection with the purchase and sale of securities, by the use of means or instrumentalities of interstate commerce or of the mails, with scienter: (1) employed devices, schemes or artifices to defraud; (2) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (3) engaged in acts, practices or courses of business which operated or would operate as a fraud or deceit upon other persons.

73.     By reason of the foregoing, Defendants, and each of them, directly or indirectly, violated, and unless restrained and enjoined by this Court, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder. [17 C.F.R. § 240.10b-5].

## SECOND CAUSE OF ACTION
## FALSE FILINGS WITH THE COMMISSION AND AIDING AND ABETTING
## FALSE FILINGS WITH THE COMMISSION
**Violations and Aiding and Abetting Violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, and 13a-11 thereunder [17 C.F.R. 240.12b-20, 240.13a-1, and 240.13a-11]**

74.     The Commission realleges and incorporates by reference the allegations contained in Paragraphs 1 through 70, above.

75.     Defendants, and each of them, by engaging in the conduct described in Paragraphs 1 through 70, above, directly and indirectly, filed the Form 8-K, the Form 8-K/A, and

the Form 10-KSB, each containing material misstatements or omissions regarding the true nature of the license agreement.

76.     By reason of the foregoing, Defendant PCS, directly or indirectly, violated and, unless restrained and enjoined, will continue to violate, Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, and 13a-11 thereunder [17 C.F.R. 240.12b-20, 240.13a-1, and 240.13a-11].

77.     By reason of the foregoing, Defendants Maher and Stith, directly or indirectly, aided and abetted violations and, unless restrained and enjoined, will continue to aid and abet violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, and 13a-11 thereunder [17 C.F.R. 240.12b-20, 240.13a-1, and 240.13a-11].

### THIRD CAUSE OF ACTION
### FALSE CERTIFICATIONS OF AN ANNUAL REPORT
### Violation of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rule 13a-14 thereunder [17 C.F.R. § 240.13a-14]

78.     The Commission realleges and incorporates by reference the allegations contained in Paragraphs 1 though 70, above.

79.     Defendant PCS's Form 10-KSB included material misstatements or omissions that, in light of the circumstances under which such statements were made, were misleading.

80.     Defendants Maher and Stith knowingly certified the Form 10-KSB in spite of their knowledge that material misstatements or omissions were contained therein.

81.     By reason of the foregoing, Maher and Stith, directly or indirectly, violated, and unless restrained and enjoined will continue to violate, Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rule 13a-14 thereunder. [17 C.F.R. § 240.13a-14].

### RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that this Court:

### I

Issue findings of fact and conclusions of law that the Defendants committed the violations charged herein.

**II**

Issue, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, orders that preliminarily and permanently enjoin Defendants PCS, Maher, and Stith, and each of them, and their officers, agents, servants, employees, attorneys, and accountants, and those persons in active concert or participation with any of them, who receive actual notice of the order by personal service or otherwise, and each of them, from engaging in transactions, acts, practices, and courses of business described herein, and from engaging in conduct of similar purport and object in violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

**III**

Issue, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, orders that preliminarily and permanently enjoin Defendant PCS, and each of its officers, agents, servants, employees, attorneys, and accountants, and those persons in active concert or participation with any of them, who receive actual notice of the order by personal service or otherwise, and each of them, from engaging in transactions, acts, practices, and courses of business described herein, and from engaging in conduct of similar purport and object in violation of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-11 thereunder.

**IV**

Issue, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, orders that preliminarily and permanently enjoin Defendants Maher and Stith, and each of their officers, agents, servants, employees, attorneys, and accountants, and those persons in active concert or participation with any of them, who receive actual notice of the order by personal service or otherwise, and each of them, from engaging in transactions, acts, practices, and courses of business described herein, and from engaging in conduct of similar purport and object in aiding and abetting violations of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-11 thereunder.

**V**

Issue, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, orders that preliminarily and permanently enjoin Defendants Maher and Stith, and each of their officers, agents, servants, employees, attorneys, and accountants, and those persons in active concert or participation with any of them, who receive actual notice of the order by personal service or otherwise, and each of them, from engaging in transactions, acts, practices, and courses of business described herein, and from engaging in conduct of similar purport and object in violating Section 13(a) of the Exchange Act and Rule 13a-14 thereunder.

**VI**

Permanently bar Defendants Maher and Stith, and each of them, from serving as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act, as amended, or that is required to file reports pursuant to Section 15(d) of the Exchange Act.

**VII**

Enter an order directing Defendants, and each of them, to pay civil money penalties pursuant to Section 21(d)(3) of the Exchange Act.

**VIII**

Grant such further equitable relief as this Court deems just, appropriate, and necessary.

**IX**

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

Dated this 8th day of September, 2010.

Respectfully submitted,

/s/ Daniel J. Wadley
Daniel J. Wadley
Thomas M. Melton
Cheryl M. Mori
Attorneys for Plaintiff
Securities and Exchange Commission
15 West South Temple, Suite 1800
Salt Lake City, Utah 84101