BRIANE NELSON MITCHELL (ISB #2346)
**MAUK & BURGOYNE**
515 South 6th Street
Post Office Box 1743
Boise, Idaho 83701-1743
Telephone: (208) 345-2654
Facsimile  (208) 345-3319
nels@maukburgoyne.com

Attorneys for Defendants PCS Edventures!.com, Inc.
and Anthony A. Maher

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | Case No. 10-CV-00433 |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| PCS EDVENTURES!.COM, INC., an Idaho corporation, ANTHONY A. MAHER, an individual, and SHANNON M. STITH, an individual, | ) ) ) ) ) | **BRIEF IN SUPPORT OF MOTION TO STRIKE SEC'S AMENDED COMPLAINT SUBMITTED BY PCS EDVENTURES!.COM, INC. AND ANTHONY A. MAHER** |
| Defendants. | ) ) | |

## TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS...................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................... ii

I.      PRELIMINARY STATEMENT .................................................................................1

II.     BACKGROUND ........................................................................................................3

III.    THE FALSE, MISLEADING, IMMATERIAL AND/OR
        IMPERTINENT PORTIONS OF THE SEC'S AMENDED COMPLAINT ....................4

        A.      The Outside Auditors - - HJ & Associates............................................................4

        B.      The Difference Between Recording Revenue, and Reporting, Booking
                or Recognizing Revenue ...................................................................................7

        C.      The Barron Partners LP $1 Million Convertible Note.............................................9

        D.      Evidence that Saudi Arabia Intended to Enter Into a Contract With Global
                Techniques for PCS Products and Services .........................................................11

IV.     THE COURT SHOULD GRANT THE MOTION TO STRIKE ....................................16

V.      CONCLUSION..........................................................................................................19

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

## <u>CASES</u>:

*Carman v. Treat*,
    7 F.3d 1379 (8th Cir. 1993) ..................................................................................17

*Chambers v. Nasco, Inc.*,
    501 U.S. 32 (1991)...............................................................................................1

*Collins v. Walden*,
    834 F.2d 961 (11th Cir. 1987) ...........................................................................18

*Freeport-McMoRan Oil & Gas Co. v. FERC*,
    962 F.2d 45 (D.C.Cir. 1992)...............................................................................2

*Ivanova v. Columbia Pictures Industries, Inc.*,
    217 F.R.D. 501 (C.D.Cal.2003) .........................................................................18

*Jiminez v. Madison Area Technical College*,
    321 F.3d 652 (7th Cir. 2003), *affirmed* 116 Fed.Appx. 100 (9th Cir. 2004),
    *cert. denied* 545 U.S. 1115 (2005) ...................................................................17

*PAE Government Services, Inc. v. MPRI, Inc.*,
    514 F.3d 856 (9th Cir. 2007) .............................................................................2

*Sidney-Vinstein v. A.H. Robins Co.*,
    697 F.2d 880 (9th Cir. 1983) .............................................................................2

*Skidmore Energy, Inc. v. KPMG*,
    455 F.3d 564 (5th Cir. 2006), *cert. denied* 549 U.S. 996 .................................18

*United States v. Excellair*,
    637 F.Supp. 1377 (D.Colo.1986).................................................................17, 18

## <u>STATUTES</u>

17 CFR §200.66 .................................................................................................................2

# I.    <u>PRELIMINARY STATEMENT</u>

The U.S. Securities and Exchange Commission (the "SEC") has devoted almost three years investigating and attempting to create a case against PCS Edventures!.com, Inc. ("PCS"), Anthony A. Maher, PCS' CEO, and Shannon Stith, PCS' former CFO.  The SEC has served at least twelve subpoenas, obtained tens of thousands of pages of documents and other material, and taken at least five depositions of the key participants.[1]  Nevertheless, despite the extensive amount of discovery that it has taken, the SEC was not able to find evidence which would *fairly* support the claims that it wanted to pursue against PCS, Ms. Stith and Mr. Maher.  As a result, the SEC filed a Complaint, and an Amended Complaint that have not only distorted the evidence, but actually contain false and misleading statements.

Federal courts have the inherent power to protect against fraud on the court.  As the Supreme Court has explained:

> [T]he inherent power also allows a federal court to vacate its own judgment upon proof that a fraud has been perpetrated upon the court….  It is a wrong against the institutions set up to protect and safeguard the public…a court has the power to conduct an independent investigation in order to determine whether it has been a victim of fraud.

*Chambers v. Nasco, Inc.*, 501 U.S. 32, 44 (1991).  Rule 11 of the Federal Rules of Civil Procedure states that, by presenting any pleading to the Court, the attorney is certifying "that to the best of the person's knowledge, information and belief, formed after an inquiry reasonable under the circumstances: it is not being presented for any improper purpose…[and] the factual contentions have evidentiary support…."  Fed.R.Civ.P. 11(b)(1) & (3).  Furthermore, Rule 12(f)

---

[1] The SEC, for all practical purposes, has had the benefit of full pretrial discovery even before filing its compliant. This Motion, like the Motion to Dismiss (and/or for Summary Judgment), relies upon the evidence already available to the SEC, either from the discovery that it took during its investigation, the SEC filings by PCS, or materials submitted to the SEC by PCS in 2009 as part of the Wells process.  The evidence used with this Motion is provided to the Court in the Affidavit of Briane Nelson Mitchell ("Mitchell Aff.").

**BRIEF IN SUPPORT OF MOTION TO STRIKE SEC'S AMENDED COMPLAINT SUBMITTED BY PCS EDVENTURES!.COM, INC. AND ANTHONY A. MAHER - 1**

of the Federal Rules of Civil Procedure provides that the "court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."[2]

Pursuant to the Court's inherent power, Rule 11, and Rule 12(f), PCS and Mr. Maher file the present Motion to Strike based upon the fact that significant portions of the SEC's Amended Complaint are demonstrably false, misleading, immaterial or impertinent. The need for addressing these issues is particularly acute in this case given the potential harm that has already and will continue to occur to PCS and its shareholders if the SEC's false and misleading statements are allowed to remain in the public record.

In considering this motion, it is important to remember that government agencies and their lawyers "have obligations beyond those of private lawyers." *Freeport-McMoRan Oil & Gas Co. v. FERC*, 962 F.2d 45, 47 (D.C.Cir. 1992). Indeed, the SEC's ethic rules state that "[t]he power to investigate carries with it the power to defame and destroy…." 17 CFR § 200.66. As one court has explained:

> A government lawyer 'is the representative not of an ordinary party to a controversy,' the Supreme Court said long ago in a statement chiseled on the walls of the Justice Department, 'but of a sovereignty whose obligation…is not that it shall win a case, but that justice shall be done.' *Berger v. United States*, 295 U.S. 78, 88 (1935). The Supreme Court was speaking of government prosecutors in *Berger*, but no one, to our knowledge…, has suggested that the principle does not apply with equal force to the government's civil lawyers. In fact, the American Bar Association's Model Code of Professional Responsibility expressly holds a 'government lawyer in a civil action or administrative proceeding' to higher standards than private lawyers….

*Freeport-McMoRan Oil & Gas*, 962 F.2d at 47.

---

[2] The Ninth Circuit has said that "the function of a 12(f) motion to strike is to avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with those issues prior to trial." *Sidney-Vinstein v. A.H. Robins Company*, 697 F.2d 880, 885 (9th Cir. 1983). The present Motion to Strike is not like the motion that was brought in *PAE Government Services, Inc. v. MPRI, Inc.*, 514 F.3d 856 (9th Cir. 2007) because the motion in *PAE* had *not* been brought pursuant to Rule 11 and the inherent power of the court like the present motion. Moreover, the plaintiff in *PAE* had *not* had the benefits of three years of discovery as the SEC has had in the present case.

## II.    **BACKGROUND**

PCS is a real company, having been in business for 25 years, with real people, real products and real revenue.  Many of the individuals who have been connected with the company, including former Idaho Governor Cecil D. Andrus, have been associated with PCS for more than a decade.  This is not a typical SEC fraud case involving crooked financial statements, a Ponzi scheme, illegal payments, or a pump-and-dump manipulation.

This matter basically involves a one-time event that was corrected by the company and its management.  On March 28, 2007, PCS filed a Form 8-K with the SEC with the press release announcing that PCS had entered into a $7.15 million License Agreement with Global Techniques (dba PCS Middle East) for distribution of PCS educational products as part of the King Abdullah educational initiative in Saudi Arabia.[3]  At the time that the Form 8-K was filed with the SEC, PCS believed that the project was to begin immediately and that the expected payment would be received by May 15, 2007, as stated in the Form 8-K.  As a public company, PCS was required, by the SEC's own rules, to make the public disclosure regarding the License Agreement within four days of entering the agreement.[4]  Also, because of the importance of this development, PCS consulted early and extensively with its outside auditors, HJ Associates, concerning the structuring of the transaction and the financial reporting issues.[5]  In addition, PCS also consulted with its outside attorney who reviewed the Form 8-K and press release in advance of their filing and release.[6]

---

[3] SEC Exhibit 8, pp. 1-3 (Mitchell Aff., Ex. A); SEC Exhibit 7, p. 16 (Mitchell Aff., Ex. B).
[4] The SEC requires that public companies, like PCS, must use Form 8-K to disclose any "material definitive agreement," which is defined as "an agreement that provides for obligations that are material to and enforceable against the registrant, or rights that are material to the registrant and enforceable against one or more other parties to the agreement, in each case whether or not subject to conditions."  SEC Form 8-K Instructions, p. 4, Item 1.01.
[5] SEC Exhibit 9, pp. 5-6 (Mitchell Aff., Ex. C).
[6] Emails with PCS' outside counsel were provided to the SEC in the Appendix to PCS' Wells Submission (and are included in the Mitchell Aff. as Ex. D).

Unfortunately, there were political problems and delays within Saudi Arabia in connection with the King Abdullah project that were not within PCS' control.  During 2007, PCS and its management made supplemental disclosures as further information was learned.  On May 17, 2007, PCS filed an Amended Form 8-K/A with the SEC stating that PCS had not received payment from Global Techniques (dba PCS Middle East) because Saudi Arabia had not made the payment to Global Techniques (dba PCS Middle East).[7]  This was followed by a public announcement, on June 28, 2007 that PCS was postponing recognition of any revenue from the License Agreement until payment was received.[8]

PCS never recognized or reported any revenue from the License Agreement on its quarterly or annual financial statements.  At the time that the License Agreement was entered, PCS did issue an invoice which triggered the recording of a corresponding revenue entry on its internal books and records.  However, that revenue (i.e., the $7.15 million) was never actually recognized by PCS (and was never reported to the SEC or public) in the quarterly or annual financial statements.

### III.     THE FALSE, MISLEADING, IMMATERIAL AND/OR IMPERTINENT PORTIONS OF THE SEC'S AMENDED COMPLAINT

**A.     The Outside Auditors - - HJ & Associates**

The SEC allegations relating to the outside auditors, HJ & Associates ("HJ"), are either false, misleading or both.   The SEC's Amended Complaint contains three key accusations involving the outside auditors that should be stricken.

First, the SEC has said that "[n]either Maher or Stith disclosed to HJ that there was no contract with Saudi Arabia…."   (SEC Amended Complaint, ¶ 61.)   The SEC knows that this

---

[7] SEC Exhibit 7, p. 22 (Mitchell Aff., Ex. B); SEC Exhibit 8, p. 5 (Mitchell Decl., Ex. A).
[8] SEC Exhibit 7, p. 26 (Mitchell Aff., Ex. B).

statement is not true.  SEC Exhibit 9 contains an April 19, 2007 email exchange between HJ and

Ms. Stith in which she responded to HJ's request for a copy of the contract with Saudi Arabia:

> We do not have an agreement with KSA [Kingdom of Saudi Arabia], but rather Global Techniques dba PCS Middle East.  You have all the documents available.[9]

The SEC has three separate copies of this email in its Exhibit.[10]

Second, the SEC has stated that "[n]either Maher nor Stith disclosed to HJ…that payment

for the purported license agreement was contingent on PCS Middle East first obtaining a contract

and funds from Saudi Arabia."  (SEC Amended Complaint, ¶ 61.)  The SEC's statement is false.

The SEC has chosen to ignore the fact that PCS filed, on May 17, 2007, an Amended Form 8-

K/A with the SEC which stated that:

> Full payment was expected to be received in a single sum payment no later than May 15, 2007.  However, PCS ME experienced delays within the Kingdom of Saudi Arabia.  These delays caused a postponement in payment to PCS ME, thus causing delays in payment to PCS.[11]

The Form 8-K/A was not only made available to HJ and the SEC, but to the investing public by

its filing with the SEC.  It is disingenuous for the SEC to claim that PCS had not disclosed that

payment was dependent upon PCS Middle East's receipt of funds from Saudi Arabia, given the

disclosure in the Form 8-K/A that was filed with the SEC on May 17, 2007, more than one

month before HJ had completed the year-end audit.

Third, the SEC has misleadingly created the impression that HJ was solely responsible

for the fact that PCS did not recognize $7.15 million in revenue.  One section of the Amended

Complaint is entitled:  "External Auditors Require Reversal of $7.15 Million Revenue For

Purported License Agreement."  (SEC Amended Complaint, ¶¶ 56-61.)  The SEC has

---

[9] SEC Exhibit 9, pp. 7, 8, 10 (Mitchell Aff., Ex. C).
[10] Id.
[11] SEC Exhibit 7, p. 22 (Mitchell Aff., Ex. B); SEC Exhibit 8, p. 6 (Mitchell Aff., Ex. A).

deliberately chosen to ignore its own evidence.  SEC Exhibit 9 contains the HJ workpaper schedule for adjusting journal entries.[12]  This schedule shows that the adjustment (or reversal as the SEC has called it) was actually proposed by both HJ and PCS.[13]  This is not the first time that the SEC has attempted to misrepresent this issue.  During the SEC Deposition of Ms. Stith the following exchange occurred:

> Q      So, it appears to me that is a proposed adjusting journal entry by HJ & Associates?
> A      That is incorrect.
> Q      It is?
> A      'Proposed by HJ/PCS' means that, in conjunction, the two of us agree that that was the adjustment that needed to be taken.  That there was some type of discussion, whether it was verbal or through e-mail, there was some discussion on it.  And the one above it that says, 'HJ,' that was proposed strictly to them. The one above that, the first one, 'PCS,' was proposed strictly by PCS.
>
> So, it just means that there was discussion around it. Whether I proposed it first or they proposed it first, I don't recall.  I can guarantee, you know, just that the two agree.[14]

The SEC should not attempt to manufacture, or even imply, that there was a dispute between the external auditors and PCS.  SEC Exhibit 9 includes a letter that HJ sent to PCS' Audit Committee which stated:

> We encountered no disagreements with management over the application of significant accounting principles, the basis for management's judgments on any significant matters, the scope of the audit or significant disclosures to be included in the financial statements.[15]

---

[12] SEC Exhibit 9, pp. 23-24 (Mitchell Aff., Ex. C).
[13] *Id.*
[14] SEC Deposition of Shannon Stith, pp. 102-103 (excerpts from the SEC Deposition of Shannon Stith are attached to the Mitchell Aff. as Ex. E).
[15] SEC Exhibit 9, p. 32 (Mitchell Aff., Ex. C).  Moreover, the SEC deposition of Ms. Stith also confirmed the lack of disagreement between PCS and the external auditors:

> Q      So there was - - I guess what I am just trying to establish for the record, so there were some disagreements, as far as that transaction, putting it on the books?
> A      I don't' know if there were disagreements.  There was - - there was conversations, definitely, on how to treat it.  And if I hadn't done the

**B.     The Difference Between Recording Revenue, and Reporting, Booking or Recognizing Revenue**

The SEC has chosen to intentionally confuse important accounting concepts and terms relating to:  (1) the *recording* of revenue, (2) the *reporting* of revenue, (3) the *booking* of revenue, and (4) the *recognition* of revenue.  In the most lengthy section of its Amended Complaint entitled "PCS Records Revenue for Purported $7.15 Million License Agreement With PCS Middle East," the SEC mischaracterizes these concepts as part of its effort to create a fraud case against PCS and Mr. Maher.  (SEC Amended Complaint, ¶¶ 30-45.)[16]  Notwithstanding the SEC's obfuscation, PCS never actually reported, recognized or booked any revenue from the License Agreement with Global Techniques (dba PCS Middle East).

In connection with the financial accounting at PCS, the concepts of recording, reporting, recognizing and booking revenue carry different meanings.  *Recording* revenue refers to making an entry on the general ledger or other internal schedule.  *Reporting* revenue means that the revenue has been not only recorded but that it also was included in the quarterly or annual financial statements that are filed with the SEC (for a public company like PCS) and, in effect, made available to investors by the public filing of the SEC Form 10-Q or Form 10-K.  *Recognizing* revenue means that the revenue was both recorded and is or will be reported in the quarterly or annual financial statements of a public company.  *Booking* revenue carries the same meaning as recognizing revenue - - that is, the revenue has or will be both recorded on the

---

research, and if we hadn't had a conversation with the auditors and the audit committee, it probably would have been put on the books.  But whether the auditors would have let it go, I don't know.  I'm not them.

Q     There wasn't pressure from them?
A     To me?
Q     Saying, 'We need to do that.'  Yeah.
A     No.

SEC Deposition of Shannon Stith, p. 129 (Mitchell Aff., Ex. E).

[16] The paragraphs in the SEC's Amended Complaint which confuse or mischaracterize the concepts of recording, reporting, booking, and/or recognition include paragraphs 30, 31, 32, 34, 35, 36, 40, 41, 44 and 45.

internal books and records, but also reported on the quarterly or annual financial statements filed

with the SEC.

During the SEC Deposition of Ms. Stith, the SEC repeatedly argued with Ms. Stith about

whether PCS had booked the $7.15 million in revenue:

> Q       Was the revenue booked?
> A       Like I answered before, I don't believe so.
>         MR. KESNER [Ms. Stith's attorney]:  I think she's
> answered that four or five times.
>         MR. KORB [SEC Officer]:  I apologize.
>         BY MS. MORI [SEC Officer]:
> Q       Well, and just to clarify, though, there was
> that…[8K] that announced that contract?
> A       Correct.  It doesn't specify anything about revenue
> recognition in that entire press release.
>         BY MR. KORB:
> Q       What is your definition of "booked"?
> A       Recorded and reported.
> Q       Both?
> A       Yes.
> Q       So, recorded, you'd not qualify as booked?
> A       No….[17]

Despite Ms. Stith's explanation, the SEC has chosen to knowingly misrepresent her

words and those accounting terms.  For example, the SEC references and quotes from a March 3,

2007 email from Ms. Stith to Mr. Maher and states that:

> Stith concluded that PCS should not record any revenue until
> payment for the anticipated contract was actually received by PCS.
> Maher did not disagree with Stith's conclusion at this time.

(SEC Amended Complaint, ¶32.)  Ms. Stith's email to Mr. Maher, however, did not discuss the

concept of "recording," but instead discussed "recognition" of revenue.[18]  At one point, the SEC

references a March 26, 2007 email and states "Stith sent an email to Maher informing him that

PCS should not record revenue…" (SEC Amended Complaint, ¶ 40).  The email, however, does

---

[17] SEC Deposition of Shannon Stith, pp. 71-72 (Mitchell Aff., Ex. E).
[18] SEC Exhibit 6, p. 25 (Mitchell Aff., Ex. F).

**BRIEF IN SUPPORT OF MOTION TO STRIKE SEC'S AMENDED COMPLAINT SUBMITTED BY PCS EDVENTURES!.COM, INC. AND ANTHONY A. MAHER - 8**

not discuss the concept of "recording" the revenue on the internal books and records, but instead refers to the much different concept of "booking" the revenue (which means recording and reporting - - i.e., recognizing the revenue).[19]   At another point, the SEC states that Ms. Stith's March 7, 2007 email to the outside auditor had outlined "steps required for structuring the transaction and recording revenue…" (SEC Amended Complaint, ¶ 35).   The March 7, 2007 email, however, addressed "revenue recognition," not "revenue recording."[20]   It was entitled "Revenue Recognition For Large Contract" and addressed the question of "the best possible approach to recognizing revenue accurately, appropriately…without errors, misstatements or misconceptions…."[21]

The SEC, of course, understands the significance of its misrepresentations.  In this case, PCS never reported the $7.15 million as revenue on its quarterly or annual financial statements with the SEC.  That is, PCS never booked or recognized any of that revenue.

## C.       The Barron Partners LP $1 Million Convertible Note

The SEC allegations about "the outstanding $1 million convertible Note" held by Barron Partners LP and EBITDA are false, misleading or both.   The SEC's Amended Complaint contains allegations that PCS faced pressure because of that Note:

> 25.     In the fiscal year ended March 31, 2007, PCS faced considerable pressure to meet certain EBITDA (earnings before interest, taxes, depreciation and amortization) requirements imposed by an outstanding $1 million convertible note (the "*Note*") held by Barron Partners LP ("Barron Partners").

> 26.     According to terms of the *Note*, if PCS did not reach EBITDA of $4.5 million for the fiscal year ended March 31, 2007, the number of shares of stock into which the Note was convertible would be increased *pro rata* by the percentage decline in EBITDA.

---

[19] SEC Exhibit 4, p. 2 (Mitchell Aff., Ex. G).
[20] SEC Exhibit 9, pp. 5-6 (Mitchell Aff., Ex. C).
[21] *Id.*

**BRIEF IN SUPPORT OF MOTION TO STRIKE SEC'S AMENDED COMPLAINT SUBMITTED BY PCS EDVENTURES!.COM, INC. AND ANTHONY A. MAHER - 9**

(SEC Amended Complaint, ¶¶ 25, 26 (emphasis added)).   The SEC's Amended Complaint discusses the *Note* and the EBITDA requirement in great detail, and suggests that they provided a motive for securities fraud:

> PCS determined that if it was able to record the $7.15 million license fee as revenue by March 31, 2007, it would meet the EBITDA goal required under the *Note*.  This would allow PCS to avoid the penalty imposed by the *Note* if PCS were not able to reach the EBITDA goal.

(SEC Amended Complaint, ¶ 36 (emphasis added).[22]

The SEC, however, fails to disclose that the $1 million convertible *Note* held by Barron Partners LP was *cancelled* by Barron Partners LP on October 17, 2006, six months before PCS entered into the License Agreement with Global Techniques (dba PCS Middle East).   On October 23, 2006, PCS filed a Form 8-K with the SEC that stated:

> On January 3, 2006, PCS Edventures!.com, Inc., an Idaho corporation, closed a *Note* Purchase Agreement dated December 29, 2005 by which Barron Partners, LP, a Delaware limited partnership purchased as described in the Company's 8K filed on January 9, 2006.
>
> On October 13, 2006, Barron Partners, LP requested that its *Note* Purchase Agreement be converted into 1,666,667 shares of Series A Preferred Stock pursuant to the automatic conversion feature in the *Note* Purchase Agreement.   This automatic conversion was established after the shareholders approved the Series A Preferred Stock at the Annual Meeting held on September 29, 2006.  The *Note* Purchase Agreement was **cancelled** by Barron Partners, LP on October 17, 2006.[23]  (emphasis added)

After a three year investigation, one would expect that the SEC would have noticed that the Barron Partners convertible *Note* was "cancelled" because it had been converted into PCS

---

[22] Other parts of the SEC's Amended Complaint discuss the Barron Partners *Note* and EBITDA include paragraphs 27, 28, 29, 46 and 47.
[23] SEC Form 8-K, filed by PCS with the SEC on October 23, 2006 (a copy is attached to the Mitchell Aff. as Ex. H).

preferred shares in October 2006.[24]  Moreover, SEC Exhibit 12 also confirms that the SEC had

knowledge of the conversion of the Note from PCS' Form 10-KSB that was filed with the SEC

on June 26, 2007.[25]  The SEC's misstatements in its Amended Complaint about the cancelled

*Note* should not be excused given the fact that six months before PCS entered the License

Agreement with Global Techniques (dba PCS Middle East) PCS filed the Form 8-K with the

SEC disclosing that the Barron Partners *Note* had been cancelled.[26]

## D.   Evidence That Saudi Arabia Intended To Enter Into A Contract With Global Techniques for PCS Products and Services

In its Amended Complaint, the SEC takes the position that as of March 28, 2007, PCS

and   Mr.   Maher   knew   that   Global   Techniques   (dba   PCS   Middle

East) "did not…have a contract with Saudi Arabia."  (SEC Amended Complaint, ¶ 3.)  The SEC

---

[24] *Id.*

[25] SEC Exhibit 12 contained the following excerpt from PCS' Form 10-KSB for the fiscal year ended March 31, 2007 that was filed with the SEC on June 26, 2007:

> During the year ended March 31, 2007, the Company issued 1,666,667 shares of preferred stock for the conversion of a note payable by Barron Partners, LP valued at $1,000,000.  These shares were later fully converted to common stock through successive conversions.

(SEC Exhibit 12, p. 4 (Mitchell Aff., Ex. I)).  SEC Exhibit 12 also included another excerpt from PCS' Form 10-KSB that discussed the elimination of the EBITDA issue from the Warrants that had been given to Barron Partners:

> On April 11, 2007, Prospectus Supplement No. 2 to our SB-2 was filed with the SEC.  Supplement No. 2 partially amended all previously submitted Supplements.  This Supplement stated that Barron Partners, LP assigned 4.6 million of its 5 million options form Warrant A and Warrant B to Burlingame Equity Investors, LP.
>
> On June 6, 2007, Prospectus Supplement No. 3 to our SB-2 was filed with the SEC.  Supplement No. 3 partially amended all previously submitted Supplements.  This Supplement stated that the CEO, Anthony Maher, was able to negotiate with Burlingame Equity Investors, LP the original Earnings Before Interest, Tax, Depreciation, and Amortization (EBITDA) downward adjustment, as well as the strike price of each of the warrants.  Warrant A has been priced at $0.68 from $1.20, while Warrant B has been priced at $0.97 from $1.80.  An additional provision that was added indicated that the Company may call up to 460,000 options per quarter when the average closing bid price for the stock is greater than $0.88 and $1.26 for Warrant A and Warrant B, respectively.

(SEC Exhibit 12, p. 2 (Mitchell Aff., Ex. I)).

[26] It is unclear whether the SEC intended to defraud the Court with its allegations regarding the cancelled *Note* or whether the SEC was merely reckless in ignoring the fact that the *Note* had been cancelled.  The SEC may attempt to blame its misstatements about the cancelled *Note* on internal PCS emails that had discussed ebitda.  However, after spending three years on its investigation, the SEC should not blame others for the fact that the SEC itself ignored the public record which clearly stated that the convertible *Note* had been cancelled.

also asserts that PCS and Mr. Maher knew that Global Techniques (dba PCS Middle East) "did not have a contract with Saudi Arabia and could not pay…without first obtaining a contract and advance funds from Saudi Arabia."  (SEC Amended Complaint, ¶ 50.)  At another point, the SEC states that by March 31, 2007, "PCS and its officers knew there was no order or contract between PCS Middle East and Saudi Arabia."  (SEC Amended Complaint, ¶ 22.)[27]  The SEC's statements are false, misleading or both, because they ignore the objective evidence upon which PCS and its management were relying upon back in March of 2007.

First, as Mr. Robert Grover, the current President of PCS, explained during his SEC deposition:

> I remember a specific phone call with Refai, asking him to confirm [if] he did, indeed, have the order in place, the contract in place, and that this was going ahead in April.  And he said, 'Absolutely, you've got to be on the ground here in April.'[28]

Dr. Refai told Mr. Grover, "there was no doubt.  Those were his words, because we asked him many times."[29]  Dr. Refai told PCS "that we [PCS] were going to have to be shipping materials as early as April."[30]  Dr. Refai "was absolutely 1,000 percent confident it was going to happen" and "was very confident that the money was coming."[31]  Dr. Refai "felt strongly that he had the contract and that [he] could get paid the license fee in advance."[32]  Prior to March 31, 2007, at the time that the Form 8K was filed, PCS believed that the funds would be collected as Mr. Grover explained to the SEC:

---

[27] The SEC also said that "PCS had no definitive evidence, other than Refai's assurances, that Saudi Arabia intended to enter into a contract with PCS Middle East or purchase any products from PCS or PCS Middle East."  (SEC Amended Complaint, ¶ 24.)

[28] SEC Deposition of Robert Grover, p. 136 (excerpts from the SEC Deposition of Robert Grover are attached to the Mitchell Aff. as Ex. J).

[29] SEC Deposition of Robert Grover, p. 53 (Mitchell Aff., Ex. J).

[30] SEC Deposition of Robert Grover, p. 56 (Mitchell Aff., Ex. J).

[31] SEC Deposition of Anthony Maher, p. 57 (excerpts from the SEC Deposition of Anthony Maher are attached to the Mitchell Aff. as Ex. K).

[32] SEC Deposition of Anthony Maher, p. 107 (Mitchell Aff., Ex. K).

Q       Okay.  And an 8K that came out that day, March 28th, it
said that the money would be collected by May 15th, correct?
A       Mm-hmm.  Refai was absolutely certain he was going to
collect, actually even before that.  He said he was going to have it
in April….
Q       Okay.  So, he said he would have the money from the
government, the cash advance in April?
A       Yes.[33]

Second, on December 27, 2006, Dr. Naif Bin Nasul Al-Romi, Deputy Minister of the

Saudi Ministry of Education, sent a letter to the Ministry of Education Contracting Department

that provided as follows:

It references all of the paperwork submitted by PCS Middle East to
everyone and from everyone including botht [sic] the Boys and the
Girls Ministers of Education.

After Study and meeting with the PCS Middle East Representative
[Dr. Refai] they have come to 3 conclusions.

1. The program proposed is best suited to two – 1 ½ hour sessions
per week
2. [T]he program is an extra curricular activity it will help student
at all grade and age levels and will help high school students
develop electronics and programming skills at a much higher level
than what is required in the schools
3. Will help students of all ages improve their science and math at
a higher level than what is required.

Recommends that [t]he Contracting department move forward and
explore cost associated with this proposal and if it is appropriate.[34]

During his SEC deposition, Mr. Grover explained that the Deputy Education Minister's letter

"was the one that confirmed, yes, we'd be doing this project, because it was essentially a

statement that they reviewed the project, please implement."[35]

---

[33] SEC Deposition of Robert Grover, p. 146 (Mitchell Aff., Ex. J).
[34] A copy of the Deputy Education Minister's letter was given to the SEC in the Appendix to PCS' Wells
Submission as well as in response to the SEC Subpoena.  A copy of the Deputy Education Minister's letter and
translation are attached to the Mitchell Aff. as Ex. L.
[35] SEC Deposition of Robert Grover, p. 47 (Mitchell Aff., Ex. J).

Third, in February 2007, the King of Saudi Arabia and his Council of Ministers announced that they had "approved a six-year, SR 9-billion project to develop the country's public education."[36]  Moreover, the news articles provided additional corroboration because of the scientific and technological focus of the education project:

> Education Minister Abdullah Al-Obaid said the King Abdullah education project was aimed at keeping pace with scientific and technological development and meeting the requirements of the Education Document presented by the king to the GCC leaders as well as the Kingdom's 8th Five-Year Development Plan.
>
> 'It will also meet the hopes and aspirations of Saudi citizens,' Al-Obaid said.  'We'll continue our efforts for the development of education, making use of the successful experiments of countries like Malaysia, Singapore, South Korea, Japan, China, New Zealand, Finland, France, Ireland, Britain, Canada and the US,' he added.
>
> * * *
>
> Teachers will be provided with modern information technology to apply them.
>
> 'They will also be given intensive training to help them get along with modern developments and changes,' he added.
>
> Al-Obaid said the ministry would carry out seven training programs for more than 400,000 teachers.  These programs will focus on subjects of specialization, school management, educational supervision, computer science, self-development and improvement of skills.  'The atmosphere in classrooms will be improved by providing modern technological facilities such as interactive boards, displaying devices, communication network and Internet services,' he said.[37]

Fourth, Dr. Refai had demonstrated the PCS products to the Saudi Minister of Education Abdullah Al-Obaid.  In fact, Dr. Refai had provided PCS with photographs showing him

---

[36] A copy of a February 13, 2007 article from the *Arab News* is attached to the Mitchell Aff. as Ex. M, and an article from the *Saudi Press Agency*, dated February 12, 2007 is attached to the Mitchell Aff. as Ex. Z.
[37] *Arab News* article, Feb. 13, 2007 (Mitchell Aff., Ex. M).

demonstrating the PCS products to the Minister of Education.[38]   Those photographs provide additional corroboration to Dr. Refai's assurances.

Fifth, the PCS products had been successfully used in pilot programs in Saudi Arabia during 2005 and 2006:

- In 2005, the Jeddah (Boys) Al Zahrawi Secondary School purchased PCS' Academy of Electronics and Academy of Robotics.

- In 2006, Al-Anjal Private Schools (under supervision of Ministry of Education) purchased the PCS Brick Lab series, Young Learner, Academy of Electronics and Academy of Robotics.

- In 2006, the First Step School purchased PCS' Young Learner and Brick Lab products.

The SEC has copies (in Arabic and in English) of the Reports confirming the success of the pilot programs.[39]   One of the Reports explained that during "the first year of implementation there was a noticeable improvement in the students' ability to apply academic science in the fields of mathematics, science and technology."[40]   The PCS' hands-on approach "created an atmosphere of excitement and competitiveness."[41]   As a result, the Report noted that the PCS' "approach provides several advantages when compared to traditional education.  For example, classes are being directed mainly by the students and experimentation and observations became dominant in students' discussions…."[42]

Sixth, in its Amended Complaint, the SEC has attacked Dr. Refai, presumably because the SEC's case is built upon the premise that PCS and Mr. Maher should not have believed Dr.

---

[38] The SEC was provided with copies of those photographs in the Appendix to PCS' Wells Submission (and copies are attached to the Mitchell Aff. as Ex. N).

[39] The Reports were given to the SEC in the Appendix to PCS' Wells Submission as well as in response to the SEC Subpoena.  Copies of the Reports, translations of the Reports, the sales orders and sales receipts are attached to the Mitchell Aff. as Ex. O.

[40] A copy of a Report from the Al-Anjal Schools, a translation of the Report, the Sales Order and Sales Receipt is included in the Mitchell Aff. at Ex. O.

[41] *Id.*

[42] *Id.*

**BRIEF IN SUPPORT OF MOTION TO STRIKE SEC'S AMENDED COMPLAINT SUBMITTED BY PCS EDVENTURES!.COM, INC. AND ANTHONY A. MAHER - 15**

Refai.  As a result, the SEC has included allegations in the Amended Complaint that the SEC knows are not admissible, but also qualify as "immaterial, impertinent and scandalous."[43] Moreover, contrary to the SEC's insinuations, over the course of the four to five years that PCS had worked with Dr. Refai, Mr. Grover, Dr. Refai's principal contact, had learned to understand and trust Dr. Refai.  As Mr. Grover explained to the SEC about Dr. Refai, "for the most part, he's always told me the truth and we have a good personal relationship as well."[44]  Mr. Grover also testified that Dr. Refai "never broke any promises."[45]  In addition, one of the principals at Barron Partners had travelled to Egypt, met with Dr. Refai, and conducted due diligence before investing with PCS which provided additional assurance to PCS' belief in Dr. Refai and the prospects in Saudi Arabia.[46]

## IV.    THE COURT SHOULD GRANT THE MOTION TO STRIKE

The appropriate remedy is to either strike the SEC's Amended Complaint, or, at a minimum, the sections which are not supported by the evidence - - the SEC's own evidence. The SEC should not be allowed to proceed with the type of false and misleading allegations that it has used in the Amended Complaint.  The private interests and reputations of PCS and Mr.

---

[43] Rule 608(b) of the Federal Rules of Evidence is clear that "specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' character for truthfulness, other than a conviction of crime as provided in Rule 609, may not be proved by extrinsic evidence."  Nevertheless, the SEC has chosen to ignore Rule 608(b).  The SEC's Amended Complaint attacks Dr. Refai by stating:

> 15.    From at least April 2003, Refai led PCS to believe that he was on the verge of completing various orders in the Middle East, but no substantial orders materialized.

(SEC Amended Complaint, ¶ 15.)  The SEC's Amended Complaint also discusses a specific incident in more detail:

> 17.    In or around November 2005, Refai represented to PCS that he would be obtaining a large contract from the Egyptian government to provide it with PCS products.  Refai indicated that he would soon be receiving an 'official letter' regarding the contract.  This purported contract was repeatedly delayed and, ultimately, never materialized.

(SEC Amended Complaint, ¶ 17.)  The SEC's allegations against Dr. Refai relating to other proposals in the Middle East or the 2005 Egyptian initiative involve the type of issues which may not be proved by extrinsic evidence.
[44] SEC Deposition of Robert Grover, p. 86 (Mitchell Aff., Ex. J).
[45] SEC Deposition of Robert Grover, p. 87 (Mitchell Aff., Ex. J).
[46] SEC Deposition of Robert Grover, pp. 111-112 (Mitchell Decl., Ex. J).

Maher have suffered from the SEC's misconduct.  But, of even greater importance, the interests of PCS' shareholders have also suffered.

The SEC has issued a press release and publicly disseminated copies of its Complaint and Amended Complaint.  In fact, the SEC's Litigation Release and the Amended Complaint are available on the SEC's website.[47]  The Release and the Amended Complaint accuse PCS and Mr. Maher of securities fraud based in large part on the false, misleading and/or immaterial allegations addressed in this motion.

The Advisory Committee Note to Rule 11 explains that the courts have "available a variety of possible sanctions to impose for violations, such as striking the offending paper…." Fed.R.Civ.P. 11, Advisory Committee Note.  Indeed, the SEC should not challenge the principle that courts have the power to dispose of cases based upon fraudulent factual allegations.  In one case, where the plaintiff "relied on falsified documents to bolster her discrimination claims" (*Jiminez v. Madison Area Technical College*, 321 F.3d 652, 656 (7th Cir. 2003)), the Seventh Circuit upheld the dismissal, commenting that the plaintiff's "claim was so unmeritorious and her behavior so deceptive that the filing of her baseless claim amounted to a veritable attack on our system of justice."  *Id.*, 321 F.3d at 657.  *See also Carman v. Treat*, 7 F.3d 1379, 1382 (8th Cir. 1993) (action dismissed "that was not well grounded in fact").

In a similar case, the District Court granted a motion to strike all of the allegations relating to the issue misstated by the government.  *United States v. Excellair, Inc.*, 637 F.Supp. 1377 (D.Colo.1986).  In *United States v. Excellair*, the District Court explained:

> It is unreasonable for the government to rely on promissory notes evincing a broad security interest of ITR when the government also knew that said security interest was never realized.  The documents relied upon by the government are not probative of what was *actually transferred*.  The government knew the promissory notes

---

[47] http://www.sec.gov/litigation/litreleases/2010/lr21635.htm.

to be an inaccurate reflection of reality in light of the government
itself having acquired the bulk of Excellair's assets.

*Id.*, 637 F.Supp. at 1397 (emphasis in the original).   As a result, the Court held that "an appropriate sanction to be the striking of all reference in the pleadings to ITR's obtaining all or virtually all of Excellair's assets."  *Id.*, 637 F.Supp. at 1398.

After three years of discovery, it is unreasonable and unfair for the SEC to rely upon factual allegations that it knows (or should know) are not true.[48]  The SEC knows that PCS had told the outside auditors that PCS did not have an agreement with Saudi Arabia.  The SEC also knows that PCS told everyone in the SEC Amended Form 8-K/A, including the outside auditors, that payment was dependent upon payment to Global Techniques (dba PCS Middle East) from Saudi Arabia.  The SEC understands the difference between recording revenue on the internal financial statements, and reporting, booking or recognizing that revenue in publicly disseminated financial statements.  The SEC also knows (or should know) that the Barron Partners $1 million Convertible Note had been cancelled.  Furthermore, the SEC knows that there was substantial evidence, prior to March 31, 2007, supporting the belief that Saudi Arabia intended to purchase PCS products from Global Techniques (dba PCS Middle East).  Following the lead of *United States v. Excellair*, these allegations should be stricken from the SEC's pleadings.  *See also, Ivanova v. Columbia Pictures Industries, Inc.*, 217 F.R.D. 501, 512 (C.D.Cal.2003), *affirmed* 116 Fed.Appx. 100 (9th Cir. 2004), *cert. denied,* 545 U.S. 1115 ("court strikes all alleged facts and references to Ivanova's Complaint which are contrary to known facts...").

---

[48] *See Skidmore Energy, Inc. v. KPMG*, 455 F.3d 564, 568 (5th Cir. 2006), *cert. denied*, 549 U.S. 996 (sanctions affirmed "based on the lack of support for the factual allegations in [the party's] pleading"); *Collins v. Walden*, 834 F.2d 961, 965 (11th Cir. 1987) (sanctions affirmed in case where attorney and party "had all of this discovery at their disposal prior to instituting [the lawsuit], they could have spared all parties involved the expense and anguish of this protracted and unnecessary litigation").

**BRIEF IN SUPPORT OF MOTION TO STRIKE SEC'S AMENDED COMPLAINT SUBMITTED BY PCS EDVENTURES!.COM, INC. AND ANTHONY A. MAHER - 18**

The prejudice caused by the SEC is further illustrated by the fact that at least one copycat class action complaint was filed directly after the SEC filed its lawsuit.  Less than a month after the SEC filed its Complaint, on September 17, 2010, Leslie Niederklein filed a securities fraud action against PCS, Mr. Maher and Ms. Stith allegedly on behalf of a class of PCS stock purchasers from the March 28, 2007 to August 19, 2007 time period - - *Niederklein, et al. v. PCS Edventures!.com, Inc., et al.*, U.S. District Court for the District of Idaho, No. 1:10-CV-00479-CWD.  As a result, because of the SEC's misstatements and distortions of the evidence, PCS and Mr. Maher are required to defend not only against the SEC's unfounded allegations but also against the copycat allegations in the class action.

## V.    <u>CONCLUSION</u>

As commentators have noted, for the subjects of SEC investigations, "perhaps the most important thing that will ever happen to [them] in [their lives], perhaps the most disturbing thing, is that the Commission will bring or contemplate bringing a civil proceeding against [them]."[49] A more disturbing thing has happened in the present case.  The SEC has initiated an action using false and misleading allegations.  The motion to strike filed by PCS and Mr. Maher should be granted in its entirety.

Dated this 8th day of November, 2010.

Respectfully Submitted,

MAUK & BURGOYNE


_____/s/_____
Briane Nelson Mitchell, of the Firm
Attorneys for PCS Edventures!.com, Inc.
and Anthony A. Maher

---

[49] Mitchell E. Herr, "SEC Enforcement:  A Better Wells Process," *Securities Regulation Law Journal*, vol. 32, p. 56, 58 n.6 (2004), *quoting* Milton V. Freeman, "Administrative Procedures," 22 Bus. Law. 891, 892 (1967).

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on the 8th day of November, 2010, I electronically filed the foregoing Brief in Support of Motion to Strike SEC's Amended Complaint Submitted by PCS Edventures!.com, Inc. and Anthony A. Maher with the U.S. District Court.   Notice will automatically be electronically mailed to the following individuals who are registered with the U.S. District Court CM/ECF System:

- **Thomas M Melton**
  meltont@sec.gov
- **Cheryl M Mori**
  moric@sec.gov
- **Holly Stein Sollod**
  hsteinsollod@hollandhart.com
- **Erik F Stidham**
  EFStidham@hollandhart.com,DLJenkins@hollandhart.com,BoiseIntakeTeam@hollandhart.com
- **Daniel J Wadley**
  wadleyd@sec.gov
- **Brian C Wonderlich**
  bcwonderlich@hollandhart.com,dljenkins@hollandhart.com,BoiseIntakeTeam@hollandhart.com


_____/s/_____
Sally Anderson,
Assistant to Briane Nelson Mitchell