BRIANE NELSON MITCHELL (ISB #2346)
**MAUK & BURGOYNE**
515 South 6th Street
Post Office Box 1743
Boise, Idaho 83701-1743
Telephone: (208) 345-2654
Facsimile  (208) 345-3319
nels@maukburgoyne.com

Attorneys for Defendants PCS Edventures!.com, Inc.
and Anthony A. Maher

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF IDAHO

|  |  |  |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | Case No. 10-CV-00433 |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| PCS EDVENTURES!.COM, INC., an Idaho corporation, ANTHONY A. MAHER, an individual, and SHANNON M. STITH, an individual, | ) ) ) ) ) | **BRIEF IN SUPPORT OF MOTION TO DISMISS THE SEC'S AMENDED COMPLAINT (AND/OR FOR SUMMARY JUDGMENT) BY DEFENDANT** |
| Defendants. | ) ) ) | **PCS EDVENTURES!.COM, INC. AND ANTHONY A. MAHER** |

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF CONTENTS ............................................................................................ i

TABLE OF AUTHORITIES ..................................................................................... ii

I.      INTRODUCTION ........................................................................................1

II.     FACTUAL BACKGROUND ........................................................................3

        A.      PCS Edventures!.com ......................................................................3

        B.      The Middle East and Saudi Arabia .................................................4

        C.      Approval of the King Abdullah Education Project ..........................6

        D.      One Time Event - - License Agreement With Global Techniques
                dba PCS Middle East ........................................................................8

III.    THE SEC'S SECURITIES FRAUD CLAIMS SHOULD BE DISMISSED ...................13

IV.     THE SEC'S REQUESTS FOR RELIEF SHOULD BE DISMISSED ............................18

V.      CONCLUSION ..........................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

## CASES:

*Aaron v. SEC*,
  446 U.S. 680 (1980)..........................................................................................20

*Ashcroft v. Iqbal*,
  129 S.Ct. 1937 (2009).................................................................................13, 18

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)..........................................................................................13

*Ernst & Ernst v. Hochfelder*,
  425 U.S. 185 (1976)..........................................................................................14

*Freeport-McMoRan Oil & Gas Co. v. FERC*,
  962 F.2d 45 (D.C. Cir. 1992)............................................................................14

*Hollinger v. Titan Capital Corp.*,
  914 F.2d 1564 (9th Cir. 1990), *cert. denied* 499 U.S. 976 (1991).....................14

*SEC v. Abacus*,
  2001 WL 940913 (N.D.Cal.2001) ....................................................................19

*SEC v. Black*,
  2008 WL 4394891 (N.D.Ill.2008) ....................................................................14

*SEC v. Cohmad Securities Corp.*,
  2010 WL 363844 (S.D.N.Y. 2010)...............................................................17, 18

*SEC v. Collins & Aikman Corp.*,
  524 F.Supp.2d 477 (S.D.N.Y.2007)..............................................................2, 13

*SEC v. First Pacific Bancorp*,
  142 F.3d 1186 (9th Cir. 1998) ..........................................................................19

*SEC v. Lyon*,
  529 F.Supp.2d 444 (S.D.N.Y.2008)..................................................................13

*SEC v. Murphy*,
  626 F.2d 633 (9th Cir. 1980) .......................................................................18, 19

*SEC v. Rubera*,
    350 F.3d 1084 (9th Cir. 2003) ...........................................................................15

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)...........................................................................................14

## **STATUTES**

17 CFR §200.66 ...........................................................................................................14

17 CFR § 240.10b-5 .....................................................................................................14

17 CFR § 240.12b-20 ...................................................................................................14

17 CFR § 240.13a-1 .....................................................................................................14

17 CFR § 240.13a-11 ...................................................................................................14

17 CFR 240.13a-14 ......................................................................................................14

15 U.S.C. 78j(b) ...........................................................................................................14

15 U.S.C. 78m(a) .........................................................................................................14

## I.     <u>INTRODUCTION</u>

This case involves PCS Edventures!.com, Inc. ("PCS"), a small public company that issued a press release (and filed a Form 8-K with the U.S. Securities and Exchange Commission ("SEC")) describing what, at that time, appeared to be a major breakthrough in its long-term efforts to provide its educational products in Saudi Arabia.  Unfortunately, due to difficulties beyond its control, that transaction did not proceed as anticipated and the company took corrective action, filed an Amended Form 8-K/A six weeks later with the SEC, reversed a ledger entry in its internal records, and never recognized or reported any revenue from the transaction on its quarterly or annual financial statements.  Nonetheless, even though PCS and its management acted in good faith and had a reasonable basis for their beliefs and actions, including the announcement by the King of Saudi Arabia that the project was starting, the SEC filed this securities fraud action against PCS and Anthony A. Maher, the CEO of PCS, and Shannon Stith, the former CFO of PCS.

The SEC has filed a Complaint and an Amended Complaint, which ignore the evidence upon which PCS and its management were relying upon at the time.  Instead, the SEC has distorted PCS' multi-year development efforts in Saudi Arabia, and with the benefit of hindsight, chosen to second guess PCS' management and cast a jaundiced eye over PCS' efforts at doing business in the Middle East.  Indeed, the SEC's case is premised upon its view that PCS was wrong to trust and believe information from the Saudi Arabian government and the people with whom PCS had been working for years in the Middle East.

The SEC's claims should be dismissed as a matter of law.  The SEC started its investigation in 2007.  Prior to filing this lawsuit in 2010, the SEC had issued at least twelve

subpoenas, received thousands of pages of documents, and taken five depositions.[1] Nevertheless, despite having full access to all of this information, the SEC has not, and cannot, state a securities fraud claim against PCS or Mr. Maher that should be allowed to advance beyond the pleading stage.

There are at least three fatal problems with the SEC's lawsuit.  First, the SEC itself, in its Amended Complaint bases its case against PCS and Mr. Maher on allegations that not only distort the evidence, but which are actually false and/or misleading.  That issue is addressed in the Motion to Strike which has been filed at the same time as the present Motion to Dismiss (and/or for Summary Judgment).  The second fatal defect is that the SEC cannot, as a matter of law, show that Mr. Maher and PCS made false and misleading statements with an intent to deceive, manipulate or defraud.  In this case, the facts developed in the SEC's own investigation demonstrate that the evidence of good faith and nonfraudulent intent in connection with PCS' disclosures is much more compelling than any allegation or evidence of fraud that the SEC could locate during its three year investigation.  Third, the SEC cannot, as a matter of law, support its requests for relief - - the Injunction, Officer and Director Bar, and Penalties.  Neither the allegations in the Amended Complaint, nor the evidence from the SEC's investigation could justify any of those remedies.[2]

---

[1] The SEC began interviewing witnesses in 2007, served document subpoenas in 2008, and took depositions in 2009.  For all practical purposes, the SEC had the benefit of full pretrial discovery before filing its complaint in 2010.

[2] Even though this Motion has been filed under Rule 12(b)(6) for failure to state a claim, the case is in a different posture because the SEC has been conducting discovery for three years.  As a result, and in order to present a fair and complete picture to the Court, this Motion uses SEC evidence (to the extent it has been made available) and other readily available material which may transform it into a Rule 56 motion.  But, regardless of its characterization, the result is the same - - the SEC should not, as a matter of law, be allowed to proceed with any of its claims, or requests for relief.  The evidence used to support this Motion is submitted in the Affidavit of Briane Nelson Mitchell.  *See, SEC v. Collins Aikman Corp.*, 524 F.Supp. 477, 483 (S.D.N.Y.2007) ("In deciding a motion to dismiss, the court is not limited to the face of the complaint, but 'may [also] consider…statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the [SEC] and upon which it relied in bringing the suit.'")

**BRIEF IN SUPPORT OF MOTION TO DISMISS (AND/OR FOR SUMMARY JUDGMENT) - 2**

## II.   FACTUAL BACKGROUND

**A.     PCS Edventures!.com**

In the mid-1980s, a rural Idaho school teacher, who wanted to provide students with a hands-on way of working with technology, started an after-school program in his garage which combined computer programming with LEGO and fischertechnik building blocks and materials. The program was successful because it provided students with the opportunity to concretely see how technology could be applied to physical projects.  Robert Grover joined PCS in 1988 and created the PCS merit system, the learning portfolio that illustrates the student achievement process.  During his SEC Deposition, Mr. Grover, the current President of PCS, explained the basic PCS philosophy:

> [W]e do a lot with robotics and engineering and hands-on manipulatives, but the core of it really is the philosophy that kids are going to learn better and more effectively when they are at the center of the learning experience.  Instead of teacher-centered, where you've got people standing in front of the classroom delivering education material and they are soaking it up, you have the kids in an inquiry model, where they are actually building, designing, developing things.[3]

Anthony Maher joined PCS a few months after Mr. Grover.  Mr. Maher was brought in to manage PCS in 1989 and has served as President, CEO and Chairman of the Board.  As the company's CEO, Mr. Maher has transformed PCS from a start-up with a good idea into an enterprise that has sold and delivered its hands-on engineering, robotics and science learning labs in all fifty states as well as several foreign countries including Canada, Germany, the United Kingdom, Korea, the United Arab Emirates, Saudi Arabia, Mexico, Egypt, and The Netherlands.[4]

---

[3] SEC Deposition of Robert Grover, p. 40 (excerpts from the SEC Deposition of Robert Grover are attached to the Mitchell Aff. as Ex. J).
[4] SEC Exhibit 7, pp. 3, 5 (Mitchell Aff., Ex. B).

**B.**     **The Middle East and Saudi Arabia**

In 2002, Dr. Mohammed Refai approached PCS about doing business in the Middle East. Dr. Refai, who owns and manages Global Techniques, an Egyptian company, has been involved in education and information technology ventures throughout the Middle East for more than twenty years.  In 2005, Dr. Refai formed PCS Middle East as a dba for purposes of developing the PCS business throughout the Middle East.  Mr. Grover thinks that over "the last four or five years" there has not been a time where he did not talk to Dr. Refai "at least once or twice a week."[5]

In the post September 11 world, the Saudi government has been under pressure to reform its educational system which has historically been controlled by religious leaders.  As two senior fellows from the Council of Foreign Relations explained, "Saudi Arabia faces an education crisis."[6]  The first problem is that its approach to education teaches intolerance and "that, at the extremes, the system produces terrorists."[7]  The second problem has been that "the system is failing to produce productive members of society."[8]  As a result, "the education system needs top-to-bottom fixes to not only root out the ideology that leads to terrorism, but to keep up with a developing society and globalization."[9]

---

[5] SEC Deposition of Robert Grover, pp.. 28-29 (Mitchell Aff., Ex. J).

[6] http://www.cfr.org/publication/8083/saudi_system_is_the_problem.html.  An article by Rachel Branson [Council of Foreign Relations Senior Fellow and Director of Middle East Studies] and Isabel Coleman [Council on Foreign Relations Senior Fellow and Director of the U.S. Foreign Policy and Women Program], from the *Dallas Morning News*, May 7, 2005, was provided to the SEC with the PCS Wells Submission (and is attached to the Mitchell Aff. as Ex. P).

[7] *Id.*

[8] *Id.*

[9] http://www.saudi-us-relations.org/newsletter2004/saudi-relations-interest-01-12.html.  An article by Faye Bowers, in *The Christian Science Monitor*, p. 2, Jan. 12, 2004.  A copy of this article was provided to the SEC with the PCS Wells Submission (and is attached to the Mitchell Aff. as Ex. Q).

**BRIEF IN SUPPORT OF MOTION TO DISMISS (AND/OR FOR SUMMARY JUDGMENT) - 4**

Starting in 2005, Dr. Refai began focusing on Saudi Arabia and its educational initiative.[10]  Dr. Refai has spent a considerable amount of time and resources in Saudi Arabia seeking inclusion of PCS products as part of the Saudi educational initiative.[11]  Dr. Refai diligently worked at demonstrating PCS products and building relationships so that PCS would be utilized in the country-wide educational initiative in Saudi Arabia.  He even had the opportunity to personally demonstrate PCS' products for the Saudi Minister of Education.[12]  Dr. Refai initiated pilot programs in Saudi Arabia schools as a means of introducing PCS products and approach to education:  (1) the Jeddah (Boys) Al Zahrawi Secondary School purchased PCS' Academy of Electronics and Academy of Robotics; (2) the Al-Anjal Private Schools (under supervision of Ministry of Education) purchased the PCS BrickLab series, Young Learner, Academy of Electronics and Academy of Robotics; and (3) the First Step School purchased PCS' Young Learner and BrickLab products.[13]

The pilot programs in Saudi Arabia were successful.  One of the Reports about the pilot programs explained that during "the first year of implementation there was a noticeable improvement in the students' ability to apply academic science in the fields of mathematics, science and technology."[14]  The PCS' hands-on approach "created an atmosphere of excitement

---

[10] http://en.wikipedia.org/wiki/Education_in_Saudi_Arabia.  The Saudi Ministry of Education developed a ten-year plan (2004-2014) which included as one of its goals:  "To prepare students academically, and culturally at a local and international level to be able to achieve advanced posts internationally in the fields of mathematics and science for the various age categories, taking into account International test standards."  *Id.*  (Wikipedia, Education in Saudi Arabia, p. 2.)  A copy of the Wikipedia article was provided to the SEC with PCS' Wells Submission (and is attached to the Mitchell Aff. as Ex. R).

[11] As Mr. Grover explained during his SEC Deposition, Dr. Refai has "literally lived there [Saudi Arabia] for, I think, three years.  I think that he's been home to see his family in Cairo three times.  So he has a large personal investment both in time, emotion, the whole thing."  SEC Deposition of Robert Grover, p. 38 (Mitchell Aff. at Ex. J).

[12] Three photographs showing Dr. Refai demonstrating PCS' products to the Saudi Minister of Education were provided to the SEC with PCS' Wells Submission (and are attached to the Mitchell Aff. as Ex. N).

[13] Copies of the Reports, translations, sales orders, and receipts about the pilot programs were provided to the SEC in the Appendix to PCS' Wells Submission (and are attached to the Mitchell Aff. as Ex. O).

[14] *Id.*  (Al Anjal Report, p. 1)

and competitiveness."[15]   As a result, the Report noted that the PCS' "approach provides several advantages when compared to traditional education.  For example, classes are being directed mainly by the students and experimentation and observations became dominant in students' discussions...."[16]

On December 27, 2006, Dr. Naif Bin Nasul Al-Romi, Deputy Minister of the Saudi Ministry of Education, sent a letter to the Ministry of Education Contracting Department stating that the PCS programs "will help high school students develop electronics and programming skills at a much higher level than what is required in the schools."  The Deputy Minister's letter also said that the PCS programs "[w]ill help students of all ages improve their science and math at a higher level than what is required."   The Deputy Minister concluded with his recommendation "that [t]he Contracting Department move forward."[17]   At his SEC Deposition, Mr. Grover explained that the Deputy Minister's letter "was the one that confirmed, yes, we'd be doing this project, because it was essentially a statement that they reviewed the project, please implement."[18]

## C.   Approval of The King Abdullah Education Project

In February of 2007, the King of Saudi Arabia and his Council of Ministers approved the King Abdullah Project for the Development of Public Education which was described as "a six-year, SR 9-billion project to develop the country's public education."[19]   The Saudi Education Minister said that the "project was aimed at keeping pace with scientific and technological

---

[15] *Id.*
[16] *Id.*
[17] The Deputy Minister's letter and the translation were given to the SEC in the Appendix to PCS' Wells Submission (and are attached to the Mitchell Aff. as Ex. L).
[18] SEC Deposition of Robert Grover, p. 47 (Mitchell Aff. at Ex. J).
[19] A news article from *Arab News*, dated February 13, 2007, was provided to the SEC in the Appendix to PCS' Wells Submission (and is attached to the Mitchell Aff. as Ex. M).

**BRIEF IN SUPPORT OF MOTION TO DISMISS (AND/OR FOR SUMMARY JUDGMENT) - 6**

development."[20]  The Education Minister also explained that:  "[t]eachers will be provided with modern information technology….  They will also be given intensive training to help them get along with modern development and changes….[21]  The "period of implementation [was] set for six years, starting at the date of approval of the Project."[22]  With the King Abdullah Project "[m]ore than 400,000 teachers [are] to be trained to handle classes in the high tech style."[23]  The King Abdullah Project emphasized "extracurricular activities for the purpose of developing intellectual, creative and communicative skills of students."[24]

At the same time, Dr. Refai confirmed that not only had the Saudi project been approved, but that the PCS products would be used in the initial phases.[25]  On February 26, 2007, PCS and Dr. Refai's company, Global Techniques, entered into a new long-term agreement.[26]  On March 2, 2007, PCS provided Dr. Refai with a new authorization for doing business in Saudi Arabia which was notarized in Idaho and authenticated by the U.S. Department of State.[27]  In connection with doing business in Saudi Arabia, PCS understood that once approval was obtained, it had to be in a position to immediately fulfill expectations that it could follow through on the larger scale.  PCS had already delivered the BrickLab curriculum to Dr. Refai.[28]  But, because of the magnitude of the Saudi Arabian project, PCS took other steps to be able to meet expectations

---

[20] *Id.*

[21] *Id.*

[22] A news article from the *Saudi Press Agency*, dated February 12, 2007, was produced to the SEC in the Appendix to PCS' Wells Submission (and is attached to the Mitchell Aff. as Ex. Z).

[23] Wikipedia Article (Mitchell Aff., Ex. R).

[24] *Id.*

[25] SEC Deposition of Robert Grover, p. 127 ("there was a contract; it was done"); p. 136 ("you've got to be on the ground here in April") (Mitchell Aff., Ex. J); SEC Deposition of Anthony Maher, p. 57 ("he was absolutely 1,000 percent confident it was going to happen") (Mitchell Aff., Ex. K).

[26] The February 26, 2007 agreement was provided to the SEC in the Appendix to PCS' Wells Submission (and is attached to the Mitchell Aff. as Ex. S).

[27] The March 2, 2007 authorization was provided to the SEC in the Appendix to PCS' Wells Submission (and is attached to the Mitchell Aff. as Ex. T).

[28] Arabic versions of the BrickLab curriculum for several grades, as well as some of the PCS' emails dealing with delivering the curriculum to Dr. Refai were provided to the SEC in the Appendix to PCS' Wells Submission (and are attached to the Mitchell Aff. as Ex. U).

with the project, including making arrangements for additional personnel to work in Idaho and abroad.[29]

### D.    <u>One Time Event - - License Agreement With Global Technologies dba PCS Middle East</u>

On March 26, 2007, Dr. Refai signed the Purchase Order for Global Techniques for 5,500 separate BrickLab units at five different teaching levels of the BrickLab program priced at $260 per unit for a total contract price of $7,150,000.[30]  The License Agreement pursuant to which PCS granted Global Techniques (dba PCS Middle East) the license to use the BrickLab program at 5,500 locations in Saudi Arabia was also dated March 26, 2007.[31]  Dr. Refai assured PCS that the Global Techniques contract from the Saudi Ministry of Education was in place.  As Mr. Grover explained during his SEC Deposition:

> I remember a specific phone call with Refai, asking him to confirm [if] he did, indeed, have the order in place, the contract in place, and that this was going ahead in April.  And he said 'Absolutely, you've got to be on the ground here in April.'[32]

Dr. Refai told Mr. Grover, "there was no doubt.  Those were his words, because we asked him many times."[33]

In February 2007, Ms. Stith, PCS' CFO, began consulting with PCS' auditors and researching the accounting and financial reporting issues that could arise if PCS' part of the King Abdullah Project moved forward.  On March 7, 2007, Ms. Stith sent a detailed email to PCS' outside auditor which, in part, explained:

> We have been working for several years to obtain a contract with our affiliate, PCS Middle East.  We do not know the specifics as of

---

[29] SEC Deposition of Robert Grover, pp. 53-54 (Mitchell Aff., Ex. J).
[30] SEC Exhibit 5 (Mitchell Aff., Ex. V).
[31] SEC Exhibit 9, pp. 71-74 (Mitchell Aff., Ex. C).
[32] SEC Deposition of Robert Grover, p. 136 (Mitchell Aff., Ex. J).  Mr. Grover also explained, "Yeah, he was adamant about Saudi Arabia.  He said there is 'no doubt.'"  *Id.*, p. 87 (Mitchell Aff., Ex. J.)
[33] SEC Deposition of Robert Grover, p. 53 (Mitchell Aff., Ex. J).

**BRIEF IN SUPPORT OF MOTION TO DISMISS (AND/OR FOR SUMMARY JUDGMENT) - 8**

> yet.  What we do know, I will pass on to you as confidential information.  The contract is a multi-year contract.  The contract will be in the millions of dollars.  The contract will contain a license fee for the curriculum, a fee for our web services, training of teachers, delivering of our hands on labs, and possibly more.  We have an International Distribution Agreement (currently being authenticated by the Saudi Arabian Embassy – we will file an 8K upon receipt of the authentication) with Refai (our independent contractor) as PCS Middle East. [34]

The email detailed Ms. Stith's understanding of the rules for revenue recognition and asked for the auditor's advice:

> To determine the best possible approach to recognizing revenue accurately, appropriately, and at the earliest possible point without errors, misstatements, or misconceptions.  Please advise if this is an acceptable means of revenue recognition for these two contracts.[35]

Under the SEC's rules, the License Agreement with the Global Techniques License Agreement was, of course, a material definitive agreement that needed to be disclosed within four days.[36]  As a result, on March 28, 2007, PCS filed a Form 8-K with the SEC that explained:

> On March 27, 2007, PCS Edventures!.com, Inc. (PCS) entered into a License Agreement for Educational Curriculum and Content with Global Techniques dba PCS Middle East (PCS ME).  The License Agreement allows PCS ME to utilize and reprint copies of a portion of the PCS BrickLab curriculum, namely PCS BrickLab ITEA Grade Series Level 1, 2, 3, and 4, and PCS BrickLab Survey Level 5 in up to 5,500 sites within the Kingdom of Saudi Arabia.  For use of this portion of the PCS BrickLab curriculum, PCS ME has agreed to pay PCS the sum of Seven Million One Hundred Fifty Thousand and No/100 US Dollars ($7,150,000).  The full payment is expected to be received in a single sum payment no later than May 15, 2007.[37]

---

[34] SEC Exhibit 9, p. 5-6 (Mitchell Aff., Ex. C).

[35] SEC Exhibit 9, pp. 5-6 (Mitchell Aff., Ex. C).

[36] According to SEC Rules, any "material definitive agreement" must be disclosed within four days of entering the agreement.  SEC Form 8-K General Instructions, p. 2.  The SEC defines a material definitive agreement as "an agreement that provides for obligations that are material to and enforceable against the registrant, or rights that are material to the registrant and enforceable against one or more other parties to the agreement, in each case whether or not subject to conditions."  *Id.*, p. 4; Item 1.01.

[37] SEC Exhibit 8, p. 2 (Mitchell Aff., Ex. A); SEC Exhibit 7, p. 16 (Mitchell Aff., Ex. B).

**BRIEF IN SUPPORT OF MOTION TO DISMISS (AND/OR FOR SUMMARY JUDGMENT) - 9**

PCS also issued a press release which was attached to the Form 8-K.  Before filing the Form 8-K and issuing the press release, PCS submitted them to outside counsel for review and approval.[38]

At the time that the Form 8-K was filed, PCS believed that it would receive the expected payment as Mr. Grover explained in his SEC Deposition:

> Q      Okay.  And in 8K that came out that day, March 28th, it said that the money would be collected by May 15th, correct?
> A      Mm-hmm.  Refai was absolutely certainly he was going to collect, actually even before that.  He said he was going to have it in April….
> Q      Okay.  So, he said he would have the money from the government, the cash advance in April?
> A      Yes.[39]

Dr. Refai was telling PCS "that we [PCS] were going to have to be shipping materials as early as April."[40]  Dr. Refai "was absolutely 1,000 percent confident it was going to happen" and "was very confident that the money was coming."[41]  Dr. Refai "felt strongly that he had the contract and that [he] could get paid the license fee in advance."[42]

During April 2007, there were additional reports from Saudi Arabia relating to the King Abdullah Project for the Development of Public Education:

> Saudi Arabia has begun a major overhaul of its education system, pumping SR11.8 billion ($3.1 billion) into the project, to ensure overall development of its students by increasing their knowledge as well as their physical, professional, psychological and intellectual capabilities.[43]

---

[38] The emails were provided to the SEC in the Appendix to PCS' Wells Submission (and are attached to the Mitchell Aff. as Ex. D).
[39] SEC Deposition of Robert Grover, p. 146 (Mitchell Aff., Ex. J).
[40] SEC Deposition of Robert Grover, p. 56 (Mitchell Aff., Ex. J).
[41] SEC Deposition of Anthony Maher, p. 57 (Mitchell Aff., Ex. K).
[42] SEC Deposition of Anthony Maher, p. 107 (Mitchell Aff., Ex. K).
[43] An April 17, 2007 *Arab News* article was provided to the SEC in the Appendix to PCS' Wells Submission (and is included in the Mitchell Aff. as Ex. W).

Also during April, Global Techniques (dba PCS Middle East) facilitated a robotics competition at the Al Riyadh Schools in Saudi Arabia.[44]

Unfortunately, due to internal political issues in Saudi Arabia, Dr. Refai was not able to immediately secure payment from the Saudi Ministry of Education to Global Techniques as he had initially anticipated.  Accordingly, on May 17, 2007, PCS filed a Form 8-K/A with the SEC announcing, in part, that:

> PCS ME experienced delays within the Kingdom of Saudi Arabia. These delays caused a postponement in payment to PCS ME, thus causing delays in payment to PCS.  These delays stemmed from the uniqueness of the project, wherein the Royal Council and the Ministry of Education held special meetings to discuss, finalize, and assign this project.[45]

This announcement explained that the payment to PCS was dependent upon Saudi Arabia's payment to Global Techniques (dba PCS Middle East).[46]

The Global Techniques invoice for License Agreement fees had been posted on PCS' internal general ledger.  The entry was adjusted in June before the completion of the audit of PCS' March 31, 2007 year-end financial statements.  Adjustments to the period being audited are common and are a normal part of the audit process.  PCS filed its Form 10-KSB with the SEC at

---

[44] Photographs from the robotics competition were provided to the SEC in the Appendix to PCS' Wells Submission (and are attached to the Mitchell Aff. as Ex. X).

[45] SEC Exhibit 7, p. 22 (Mitchell Aff., Ex. B); SEC Exhibit 8, pp. 5-8 (Mitchell Aff., Ex. A).

[46] Mr. Grover explained what he was being told by Dr. Refai:

> And he said this - - there is a division of the ministry that is - - the Ministry of Education, which is called the Department of Mentors, I think is what it translates to.  And he said they were holding it up for whatever reason. It had been approved.  It had been run through channels.  It was supposed to be moving on to the Department of Finance, Ministry of Finance, which would be issuing Refai's down payment.  We would get our payment.  We would be able to deploy.
>
> In June, it was still being held up by this Department of Mentors, and he was continually being called in to do more presentations.  And at that point, and from there on, it just continued to draw out.

SEC Deposition of Robert Grover, pp. 119-120 (Mitchell Aff., Ex. J).

**BRIEF IN SUPPORT OF MOTION TO DISMISS (AND/OR FOR SUMMARY JUDGMENT) - 11**

the end of June.[47]  No revenue from the Global Techniques License Agreement was recognized

or reported in the PCS quarterly or annual financial statements.  On June 28, 2007, PCS

"announced that it [had] elected to postpone the recognition of certain license fee income from

Global Techniques (d/b/a PCS Middle East) in the amount of approximately $7.2 million until

such payment is actually received from PCS Middle East."[48]  By August, PCS still had not been

able to obtain payment or formal confirmation because of delays with the King Abdullah

initiative caused by political issues within Saudi Arabia.  As a result, PCS issued a press release

describing the delays and problems encountered in attempting to obtain confirmation and

payment.[49]

Shortly after the August press release, the SEC's Salt Lake office began its investigation

which included interviewing PCS' outside auditors in October 2007.  In addition, in March 2008,

the SEC's Washington D.C. office wrote a letter to PCS stating that the Form 10-K for year-end

March 31, 2007 and the Form 10-Q for the December 31, 2007 quarter had been reviewed by the

SEC for compliance "with the applicable disclosure requirements."[50]  The SEC's Washington

D.C. office asked PCS to provide further information regarding PCS' revenue recognition

policies and also made specific inquiry relating to "the status of the material contract with PCS

Middle East, including the nature of the contract and how you recognize revenue on any

---

[47] The SEC Form 10-KSB that was filed with the SEC on June 26, 2007 explained that:

> PCS announced on March 28, 2007 that it had obtained a contract with Global Techniques, a Licensee dba PCS Middle East.  The contract information was listed in a press release as well as in Form 8K on file with the SEC.  Amendment One to the 8K was filed on May 17, 2007 wherein the Company stated that the funds had yet to be received from PCS Middle East due to delays.  As of the date of this 10-KSB, the funds have yet to be received by the Company.  Additional inquiries have been placed with PCS Middle East regarding the delays that have been experienced.  Additional amendments to the 8K will be filed as needed.

http://www.sec.gov/Archives/edgar/data/1122020/000101041207000153/f10ksbdraft7.htm (excerpts included in the Mitchell Aff. at Ex. Y).
[48] SEC Exhibit 7, p. 26 (Mitchell Aff., Ex. B).
[49] SEC Exhibit 7, pp. 27-28 (Mitchell Aff., Ex. B).
[50] SEC Exhibit 8, pp. 23-25 (Mitchell Aff., Ex. A).

**BRIEF IN SUPPORT OF MOTION TO DISMISS (AND/OR FOR SUMMARY JUDGMENT) - 12**

transactions under the contract."[51]   After PCS promptly responded,[52] on March 20, 2008, an

Assistant Director at the SEC wrote back and told PCS:  "We have completed our review of your

Form 10-K and related filings and do not, at this time, have any further comments."[53]

## III.    THE SEC'S SECURITIES FRAUD CLAIMS SHOULD BE DISMISSED

To survive a motion to dismiss, the SEC's Amended Complaint must contain sufficient

factual detail to "state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*,

550 U.S. 544, 570 (2007) (interpreting Fed.R.Civ.P. 8(a)).   "A claim has facial plausibility when

the pleaded factual content allows the court to draw the reasonable inference that the defendant is

liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009).   Allegations

phrased as legal conclusions need not be accepted as true.   *Twombly*, 550 U.S. at 555.   A

complaint alleging facts that are "merely consistent with a defendant's liability…stops short of

the line between possibility and plausibility of entitlement to relief."  *Iqbal*, 129 S.Ct. at 1949.

The determination as to "whether a complaint states a plausible claim is context-specific,

requiring the reviewing court to draw on its experience and common sense."  *Id.* at 1950.

Allegations consistent with an "obvious alternative explanation" do not give rise to a plausible

inference of misconduct.  *See Twombly*, 550 U.S. at 566-67.[54]

---

[51] SEC Exhibit 8, p. 24 (Mitchell Aff., Ex. A).

[52] The PCS response explained, in part, that:

> Effective   March   2007,   PCS   entered   into   a   Fixed   License
> Agreement with PCS Middle East for the exclusive use, deployment, and
> distribution in the Kingdom of Saudi Arabia of the Brick Lab curriculum for
> grade levels 1 through 5.  The license agreement is for a fixed term of 25 years.
> As of December 31, 2007 there has been no distribution or deployment of the
> Brick Lab curriculum and thus no revenue has been recognized.
> Revenue will be recognized when the criteria of SOP 97-2 is met.

SEC Exhibit 8, p. 30 (Mitchell Aff., Ex. A).

[53] SEC Exhibit 8, p. 32 (Mitchell Aff., Ex. A).

[54] The pleading standard required by the Supreme Court in *Twombly* is applicable to civil actions brought by the
SEC.   *See, e.g., SEC v. Collins & Aikman Corp.*, 524 F.Supp.2d 477, 484 (S.D.N.Y.2007).   Accordingly, the SEC
must plead facts that satisfy the "heightened pleading requirement established by Fed.R.Civ.P. 9(b)."   *SEC v. Lyon*,
529 F.Supp.2d 444, 453 (S.D.N.Y.2008).

**BRIEF IN SUPPORT OF MOTION TO DISMISS (AND/OR FOR SUMMARY JUDGMENT) - 13**

The Supreme Court recently provided guidance to the federal courts as to how they should evaluate fraud charges under the federal securities laws in *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007).[55]  Even though *Tellabs* involved an issue under the Private Securities Litigation Reform Act ("PSLRA"), the Supreme Court's guidance should apply with equal, if not more, vigor to SEC cases, given the heightened ethical obligations of the SEC and government lawyers.[56]  In evaluating whether the district courts should open their doors to federal securities law claims, the Supreme Court explained that the district "court's job is not to scrutinize each allegation in isolation but to assess all of the allegations holistically." *Id.*, 551 U.S. at 326.  Similarly, this Court should not scrutinize the SEC's allegations in isolation, but should look "holistically" at the underlying facts developed during the SEC's three year investigation.

In addition, the Supreme Court provided guidance as to how federal courts should evaluate the scienter or knowledge element under the federal securities laws.[57]  The Supreme

---

[55] The SEC's Amended Complaint has three claims, all of which are predicated upon the SEC's theory that PCS and Mr. Maher committed securities fraud by failing to disclose that the expected payment to PCS under the License Agreement was dependent upon Global Techniques (dba PCS Middle East) receiving payment from Saudi Arabia, and that Global Techniques did not have a contract with Saudi Arabia.  The first, and primary claim, charges that PCS and Mr. Maher committed fraud in connection with the purchase or sale of securities in violation of Section 10(b) of the Securities and Exchange Act (15 U.S.C. § 78j(b)) and Rule 10b-5 (17 CFR § 240.10b-5).  (SEC Amended Complaint, ¶¶ 71-73.)  The second claim charges that PCS made false filings with the SEC and that Mr. Maher knowingly aided and abetted the false filings in violation of Section 13(a) of the Securities Exchange Act (15 U.S.C. § 78m(a) and Rules 12b020, 13a-1 and 13a-11 (17 CFR § 240.12b-20, 13a-1, 13a-11).  (SEC Amended Complaint, ¶¶ 74-77.)  The third claim is brought against Mr. Maher and charges that he made a false certification of PCS' annual report in violation of Section 13(a) of the Securities Exchange Act (15 U.S.C. § 78m(a) and Rule 13a-14 (17 CFR § 240.13a-14).  (SEC Amended Complaint, ¶¶ 78-81.)  There is authority which holds that the SEC cannot bring a separate cause of action for allegedly false certification of the Form 10-K as it has attempted to do against Mr. Maher, which provides another ground for dismissing the third claim.  *See SEC v. Black*, 2008 WL 4394891, p. 15 (N.D.Ill.2008) ("consistent with the SEC Release and the two cases that have addressed the issue, it is held that a false Sarbanes-Oxley certification does not state an independent violation of the securities law").

[56] The SEC's ethic rules specifically state that "[t]he power to investigate carries with it the power to defame and destroy…." 17 CFR § 200.66.  *See also Freeport-McMoRan Oil & Gas Co. v. FERC*, 962 F.2d 45, 47 (D.C.Cir. 1992) ("government lawyers have obligations beyond those of private lawyers").

[57] Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12 (1976).  With Section 10(b), scienter requires proof that the defendant acted knowingly or recklessly.  *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1568-69 (9th Cir. 1990) (en banc), *cert. denied* 499 U.S. 976 (1991).  Recklessness has been defined as:  "a highly unreasonable omission, involving not merely simple,

---

**BRIEF IN SUPPORT OF MOTION TO DISMISS (AND/OR FOR SUMMARY JUDGMENT) - 14**

Court said that the "strength of an inference cannot be decided in a vacuum" and that "consideration must be given to plausible nonculpable explanations for the defendant's conduct." *Id.*, 551 U.S. at 323-4.  In the context of a private securities fraud action, the Supreme Court held that a "complaint will survive…only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.*, 551 U.S. at 324.  In the present matter, the SEC's claims against PCS and Mr. Maher are predicated upon inferences of scienter and knowledge of fraud that are not even close to being as compelling as the opposing inferences that can be drawn from the underlying facts.

The SEC's case boils down to a few isolated allegations, none of which can support the critical element of the SEC charge that PCS and Mr. Maher should have predicted (and disclosed) that the Saudi Arabia Ministry of Education would not move forward with the King Abdullah educational initiative.[58]  Furthermore, and of more importance, the SEC's allegations cannot be viewed in a vacuum, but must be considered in the context of the "non-culpable" explanations for the actions of PCS and Mr. Maher.  A holistic evaluation of the facts in this matter requires looking at the complete history behind PCS' development efforts in Saudi Arabia against the backdrop of the SEC's requirement for timely disclosure of any material agreement.  And that evaluation must also consider the plausible non-culpable explanation for the actions of Mr. Maher and the other principals at PCS.   Indeed, an evaluation of the actual facts demonstrates that Mr. Maher and PCS acted in good faith and had a reasonable basis for what they said and when they said it in this matter:

---

or even inexcusable negligence, but an extreme departure…."  *Id.* At 1569.  "Reckless conduct must be something more egregious than…good faith and represents an extreme departure from the standards of ordinary care such that the defendant must have been aware of it.'  *SEC v. Rubera,* 350 F.3d 1084, 1094 (9th Cir. 2003).  "Recklessness satisfies the scienter requirement only 'to the extent that it reflects some degree of intentional or conscious misconduct.'"  *Id.* at 1094-95.

[58] Most of the allegations from which the SEC is attempting to draw inferences of fraud are the subject of the Motion to Strike filed by PCS and Mr. Maher.  As shown in that Motion, the SEC has itself resorted to false and misleading statements as part of its attempt to make a case against PCS and Mr. Maher.

**BRIEF IN SUPPORT OF MOTION TO DISMISS (AND/OR FOR SUMMARY JUDGMENT) - 15**

1.      Prior to March 2007, Dr. Refai and PCS had spent the better part of two to three years laying the groundwork for participating in the educational initiative that was planned for reforming the educational system in Saudi Arabia.

2.      In 2005 and 2006, successful pilot programs had been implemented in Saudi Arabia using PCS products.

3.      In December 2006, the Deputy Minister of the Saudi Ministry of Education, endorsed the use of PCS' products.

4.      In February 2007, the King and his Council of Ministers announced the approval of the King Abdullah Education Project to improve its educational system.  The reports announced that the implementation of the King Abdullah Project would start right away and would cost more than $3 billion (or more than SR 9 billion).

5.      Starting in February 2007, PCS' CFO consulted with PCS' auditors and researched the accounting and financial reporting issues.

6.      On March 26, 2007, Dr. Refai and his company, Global Techniques dba PCS Middle East, entered into the License Agreement with PCS that allowed Global Techniques to use the BrickLab curriculum at 5500 sites within Saudi Arabia.[59]

7.      Dr. Refai "was absolutely 1,000 percent confident" and "was very confident that the money was coming."[60]  He "had the contract and…could get paid the license fee in advance."[61]  PCS was told that it was "going to have to be shipping materials as early as April."[62]  Dr. Refai also told Mr. Grover, "there was no doubt.  Those were his words, because we asked him many times."[63]

8.      PCS sent the draft Form 8-K and press release to its outside counsel for his review before filing the Form 8-K with the SEC and issuing the press release announcing the License Agreement with Global Techniques dba PCS Middle East and that

---

[59] SEC Exhibit 9, pp. 71-74 (Mitchell Aff., Ex. C).
[60] SEC Deposition of Anthony Maher, p. 57 (Mitchell Aff., Ex. K).
[61] SEC Deposition of Anthony Maher, p. 107 (Mitchell Aff., Ex. K).
[62] SEC Deposition of Robert Grover, p. 56 (Mitchell Aff., Ex. J).
[63] SEC Deposition of Robert Grover, p. 53 (Mitchell Aff., Ex. J).

**BRIEF IN SUPPORT OF MOTION TO DISMISS (AND/OR FOR SUMMARY JUDGMENT) - 16**

the $7,150,000 license fee was expected to be paid by May 15, 2007.[64]

9.      In the post-March 28, 2007 period, Mr. Maher and PCS made further disclosures after the initial stages of the King Abdullah Education Project did not progress as originally anticipated.  This included filing an Amended Form 8-K/A[65] with the SEC on May 17, 2007 announcing delay in payment from Saudi Arabia to Global Techniques (dba PCS Middle East) which meant delay in any payment to PCS.  This was followed by the June announcement that any revenue recognition would be postponed until the payments were actually received.[66]  Moreover, in August, PCS issued a press release in which Mr. Maher explained, in detail, the problems that had been encountered in connection with the License Agreement and the Saudi educational initiative.[67]

10.      After the Purchase Order and License Agreement were received in March, an entry was made in PCS' internal general ledger regarding the anticipated revenue.  However, when the revenue was not received as anticipated, the internal ledger entry was reversed.  The revenue was never recognized or reported on PCS financial statements.  And, contrary to the suggestion made by the SEC, the adjusting entry was actually prepared by both PCS and its auditor, not just the auditor.[68]

A recent SEC case is instructive.  In *SEC v. Cohmad Securities Corp.*, 2010 WL 363844

(S.D.N.Y. 2010), the SEC sued a Broker-Dealer and three of its officers for securities fraud

based upon the fact that they had been paid for recruiting clients for Bernie Madoff's Ponzi

scheme.  The SEC's fraud case boiled down to its allegation that the *Cohmad* defendants should

not have trusted Bernie Madoff, which is similar to the charge in the present case that PCS and

---

[64] Mitchell Aff., Ex. D.
[65] SEC Exhibit 7, p. 22 (Mitchell Aff., Ex. B).
[66] SEC Exhibit 7, p. 26 (Mitchell Aff., Ex. B).
[67] SEC Exhibit 7, pp. 27-28 (Mitchell Aff., Ex. B).
[68] During the examination of Ms. Stith, the staff asked:
      Q      So, it appears to me that is a proposed adjusting journal entry
      by HJ & Associates?
      A      That is incorrect.
SEC Deposition of Shannon Stith, p. 102 (Mitchell Aff., Ex. E).

Mr. Maher should not have trusted Dr. Refai.   In *Cohmad*, the District Court dismissed the securities fraud claims explaining that:

> Absent facts showing that defendants were on notice of Madoff's fraud, the chain of inferences that Cohmad's recent regulatory disclosures' failure 'to accurately identify the nature and scope of the business arrangement between Cohmad and [Madoff],' …showed an intention to conceal that relationship, and further that the concealment was because any defendant knew that Madoff was committing fraud, is speculative and flimsy.[69]

Similarly, the SEC's case against PCS and Mr. Maher is speculative and flimsy; there are no allegations or evidence that PCS or Mr. Maher knew that Saudi Arabia and/or Dr. Refai could have been committing a fraud.

## IV.    THE SEC'S REQUESTS FOR RELIEF SHOULD BE DISMISSED

In this action, the SEC not only has the burden of proving the actual securities fraud violations, but it also has the separate burden of establishing entitlement to the remedies that it is seeking - - an Injunction, Penalties, as well as an Officer and Director Bar against Mr. Maher. Neither the allegations in the Amended Complaint nor the SEC evidence can support the SEC's requests for any of these rather drastic remedies.[70]

Injunctions and Penalties are imposed to deter wrongdoers from future securities fraud violations.  The "SEC ha[s] the burden of showing there was a reasonable likelihood of future violations of the securities laws."  *SEC v. Murphy*, 626 F.2d 633, 655 (9th Cir. 1980).  As the Ninth Circuit explained in *Murphy*, the courts must assess the "totality of the circumstances" and evaluate:

---

[69] *SEC v. Cohmad Securities Corp.*, 2010 WL 363844, p. 5 (S.D.N.Y. 2010).

[70] The SEC's Amended Complaint contains a conclusory allegation that "Defendants, unless restrained and enjoined by this Court, will continue to engage in the transactions, acts, practices, and course of business alleged herein and in transactions, acts, practices, and courses of business of similar purport and object." (SEC Amended Complaint, ¶ 10).  However, there are no factual allegations (or evidence) that support that conclusory accusation, and, as the Supreme Court has explained, allegations phrased as legal conclusions need not be accepted as true. *See, Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1940 (2009) ("not entitled to the assumption of truth").

**BRIEF IN SUPPORT OF MOTION TO DISMISS (AND/OR FOR SUMMARY JUDGMENT) - 18**

> factors such as the degree of scienter involved; the isolated or
> recurrent nature of the infraction; the defendant's recognition of
> the wrongful nature of his conduct; the likelihood, because of
> defendant's professional occupation, that future violations might
> occur; and the sincerity of his assurances against future violations.

*Id.* The SEC "penalties are imposed to deter the wrongdoer from similar violations in the future;

therefore the factors listed in *SEC v. Murphy*, 626 F.2d 633, 655 (9th Cir. 1980) apply." *SEC v.*

*Abacus*, 2001 WL 940913, p. 4 (N.D.Cal.2001)  Similarly, in determining whether to impose an

Officer and Director Bar, courts consider:

> (1) the 'egregiousness' of the underlying securities law violation;
> (2) the defendant's 'repeat offender' status; (3) the defendant's
> 'role' or position when he engaged in the fraud; (4) the defendant's
> degree of scienter; (5) the defendant's economic stake in the
> violation; and (6) the likelihood that misconduct will recur.

*SEC v. First Pacific Bancorp*, 142 F.3d 1186, 1193 (9th Cir. 1998).

A cursory review of the overlapping factors needed to support the SEC's requested

remedies reveals their absence in the present case:

1. Recurrent Nature:  The SEC's lawsuit focuses on a one-time event that occurred more than three years ago.  Moreover, PCS never recognized revenue from the transaction in its quarterly or annual financial statements, and, of equal importance, PCS made corrective disclosures as further information was learned.

2. Scienter:  Neither PCS nor Mr. Maher intended to defraud anyone.  On the contrary, they had a good faith belief based upon the objective evidence discussed in the preceding section.

3. Repeat Offender:  Neither PCS nor Mr. Maher is a repeat offender.

4. Egregiousness:  If there was any type of violation, it cannot be viewed as egregious given what PCS and Mr. Maher knew at the time.  Indeed, the evidence supports their good faith belief that was held when the Form 8-K was filed on March 29, 2007 and the press release was issued.

5. Economic Stake:  The SEC has not alleged that Mr. Maher or PCS received the type of economic benefit normally associated with fraud cases.

6.  Role or Occupation:  Mr. Maher is still the CEO of PCS, although he no longer serves as President following his heart attacks last year.

7.  Future Reoccurrence:  Given the isolated nature of the incident that triggered the SEC's interest, any future reoccurrence is extremely unlikely.  In addition, PCS has actually strengthened its corporate governance policies making future problems even less likely.

In evaluating the SEC's requested remedies, it is important to remember that "[a]n injunction is a drastic remedy, not a mild prophylactic, and should not be obtained against someone acting in good faith."  *Aaron v. SEC*, 446 U.S. 680, 703 (1980) (Burger, concurring). Given the objective evidence available to PCS and its principals at the pertinent time, the SEC has not alleged and cannot establish the requirements necessary to support its requests for any of the drastic remedies that it seeks in this matter.  Neither an Injunction, Penalties nor an Officer and Director Bar are warranted because there is not a reasonable likelihood of future securities fraud violations by PCS or Mr. Maher.

## V.   **CONCLUSION**

The SEC's claims and requests for relief should be dismissed as a matter of law.

Dated this 8th day of November, 2010.

Respectfully Submitted,

MAUK & BURGOYNE

_____/s/_____
Briane Nelson Mitchell, of the Firm
Attorneys for PCS Edventures!.com, Inc. and Anthony A. Maher

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that on the 8th day of November, 2010, I electronically filed the foregoing Brief in Support of Motion to Dismiss the SEC's Amended Complaint (and/or For Summary Judgment) by Defendant PCS Edventures!.com, Inc. and Anthony A. Maher with the U.S. District Court.   Notice will automatically be electronically mailed to the following individuals who are registered with the U.S. District Court CM/ECF System:

- **Thomas M Melton**
  meltont@sec.gov
- **Cheryl M Mori**
  moric@sec.gov
- **Holly Stein Sollod**
  hsteinsollod@hollandhart.com
- **Erik F Stidham**
  EFStidham@hollandhart.com,DLJenkins@hollandhart.com,BoiseIntakeTeam@hollandhart.com
- **Daniel J Wadley**
  wadleyd@sec.gov
- **Brian C Wonderlich**
  bcwonderlich@hollandhart.com,dljenkins@hollandhart.com,BoiseIntakeTeam@hollandhart.com

_____/s/_____
Sally Anderson,
Assistant to Briane Nelson Mitchell