Erik F. Stidham, ISB # 5483
Brian Wonderlich, ISB # 7758
HOLLAND & HART LLP
Suite 1400, U.S. Bank Plaza
101 South Capitol Boulevard
P.O. Box 2527
Boise, Idaho  83701-2527
Telephone:   (208) 342-5000
Facsimile:   (208) 343-8869
efstidham@hollandhart.com
bcwonderlich@hollandhart.com

Holly Stein Sollod (*pro hac vice*)
Holland & Hart LLP
555 Seventeenth Street, Suite 3200
Post Office Box 8749
Denver, Colorado  80201-8749
Phone: (303) 295-8000
Fax: (303) 295-8261
hsteinsollod@hollandhart.com

Attorneys for Defendant Shannon M. Stith

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | Case No. 10-CV-00433 |
| Plaintiff, | ) ) | |
| vs. | ) ) ) | **MEMORANDUM IN SUPPORT OF MOTION TO DISMISS BY DEFENDANT SHANNON M. STITH** |
| PCS EDVENTURES!.COM, INC., an Idaho corporation, ANTHONY A. MAHER, an individual, and SHANNON M. STITH, an individual, | ) ) ) ) | |
| Defendants. | ) ) ) | |

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................................1

FACTUAL ALLEGATIONS AGAINST SHANNON WILSON STITH .....................................2

ARGUMENT ...........................................................................................................................10

I.      Rule 9(b)'s Heightened Pleading Standard Requires that
Pleadings Grounded in Fraud be Pled with Particularity...................................10

II.     Stith Did Not Make a Material Misrepresentation or Omission
with Scienter, and Thus the SEC Fails to State a Claim Against
Stith for a Violation of Section 10(b) ................................................................12

         A.     The SEC Has Failed to Allege with Requisite Specificity
that Stith Made a Material Misrepresentation or Omission ...................12

         B.     The SEC Has Failed to Alleged with Requisite Specificity Any Facts
Giving Rise to a Strong Inference that Ms. Stith Acted with Scienter .................15

III.    The SEC's Claim Against Stith for Aiding and Abetting
False Filings Should Be Dismissed....................................................................18

IV.    The SEC's Claim of a Violation of Section 13(a) and Rule 13-14,
the False Certification of PCS' Financial Statements, Should be Dismissed...................19

CONCLUSION..........................................................................................................................20

i

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

### CASES

*Ashcroft v. Iqbal,* 129 S.Ct. 1937 (2009) .....................................................................................11

*Balistreri v. Pacifica Police Dep't,* 901 F.2d 696 (9th Cir.1990)..................................................10

*Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007) ............................................................10, 11

*Bruns v. Ledbetter,* 583 F. Supp. 1050 (S.D. Cal. 1984) .............................................................11

*Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976)......................................................................15

*Hollinger v. Titan Capital Corp.*, 914 F.2d 1564 (9th Cir. 1990) *cert. denied* 499 U.S.
976 (1991).............................................................................................................................15

*In re Stac Elecs. Sec. Litig.,* 89 F.3d 1399 (9th Cir.1996) .......................................................3, 11

*Kennilworth Partners L.P. v. Cendant Corp.*, 59 F. Supp. 2d 417 (D.N.J. 1999).........................16

*Ponce v. SEC,* 345 F.3d 722 (9th Cir. 2003) ................................................................................18

*SEC v Black*, No. 04 C 7377, 2008 WL 4394891 (N.D. Ill. Sept. 24, 2008)................................19

*SEC v. Durgarian,* 477 F. Supp. 2d 342 (D. Mass. 2007) ............................................................16

*SEC v. Fehn,* 97 F.3d 1276 (9th Cir. 1996) ..................................................................................18

*SEC v. KPMG LLP,* No. 03 Civ. 671(DLC), 2003 WL 21998052 (S.D.N.Y. Aug. 22,
2003)....................................................................................................................................16

*SEC v. Mozilo*, No. CV 09-3994-JFW, 2010 WL 3656068 (C.D. Cal. Sept. 16, 2010)...............19

*SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072 (9th Cir. 2010).........................................12

*SEC v. Retail Pro, Inc.*, 673 F. Supp. 2d 1108 (S.D. Cal. 2009) ..................................................18

*SEC v. Rubera,* 350 F.3d 1084 (9th Cir. 2003).............................................................................16

*SEC v. Yuen*, No. CV 03-4376MRP(PLAX), 2006 WL 1390828 (C.D. Cal. March 16,
2006) ....................................................................................................................................18

ii

*Segal v. Gordon,* 467 F.2d 602 (2d Cir. 1972) ...............................................................11

*Semegen v. Weidner,* 780 F.2d 727 (9th Cir. 1985) ........................................................11

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308 (2007) ................................16

*Vess v. Ciba-Geigy Corp.,* 317 F.3d 1097 (9th Cir.2003) ...............................................11

## RULES

Fed. R. Civ. P. 8(a)(2) .....................................................................................................11

Fed. R. Civ. P. 9(b) ...............................................................................................1, 11, 19

Fed. R. Civ. P. 12(b) .............................................................................................1, 11, 19

## STATUTES AND REGULATIONS

15 U.S.C. § 78j(b) ..............................................................................................................1

15 U.S.C. § 78m(a) .............................................................................................................2

15 U.S.C. § 78u-4(b)(2) ....................................................................................................16

17 C.F.R. § 240.10b-5 .........................................................................................................1

17 C.F.R. § 240.12b-20 .......................................................................................................2

17 C.F.R. § 240.13a-1 .........................................................................................................2

17 C.F.R. § 240.13a-11 .......................................................................................................2

17 C.F.R. § 240.13a-14 .......................................................................................................2

Defendant Shannon M. Stith ("Stith"), respectfully submits this memorandum in support of her Motion to Dismiss the Amended Complaint ("Complaint" or "Compl.") of Plaintiff, the United States Securities and Exchange Commission (the "SEC" or "Plaintiff"), pursuant to FED. R. CIV. P. 9(b) and 12(b)(6) and asks this Court to dismiss all claims against her for failure to state a claim upon which relief may be granted.

## PRELIMINARY STATEMENT

The SEC's claims against Stith, the former Chief Financial Officer of PCS Edventures!.com, Inc. ("PCS"), arise out of her role in the issuance of a single press release (and Form 8-K) in March 2007 by PCS of an expected $7.15 million contract with PCS Middle East to supply learning modules to Saudi Arabia.  Stith was presented with a purchase order by PCS senior executives.  Stith researched and considered the applicable accounting principles pertaining to license revenue recognition, confirmed those accounting principles with PCS's auditors, and followed them correctly.  None of PCS's publicly filed quarterly or annual reports reported any asset, account, revenue, receivable, accrual or deferral associated with the purchase order or license.  Indeed, Stith was the primary reason that no financial statement reporting revenue from the transaction was ever included in either the Annual Report on Form 10K for 2007, or the PCS Current Report on Form 10Q for the Quarter ended June 30, 2007.

Totally oblivious to the important gatekeeper role played by Stith in this matter in which she correctly advised against booking the license agreement as revenue, the SEC has alleged the following claims against her:

- First Cause of Action for alleged violations of Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Rule 10b-5 (17 C.F.R. § 240.10b-5) for Fraud in Connection with the Purchase or Sale of Securities;

- Second Cause of Action for alleged violations of Section 13(a) of the Exchange Act (15 U.S.C. § 78m(a)) and Rules 12b-20, 13a-1, and 13a-11 (17 C.F.R. §§ 240.12b-20, 13a-1, 13a-11) for Aiding and Abetting False Filings with the Commission.

- Third Cause of Action for alleged violation of Section 13(a) of the Exchange Act (15 U.S.C. § 78m(a)) and Rule 13a-14 (17 C.F.R. § 240.13a-14) for False Certifications of an Annual Report.

The allegations contained in the Complaint distort the investigative evidence, and are actually false and/or misleading.  Defendants PCS and Anthony A. Maher ("Maher") have filed a motion to strike the false allegations contained in the Complaint. (Docket No. 15).  Stith has joined in that Motion to Strike.  Even accepting the facts alleged as true for purposes of this motion, the SEC fails to state a claim against Stith.  The allegations of the Complaint demonstrate Stith's good faith and non-fraudulent intent in connection with PCS's disclosures. For the reasons set forth below, each of the claims asserted against Stith fails to satisfy the pleading requirements and should be dismissed with prejudice.

## FACTUAL ALLEGATIONS AGAINST SHANNON M. STITH[1]

PCS is an Idaho corporation headquartered in Boise, Idaho.  (Compl., ¶ 2.)  PCS develops and markets educational learning labs and curricula and related software and technology.  (*Id.*) PCS was formed in the mid-1980s and was incorporated in Idaho in 1994.  (*Id.* at ¶ 11.)  PCS's common stock has been registered pursuant to Section 12(g) of the Exchange Act since May 11, 2001.  (*Id.*)  PCS's stock is quoted on the OTC Bulletin Board.  (*Id.* at ¶ 2.)

Stith (formerly known as "Shannon Wilson"), age 31, joined PCS as Assistant Chief Financial Officer in August 2005.  (*Id.* at ¶ 13.)  She served as Vice President and Chief

---

[1] Stith refers to the material facts alleged as to her in the Complaint solely for purposes of this motion to dismiss and without admitting the allegations of the Complaint.

Financial Officer ("CFO") of PCS from September 1, 2006 to January 11, 2008.  (*Id.*)  Currently, Stith is employed by Boise Inc.  She holds a Bachelor of Business Administration in Finance and an M.B.A. and received her CPA license in Idaho on September 17, 2009, after she departed PCS.  (*Id.* at ¶ 13.)

In 2002, PCS became acquainted with Dr. Mohammed Yasser Refai ("Dr. Refai"), the owner and manager of Global Techniques, an Egyptian entity in the business of information technology consulting.  (*Id.* at ¶ 14.)  Over the next few years, Dr. Refai acted as a distributor of PCS products in the Middle East.  (*Id.*)  PCS worked with Dr. Refai, attempting to develop projects in Egypt and other countries in the Middle East.  (*Id.*)  These events pre-date Stith's joining PCS in 2005.  During March 2007, PCS discussed internally, and with its outside auditor, HJ & Associates, LLC ("HJ & Associates"), whether it could recognize revenue from the anticipated contract with Saudi Arabia before PCS's fiscal year end on March 31, 2007.  (*Id.* at ¶ 30.)  When Stith learned of the anticipated license agreement with Dr. Refai, she researched the accounting treatment of license and supply agreements.  (*Id.* at ¶ 31.)  Stith then "completed research and determined that under Generally Accepted Accounting Principles ("GAAP"), PCS could properly recognize revenue from the anticipated contract if four conditions were met." (*Id.* at ¶ 31.)  Stith advised PCS's President and CEO, Maher, and Chief Technology Officer ("CTO"), Robert Grover ("Grover") as follows:[2]

---

[2]The district court may consider the full text of the documents referenced in the Complaint, including portions which were not mentioned in the Complaint.  Such consideration is appropriate in the context of a motion to dismiss, and does not convert the motion into one for summary judgment. "[D]ocuments whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be

> Ok, I have completed my research related to the KSA revenue recognition.  We can recognize the license fee so long as it's:
>
> - Persuasive evidence of an arrangement exists. — i.e. a contract -
> - Delivery has occurred. — once we send the curriculum to Refai to print
> - Vendor's fee is fixed or determinable. — the fixed fee amount is written in the contract.
> - Collectibility is probable. — because of the ME [Middle East] we need to have **collection prior to recognition** given the turmoil in the ME and uncertainty of collection.
>
> I am talking with Greg [the auditor] on Monday.  We have been emailing back and forth providing insight and further reference requests and receipt to each other to go over revenue recognition issues.  He even had to get Frank the senior partner, involved because of its complexity.  I sure have learned a lot, but am comfortable with this so long as the 4 items above are met fully. How exciting!

See March 3, 2007 email, attached as Ex. A (emphasis added).

The March 3, 2007 email clearly demonstrates that Stith concluded that PCS should not recognize any revenue until collection of the payment for the license fee was actually received by PCS.[3]  (Compl., ¶ 32.)  Maher did not disagree with Stith's conclusion at that time.  (*Id.*)  On March 7, 2007, Stith sent a detailed two-page single spaced e-mail to the Senior Partner at PCS's outside auditor, HJ & Associates, Franklin Hunt, outlining a proposed procedure and steps required for structuring the transaction and recording revenue from the anticipated contract.  (*Id.* at ¶ 35.)  Among other things, Stith told the auditors that "the fixed fee for the license is in the

---

considered in ruling on a Rule 12(b)(6) motion to dismiss." S*ee In re Stac Elecs. Sec. Litig.,* 89 F.3d 1399, 1405 n.4 (9th Cir. 1996).

[3] While the Complaint alleges in paragraph 32 that "Stith concluded that PCS should not record any revenue until payment for the anticipated contract was actually received by PCS" all of Stith's research and recommendations related to *recognition* of revenue, not *recording* of revenue.

process of being negotiated" and that PCS "will not be booking revenue until funds are

received."  March 7, 2007 email, attached as Ex. B.  She wrote:

> From: Shannon M. Wilson
>
> Sent: Wednesday, March 7, 2007 3:10am
>
> To: Franklin Hunt, Greg Bleazard
>
> **Subject: Revenue Recognition for Large Contract**
>
> Hi Frank:
>
> I have been in touch with Greg over the last few weeks regarding a
> potential contract for a large amount. He stated that the following
> needs to be sent directly to you instead of him because you will be
> the reviewing person.
>
> **Background:**
>
> [PCS] has been working for several years to obtain a contract with
> its affiliate PCS Middle East.  We do not know the specifics as of
> yet.  What we do know, I will pass on to you as confidential
> information.  The contract is a multi-year contract.  The contract
> will be in millions of dollars.  The contract will contain a license
> fee for the curriculum, a fee for our web services, training of
> teachers, delivering of our hands on labs, and possible more.  We
> have an International Distribution Agreement  (currently being
> authenticated by the Saudi Arabian Embassy- we will file an 8K
> upon receipt of the authentication) with Refai (our independent
> contractor) as PCS Middle East.
>
> **Steps:**
> 1.  PCS Middle East obtains a contract from the Saudi Arabian
> Ministry of Education;
> 2.  PCS Middle East contract with PCS Edventures to provide a
> license to sell curriculum within the Middle Eastern countries
> named therein (still to be written to be completed by March 31,
> 2007);
> 3.  PCS delivers curriculum to Mr. Refai to print and distribute to
> the various schools as he sees fit to fulfill his side of the contract;
> 4.  PCS Middle East contracts with PCS Edventures to provide
> remaining items (still to be written and at a later date); and

5.  PCS delivers learning labs, training of personnel, etc. to Mr. Refai at a later date.

**Purpose:**
To determine the best possible approach to recognizing revenue accurately, appropriately, and at the earliest possible point without errors, misstatements or misconceptions.  Please advise if this is an acceptable means of revenue recognition for these two contracts.

**Potential Procedure:**

Once we obtain a curriculum license with PCS ME pursuant to SOP 97-2 we will have "persuasive evidence of an arrangement". After obtaining this agreements, we will be sending copies (electronically, physically or otherwise) of our curriculum to Mr. Refai, which constitutes delivery pursuant to SOP 97-2 and ARB 101 ("the customer (PCS Middle East) has taken title and assumed the risks and rewards of ownership of the products specified…sales agreement," Q3 response).  Mr. Refai has previously provided single use licenses for other schools to which he services.  PCS sells the license of curriculum to various entities, including PCS Middle East, as a stand alone-product, thus the nonrefundable, upfront fee to have license to print, use, and distribute the curriculum to maximum of 5500 sites (should additional sites be needed, additional agreements will be written) is appropriately recognized as revenue upon delivery pursuant to ARP 101 Q5, response.  The term of the license begins immediately upon receipt of the curriculum (ARB 101, Q3 last paragraph).  The fixed fee for the license is in the process of being negotiated, once negotiated the amount is determinable as well as fixed, which meets the criteria in SOP 97-2.  We will not be booking revenue until funds are received in our account, which meets the collectability criteria of SOP 97-2.  This agreement is considered a fixed fee license agreement for curriculum, not a site license as defined in SOP 97-2.

\* \* \*

*Id.*  Stith cited the following accounting literature as references in support of PCS's potential procedure: SAB 101, FASB No.5, FASB No. 48, SOP 97-2, FASB No. 53, FASB No. 91, SOP 96-9, and SOP 81-1.  *Id.*

On March 26, 2007 at 9:36 AM, Maher emailed Stith, Grover and Joe Egusquiza,

International Sales Manager at PCS, and said:

> Not sure whether we are going to have a Kings' Order in our fat
> little hands before the end of the month or not.  Decision we jointly
> need to make, except that I will suffer the consequences of
> whatever decision we make if its wrong, is whether we have
> enough information yet to invoice Refai for the License
> Agreement.  I would be inclined to do it, if we can reassure
> ourselves that such a document actually exits.  If it's there, I think
> we can invoice, if we can't convince ourselves that it exists, I am
> not sure about it…. I guess Refai thinks he is still going to get the
> document yet this week, but I don't think he has gotten it yet, or if
> he has I haven't heard about it."

March 26, 2007 email, attached as Ex C.[4]

In response to Maher's earlier email, on March 26, 2007, at 11:12 AM, Stith emphatically

told Messrs. Maher, Grover and Egusquiza, she was not comfortable booking this as revenue and

"no booking of revenue until we have contracts":

> We cannot book the amount without 1) a contract with Refai
> (done); 2) a contract between Refai (or PCS) and the KSA MoE
> (not done); and 3) collection funds (not done).  I was willing to
> book the $7.5 million in revenue should we have 1 and 2, as long
> as 3 was going to be in our hands by the end of April (or before the
> auditors arrive).  As soon as I put the amount on the books, we
> have to release information to the shareholders (through an 8K and
> PR).  Since we do not have any contract with MoE or reason to
> believe that Refai could pay us the $7.15 M if he doesn't obtain 2
> above, I am not comfortable booking this as revenue.  I do not
> want to have to deal with lawsuits should we release information
> of our booking of revenue and then have to retract our statement.  I
> say no booking of revenue until we have contracts.

March 26, 2007 email, Ex. C.  At 3:09 PM Maher responded to Stith as follows:

---

[4] The SEC's Complaint refers to Stith's response to this email (Compl., ¶ 40.) but not to Maher's
email which is attached hereto as Exhibit C.

> You and I don't know if #2 is done or not, apparently there is a
> Royal Order floating around somewhere which is as much a legally
> binding document as a contract.  And #3 does not need to be
> collected, but certainly needs to be 'collectable' such as 30 day
> terms.

March 26, 2007 email, attached as Ex. D.

That day, PCS executed a "License Agreement for Educational Curriculum and Content"
with PCS Middle East on or about March 26, 2007.  (Compl., ¶ 42.)  The license agreement was
signed by Maher and Dr. Refai on behalf of PCS and PCS Middle East, respectively.  (*Id.*)  On or
about March 26, 2007, PCS Middle East provided to PCS a purchase order in the amount of
$7,150,000 for a license to sell PCS products to Saudi Arabia.  (*Id.* at ¶ 43.)  PCS generated an
invoice to Global Techniques-PCS Middle East for $7,150,000.  (*Id.* at ¶ 44.)  Issuance of the
invoice automatically posted the $7,150,000 to PCS's internal general ledger. (*Id.*)  It also
triggered PCS's responsibility to issue a Form 8-K and press release.

On March 28, 2007, PCS issued a press release announcing "the signing of a License
Agreement for Educational Curriculum and Content with PCS Middle East, its sales and
distribution partner in the Middle East" for a fixed license fee in the amount of $7,150.000.  (*Id.*
at ¶ 48); March 28, 2007, Form 8-K and Press Release, attached as Ex. E.  On March 29, 2007,
PCS filed its Form 8-K with the Commission announcing the $7.15 million license agreement.
(Compl., ¶ 49.)  The Form 8-K states, "PCS Middle East has agreed to pay PCS the sum of
[$7.15 million.]  The full payment is expected to be received in a single sum payment no later
than May 15, 2007."  March 28, 2007, Form 8-K and Press Release, Ex. E.  The Form 8-K and
press release noted that the "License Agreement is in conjunction with the Global Techniques
International Distribution Agreement between PCS Edventures!.com, Inc. (PCS) and Global

Techniques, wherein PCS agreed to allow Global Techniques to be the exclusive distributor of

PCS products in the Middle East . . ..”

When payment was not received by May 15, 2007, PCS filed an amended Form 8-K/A

with the Commission stating that payment under the purported license agreement had not been

received by May 15, 2007, as previously announced.  (*Id.* at ¶ 63.)  That Form 8-K/A states in

part:

> Full payment was expected to be received in a single sum payment
> no later than May 15, 2007.  However, PCS ME experienced
> delays within the Kingdom of Saudi Arabia.  **These delays caused
> a postponement in payment to PCS ME, thus causing delays in
> payment to PCS.**  These delays stemmed from the uniqueness of
> the project, wherein the Royal Council and the Ministry of
> Education held special meetings to discuss, finalize, and assign this
> project.  Upon receipt of payment from PCS ME, the Company
> will file Amendment 2 to this 8K notifying all persons of receipt of
> payment.  (Emphasis added).

May 17, 2007 Form 8-K/A, attached as Ex. F.  The announcement clearly explained that

payment to PCS was dependent upon Saudi Arabia's payment to Global Techniques (dba PCS

Middle East).  *Id.*

The Global Techniques invoice for License Agreement fees had been posted on PCS's

internal general ledger.  (Compl., ¶ 44.)  It is undisputed that the entry was adjusted in June

before the completion of the company's March 31, 2007 year-end audit.

PCS filed its Form 10-KSB with the SEC at the end of June 2007.  (*Id.* at ¶ 65.)  The SEC

Form 10-KSB that was filed with the SEC on June 26, 2007 explained that:

> PCS announced on March 28, 2007 that it had obtained a contract
> with Global Techniques, a Licensee dba PCS Middle East.  The
> contract information was listed in a press release as well as in
> Form 8K on file with the SEC.  Amendment One to the 8K was
> filed on May 17, 2007 wherein the Company stated that the funds

> had yet to be received from PCS Middle East due to delays.  As of
> the date of this 10-KSB, the funds have yet to be received by the
> Company.  Additional inquiries have been placed with PCS Middle
> East regarding the delays that have been experienced.  Additional
> amendments to the 8K will be filed as needed.

June 26, 2007 Form 10-KSB, portions attached as Ex. G, at 13.

As the SEC concedes:  "***The license revenue of \$7.15 million was not included in PCS' audited financial statements in the Form 10-KSB***."   (Compl., ¶ 65 (emphasis added).)  On June 28, 2007, PCS "announced that it [had] elected to postpone the recognition of certain license fee income from Global Techniques (d/b/a PCS Middle East) in the amount of approximately \$7.2 million until such payment is actually received from PCS Middle East."  (*Id.* at ¶ 67); June 28, 2007 Press Release, attached as Ex. H.  On August 15, 2007, PCS issued a press release providing an update to the market on the Saudi Education Initiative stating, in part, "To date, however, in spite of our continued efforts through Dr. Refai and others to determine when and to what extent such a contract or contracts would be forthcoming, we have been unable to confirm a timeframe or other specifics regarding any such contracts."  August 15, 2007 Press Release, attached as Ex. I.

## ARGUMENT

**I.**    **Rule 9(b)'s Heightened Pleading Standard Requires that Pleadings Grounded in Fraud be Pled with Particularity.**

A complaint must be dismissed when a plaintiff's allegations fail to state a claim upon which relief can be granted.  Once it has adequately stated a claim, a plaintiff may support the allegations in its complaint with any set of facts consistent with those allegations. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 563 (2007).  Dismissal for failure to state a claim does not require the appearance, beyond a doubt, that the plaintiff can prove "no set of facts" in support of

its claim that would entitle it to relief.  *Id.* at 562-63.  If the complaint "lacks a cognizable legal theory" or "sufficient facts alleged under a cognizable legal theory," it must be dismissed. *Balistreri v. Pacifica Police Dep't,* 901 F.2d 696, 699 (9th Cir. 1990).

A heightened pleading standard applies to claims of fraud.  FED. R. CIV. P. 9(b) (requiring that a party alleging fraud must "state with particularity the circumstances constituting fraud"). This standard extends to claims grounded in fraud, that is, claims in which fraudulent conduct serves as an element. *See In re Stac Elecs. Sec. Litig.,* 89 F.3d 1399, 1404-05 (9th Cir. 1996).  To meet this standard, the plaintiff must allege the "who, what, where, when, and how" of the fraudulent conduct.  *Vess v. Ciba-Geigy Corp.,* 317 F.3d 1097, 1106 (9th Cir. 2003) (citation omitted). At the same time, "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly,* 550 U.S. at 555 (internal citations omitted).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'show[n]'—'that the pleader is entitled to relief.'"  *Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1950 (2009) (quoting FED. R. CIV. P. 8(a)(2)).

Here, the SEC alleges that Stith, along with Maher, made false and misleading statements in press releases, and filings with the SEC.  Thus, Plaintiff's allegations are subject to Rule 9(b)'s particularity requirement.  Conclusory allegations that a defendant's conduct was fraudulent or in violation of federal securities law are insufficient.  *See Semegen v. Weidner,* 780 F.2d 727, 731 (9th Cir. 1985); *Segal v. Gordon,* 467 F.2d 602, 606-08 (2d Cir. 1972).  Further,

11

Plaintiff must satisfy Rule 9(b) for each Defendant; Plaintiff must distinguish among those he sues and "enlighten each defendant as to his or her part in the alleged fraud." *Bruns v. Ledbetter,* 583 F. Supp. 1050, 1052 (S.D. Cal. 1984).

**II.     Stith Did Not make a Material Misrepresentation or Omission with Scienter, and Thus the SEC Fails to State a Claim Against Stith for a Violation of Section 10(b).**

The SEC's Complaint fails to plead a primary violation by Stith of Section 10(b) and Rule 10b-5.  In order to allege sufficiently a claim for violation of Rule 10b-5, the SEC must prove four elements: that Stith (1) made a material misrepresentation or omission (2) in connection with the purchase or a sale of a security (3) with scienter (4) in interstate commerce. *SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1092 (9th Cir. 2010).  Here, the SEC's claims fail because Stith did not make a material misrepresentation or omission, and she did not do so with scienter.

**A.     The SEC Has Failed to Allege with Requisite Specificity that Stith Made a Material Misrepresentation or Omission.**

The SEC's Section 10(b) and Rule 10b-5 claim against Stith fails because the facts alleged in the Complaint do not show that Stith made a material misrepresentation or omission. Stith was required to report the existence of the License Agreement in filings with the SEC.  All of PCS's filings with the SEC were accurate and truthful.  In this case, a PCS invoice was authorized by Maher, as the CEO, and Grover, as the CTO, persons upon whom custom and practice makes it reasonable for Stith, as CFO, to rely.  When Stith did not receive the confirmation of payment that was required to validate the entries, all journal entries related to the Global Techniques license and KSA were reversed.  No receivable, revenue or asset was ever booked or recorded.  No deferred asset or other entry remained after the reversal.  No Form 10-K

or Form 10-Q financial result relating to PCS Middle East was reported either before or after the reversal of the journal entries.  There is simply no basis in fact or law to suggest that an internal general ledger entry alone can support an Exchange Act fraud claim when a company issues an invoice in response to an executed *bona fide* licensing agreement.

The March 28, 2007 press release announced "the signing of a License Agreement for Educational Curriculum and Content with PCS Middle East, its sales and distribution partner in the Middle East" for a fixed license fee in the amount of $7,150,000.  March 28, 2007 Form 8-K and Press Release, Ex. E; (Compl., ¶ 48).  The May 17, 2007 Form 8-K/A stated, "PCS ME experienced delays within the Kingdom of Saudi Arabia.  These delays caused a postponement in payment to PCS ME, thus causing delays in payment to PCS."  May 17, 2007 Form 8-K/A, Ex. F.  These statements are truthful.  PCS had, in fact, entered into a License Agreement with PCS Middle East under which payment to PCS was contingent upon PCS Middle East receiving funds from Saudi Arabia.

The SEC concedes that although "the $7,150,000 invoice was posted to PCS's general ledgers as revenue, and thereby was recorded in PCS's internal financial records within the fiscal year ended March 31, 2007," (Compl., ¶ 44), "[t]he license revenue of $7.15 million was **not** included in PCS' audited financial statements in the Form 10-KSB."   (*Id.* at ¶ 65 (emphasis added)).  The June 28, 2007 press release announcing the filing of PCS's year end financial statements "announced that [PCS had] elected to postpone the recognition of certain license fee income from Global Techniques (d/b/a PCS Middle East) in the amount of approximately $7.2 million until such payment is actually received from PCS Middle East."  June 28, 2007 Press Release, Ex. H.  Thus, Stith never made a false statement to the public or in government filings

13

regarding revenue from the agreement with PCS Middle East.  Instead, the March 3, 2007, March 7, 2007, and March 26, 2007 emails drafted by Stith demonstrate that Stith urged caution in accurately recognizing and reporting revenue.

The allegations that Stith omitted material facts in communications with PCS's outside auditors, HJ & Associates, are not credible.  The SEC alleges that "[n]either Maher nor Stith disclosed to HJ . . . that payment for the purported license agreement was contingent on PCS Middle East first obtaining a contract and funds from Saudi Arabia."  (Compl., ¶ 61.)  First, Stith communicated regularly with the auditors and sought their advice on how to recognize revenue with respect to the transaction.  Again, her March 7, 2007 email to the senior partner at HJ & Associates demonstrates her full disclosure of the facts as she knew them.

Second, on May 17, 2007, PCS filed a Form 8-K/A with the SEC disclosing that payment to PCS was contingent on PCS Middle East receiving funds from Saudi Arabia.  May 17, 2007 Form 8-K/A, Ex. F.  The Form 8-K/A was not only made available to HJ & Associates and the SEC, but to the investing public by its filing with the SEC more than one month before HJ & Associates had completed the year-end audit.

The SEC also references and quotes from the March 3, 2007 email from Stith to Maher and states, "Stith concluded that PCS should not record any revenue until payment for the anticipated contract was actually received by PCS.  Maher did not disagree with Stith's conclusion at this time."  (Compl., ¶ 32.)  Stith's email to Maher, however, did not discuss the concept of "recording," but instead discussed "recognition" of revenue.  March 3, 2007 email, Ex. A.  The SEC also references a March 26, 2007 email and states "Stith sent an email to Maher informing him that PCS should not record revenue . . ." (Compl., ¶ 40.)  That email, however,

does not discuss the concept of "recording" the revenue on the internal books and records, but instead refers to the much different concept of "booking" the revenue (which means recording and reporting—i.e., recognizing the revenue).  March 26, 2007 email, Ex. C.  At another point, the SEC states that Stith's March 7, 2007 email to the outside auditor had outlined "steps required for structuring the transaction and recording revenue . . ." (Compl., ¶ 35.)  The March 7, 2007 email, however, addressed "revenue recognition," not "revenue recording."  March 7, 2007 email, Ex. B.  It was entitled "Revenue Recognition For Large Contract" and addressed the question of "the best possible approach to recognizing revenue accurately, appropriately . . . without errors, misstatements or misconceptions . . .."  *Id.*

The fact remains that PCS and Stith never reported the $7.15 million as revenue on quarterly or annual financial statements with the SEC.  That is, Stith never booked or recognized any of that revenue.  There simply was no misrepresentation in this case.  Stith acted upon information provided to her by other senior executives at PCS.  She did not make misleading statements or omissions at any point.  Accordingly, the Court should dismiss the SEC's claim for violations of Section 10(b).

**B.    The SEC Has Failed to Allege with Requisite Specificity Any Facts Giving Rise to a Strong Inference that Stith Acted with Scienter.**

Even if the SEC had alleged a misstatement or omission by Stith, its Section 10(b) and Rule 10b-5 claim against her would still fail because the facts alleged in the Complaint against her do not come close to establishing the essential element of scienter.  Scienter is "a mental state embracing intent to deceive, manipulate, or defraud."  *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976).  In the Section 10(b) context, scienter requires "proof that the defendant

acted knowingly or recklessly." *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1568-69 (9th

Cir. 1990) (en banc), *cert. denied* 499 U.S. 976 (1991).  Recklessness is defined as:

> a highly unreasonable omission, involving not merely simple, or
> even inexcusable negligence, but an extreme departure from the
> standards of ordinary care, and which presents a danger of
> misleading buyers or sellers that is either known to the defendant
> or is so obvious that the actor must have been aware of it.

*Id.* at 1569.  "Reckless conduct must be something more egregious than . . . good faith and

represents an extreme departure from the standards of ordinary care such that the defendant must

have been aware of it."  *SEC v. Rubera,* 350 F.3d 1084, 1094 (9th Cir. 2003).  "Recklessness

satisfies the scienter requirement only to the extent that it reflects some degree of intentional or

conscious misconduct."  *Id.* at 1094-95 (internal quotations omitted).

The "SEC must . . . set forth facts giving rise to a 'strong inference' that the defendants

acted with the required state of mind."  *SEC v. Durgarian,* 477 F. Supp. 2d 342, 353 (D. Mass.

2007) (internal quotation omitted). "To qualify as 'strong' . . . an inference of scienter must be

more than merely plausible or reasonable—it must be cogent and at least as compelling as any

opposing inference of non-fraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551

U.S. 308, 314 (2007).

Moreover, the SEC cannot "lump the defendants together and make general conclusory

allegations of wrongdoing."  *Kennilworth Partners L.P. v. Cendant Corp.*, 59 F. Supp. 2d 417,

430 (D.N.J. 1999).  To the contrary, the SEC must specifically allege that "'defendant acted with

a particular state of mind . . . with respect to *each* act or omission alleged'" and "'state with

particularity facts giving rise to a strong inference that the defendant acted with the required state

of mind.'" *SEC v. KPMG LLP,* No. 03 Civ. 671(DLC), 2003 WL 21998052, at *4 (S.D.N.Y.

Aug. 22, 2003) (quoting 15 U.S.C. § 78u-4(b)(2) (emphasis added)).

The SEC has not pled particularized facts to show that Stith acted with scienter sufficient

to support a claim.  To the contrary, every allegation made against Stith demonstrates her good

faith belief that the license agreement existed and needed to be disclosed as a material event

under the SEC's rules.  Stith never wavered from her position that PCS could record the revenue

*only so long as the payments were, in fact, received*.  (Compl., ¶¶ 35, 40.)  Payment was never

received, thus Stith acted entirely correctly and reached the correct accounting and financial

reporting conclusions and result, saving the company from any potential misstatement or future

restatement of financial information.  Her March 3, 2007, March 7, 2007, and March 26, 2007

emails to Maher and the outside auditors clearly demonstrate that Stith (1) researched applicable

GAAP literature; (2) conferred with the outside auditors; and (3) advised against recognizing

revenue with respect to the contract with PCS Middle East.  Her cautious, well-reasoned

approach to the issues and the resulting non-recognition of the revenue speak volumes as to her

state of mind and lack of scienter.

In *SEC v. Retail Pro, Inc.*, 673 F. Supp. 2d 1108 (S.D. Cal. 2009), the SEC brought

claims against a CFO who was kept in the dark by other executives at the company and acted on

incorrect information in making public statements and filings regarding the company's financial

status.  The court noted that the CFO's "beliefs may have been negligent and unreasonable, but

in light of the evidence of [the CFO's] reliance on [the CEO] and other more-senior members of

[the company's] management team, the Court cannot find as a matter of law that it shows 'a

mental state embracing intent to deceive, manipulate, or defraud.'"  *Id.* at 1137.  The facts here

17

are even more compelling.  Stith relied on the information presented to her by Maher and Grover regarding PCS Middle East's dealings in Saudi Arabia.  Stith, like the CFO in *Retail Pro*, lacked the mental state embracing intent to deceive, manipulate, or defraud.  Therefore, the Court should dismiss the SEC's first claim against Stith.

## III.    The SEC's Claim Against Stith for Aiding and Abetting False Filings Should Be Dismissed.

The SEC's second claim charges that Stith knowingly aided and abetted PCS in making false filings with the SEC in violation of Section 13(a) of the Securities Exchange Act. (Compl., ¶¶ 71-73).  Stith is alleged to have directly or indirectly aided and abetted PCS by filing the Form 8-K, Form 8-K/A and the Form 10-KSB, each containing material misrepresentations or omissions regarding the true nature of the license agreement.  (*Id.* at ¶ 75.)[5]  In order to prove Stith aided and abetted PCS' violation of these provisions, the SEC must prove that (1) PCS violated Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-11; (2) Stith had actual knowledge of the primary violation and of her own role in furthering it; and (3) Stith provided "substantial assistance" in the commission of the primary violation.  *SEC v. Fehn*, 97 F.3d 1276, 1288 (9th Cir. 1996); *see also Ponce v. SEC*, 345 F.3d 722, 737 (9th Cir. 2003).

As set forth above, the SEC utterly fails to allege that Stith made any misrepresentation or omission in the Form 8-K, Form 8-K/A, and Form 10-KSB filed by PCS.  Since the SEC has

---

[5] Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-11 require issuers of securities registered pursuant to Section 12 of the Exchange Act such as PCS to file with the SEC accurate periodic and current reports.  An issuer violates these provisions if it files a report that contains materially false and misleading information.  *SEC v. Yuen*, No. CV 03-4376MRP(PLAX), 2006 WL 1390828, at *41 (C.D. Cal. March 16, 2006).

failed to allege a primary violation against PCS for filing false reports with the SEC, there can be

no violation for aiding and abetting.  Furthermore, nowhere in the Complaint does Plaintiff plead

what Stith did to aid and abet PCS's violations of Section 13 of the Exchange Act (Second Claim

for Relief), other than by offering the vague suggestion that she did so "by engaging in the

conduct described in Paragraph 1 through 70." (Compl., ¶ 75).  Accordingly, the Court should

dismiss the SEC's second claim against Stith.

**IV.     The SEC's Claim of a Violation of Section 13(a) and Rule 13-14, the False
         Certification of PCS's Financial Statements, Should Be Dismissed.**

        The SEC alleges Stith (and Maher) violated Rule 13a-14 of the Exchange Act which

required her to certify that PCS's 2007 Form 10-KSB did not contain any material misstatements

of omissions.  (*Id.* at ¶¶ 80-81). The SEC's only supporting allegation is found in paragraphs 65-

66 of the Complaint:  "On June 29, 2007, PCS filed its Form 10-KSB for the fiscal year ended

March 31, 2007 with the Commission.  The license revenue of $7.15 million was not included in

PCS' audited financial statements."  As a matter of law, if the suspected revenue was not in the

financial statements, there was no misrepresentation or omission.  The SEC again alleges no

facts to suggest that Stith's certifications were false when made.  Moreover, a false Sarbanes-

Oxley certification does not state an independent violation of the securities laws.   *SEC v.*

*Mozilo*, No. CV 09-3994-JFW, 2010 WL 3656068, at *21 (C.D. Cal. Sept. 16, 2010); *SEC v*

*Black*, No. 04 C 7377, 2008 WL 4394891, at *17 (N.D. Ill. Sept. 24, 2008).  Thus, the Court

should dismiss the SEC's third claim against Stith.

## <u>CONCLUSION</u>

For all of the foregoing reasons, the Amended Complaint must be dismissed for failure to state a claim against Stith pursuant to Rule 12(b)(6), and failure to plead fraud with particularity pursuant to Rule 9(b).

Dated this 15th day of November, 2010.

Respectfully Submitted,

Holland & Hart LLP

 */s/ Holly Stein Sollod*
Holly Stein Sollod
Erik Stidham
Attorneys for Shannon M. Stith

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 15th day of November, 2010, I caused to be electronically filed the foregoing Memorandum in Support of Motion to Dismiss by Defendant Shannon M. Stith with the U.S. District Court.  Notice will automatically be electronically mailed to the following individuals who are registered with the U.S. District Court CM/ECF System:

- **Thomas M Melton**
  meltont@sec.gov

- **Cheryl M Mori**
  moric@sec.gov

- **Daniel J Wadley**
  wadleyd@sec.gov

- **Briane Nelson Mitchell**
  nels@maukburgoyne.com

_/s/ Holly Stein Sollod_
HOLLAND & HART LLP

4953932_7.DOC