Daniel J. Wadley (Utah State Bar No. 10358)
wadleyd@sec.gov
Thomas M. Melton (Utah State Bar No. 4999)
meltont@sec.gov
Cheryl M. Mori (Utah State Bar No. 8887)
moric@sec.gov
Attorneys for Plaintiff
Securities & Exchange Commission
15 West South Temple, Suite 1800
Salt Lake City, Utah 84101
Telephone:  801-524-5796
Facsimile: 801-524-5262

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) |
| PLAINTIFF, | ) ) ) |
| v. | ) ) |
| PCS EDVENTURES!.COM, INC., an Idaho Corporation, ANTHONY A. MAHER, an individual, and SHANNON M. STITH, an individual, | ) ) ) ) |
| DEFENDANTS. | ) ) ) |

**RESPONSE TO MOTION TO DISMISS THE SEC'S AMENDED COMPLAINT (AND/OR FOR SUMMARY JUDGMENT) BY DEFENDANTS PCS EDVENTURES!.COM, INC. AND ANTHONY A. MAHER**

Case No: 1:10-cv-00433

Judge B. Lynn Winmill

Plaintiff, Securities and Exchange Commission (the "Commission"), submits this Response ("Response") to Motion to Dismiss the SEC's Amended Complaint (and/or for Summary Judgment) by Defendants PCS Edventures!.com, Inc. ("PCS") and Anthony A. Maher ("Maher") (hereinafter "Motion to Dismiss").  PCS and Maher (together "Defendants") go to great lengths in their Motion to Dismiss to convince the Court that they share no responsibility for the materially false and misleading press release and Form 8-K announcing millions of

dollars in revenue.  Unfortunately for PCS and Maher, the story that they provide does not

comport with the evidence in this matter.

Contrary to the assertions of the Defendants, the evidence demonstrates convincingly that

Maher and PCS knew that they were providing materially false and misleading information in

connection with the March 28, 2007 press release, the March 28, 2007 Form 8-K, the May 17,

2007 Form 8-K/A, and the June 29, 2007 Form 10-KSB.  The allegations set forth in the

Amended Complaint sufficiently plead the causes of action, including violations of Section 10(b)

of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder, and

Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-14 thereunder.

Because these causes of action have been sufficiently and adequately pled, PCS's and Maher's

Motion to Dismiss should be denied.

## ARGUMENT

### A.    Standards of Review Under Rule 12(b)(6) and Rule 9(b).

"Under Rule 12(b)(6), a complaint should not be dismissed unless it appears beyond

doubt that [the] plaintiff can prove no set of facts in support of his claim which would entitle him

to relief."  *Wyler Summit P'ship v. Turner Broad. Sys., Inc.*, 135 F.3d 658, 661 (9th Cir. 1998)

(quoting *Hydranautics v. Filmtec Corp.*, 70 F.3d 533, 535-36 (9th Cir.1995)).  "On a motion to

dismiss, all well-pleaded allegations of material fact are taken as true and construed in a light

most favorable to the non-moving party."  *Wyler*, 135 F.3d at 661 (citing *Parks School of

Business, Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995)).[1]

---

[1]    Further, "the issue is not whether a plaintiff will ultimately prevail but whether [he] is entitled to offer evidence
in support of the claims.  Consequently, the court should not grant a motion to dismiss 'for failure to state a claim unless
it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to
relief.'"  *U.S. ex rel. Mason v. State Farm Mut. Auto. Ins. Co.*, 2008 WL 2857372 at *3 (D. Idaho) (quoting *Conley v.
Gibson*, 355 U.S. 41, 45-46 (1957)); *see also Hicks v. Small*, 69 F.3d 967, 969 (9th Cir. 1995).  The Supreme Court has
determined that a complaint need not contain "detailed factual allegations," so long as its factual allegations are "enough

Federal Rule 9(b) requires that the circumstances of fraud be pled with particularity.  *See* Fed. R. Civ. P.  9(b).  To comply with Rule 9(b), the allegations of fraud must be "specific enough to give defendants notice of particular misconduct which is alleged to constitute a fraud. Mere conclusory allegations of fraud are insufficient."  *U.S. ex rel. Mason v. State Farm Mut. Auto. Ins. Co.*, 2008 WL 2857372 at *13 (D. Idaho).

Rule 9(b)'s heightened pleading standard "is not an invitation to disregard Rule 8's requirement of simplicity, directness, and clarity."  *Kanady v. GMAC Mortg., LLC,* 2010 WL 4010289 at *6 (E.D. Cal.) (citing *McHenry v. Renne*, 84 F.3d 1172, 1178 (9th Cir. 1996)). Rather, Rule 9(b) requires "specific" allegations of fraud "to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong."  *Kanady v. GMAC Mortg., LLC*, 2010 WL 4010289 at *6 (citing *Semegen v. Weidner*, 780 F.2d 727, 731 (9th Cir. 1985)).  Under Rule 9(b), allegations of "[m]alice, intent, knowledge, and other conditions of mind of a person may be averred generally."  Fed. R. Civ. P. 9(b).  "A pleading is sufficient under Rule 9(b) if it identifies the circumstances constituting fraud so that the defendant can prepare an adequate answer from the allegations."  *Neubronner v. Milken*, 6 F.3d 666, 671-72 (9th Cir. 1993).[2]

As set forth below, PCS and Maher have failed to satisfy their required burden in seeking to dismiss the Commission's Amended Complaint.  The Commission's eighteen-page Amended

---

to raise a right to relief above the speculative level." *Hawkins v. County of Lincoln*, 2010 WL 2039656 at *2 (D. Neb. May 20, 2010) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

[2]       In private securities fraud claims, plaintiff must plead with specific facts giving rise to a "strong inference" that the defendant acted with scienter. *See e.g., Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 654 (8th Cir. 2001).  However, this heightened pleading requirement does not apply in enforcement actions brought by the Commission. *SEC v. Small Cap Research Group, Inc.*, 2007 U.S. App. LEXIS 4317 at *2 (9th Cir. Feb. 13, 2007); *SEC v. Lucent Techs., Inc.*, 363 F. Supp. 2d 708, 716-17 (D.N.J. 2005).

Complaint contains numerous factual allegations pled with sufficient particularity regarding the materially false and misleading nature of the press releases and the Forms 8-K, 8-K/A, and 10-KSB.  Neither PCS nor Maher can reasonably contend that "it appears beyond doubt that the [Commission] can prove no set of facts in support of [its] claim which would entitle [it] to relief."  *U.S. ex rel. Mason v. State Farm Mut. Auto. Ins. Co.*, 2008 WL 2857372 at *3 (D. Idaho).  Because the Defendants cannot meet this burden, their Motion to Dismiss must be denied.

**B.     First Claim for Relief:  The Commission Has Sufficiently Pled its Fraud Claims Against PCS and Maher.**

**1.     Elements of the Fraud Claim**

In the Amended Complaint's First Claim for Relief, the Commission alleges violations of Section 10(b) and Rule 10b-5 against Defendants.  "To establish a violation of section 10(b) and Rule 10b-5, the Commission is required to show that there has been a misstatement or omission of material fact, made with scienter."  *Gebhart v. S.E.C.*, 595 F.3d 1034, 1040 (9th Cir. 2010).

Scienter may be established "by proving either actual knowledge or recklessness."  *Gebhart*, 595 F.3d at 1040-1041 (quoting *In re Software Toolworks Inc.*, 50 F.3d 615, 626 (9th Cir. 1994)); *see also Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1568-69 (9th Cir. 1990).  Proof of recklessness may be inferred from circumstantial evidence.  *See Herman & MacLean v. Huddleston*, 459 U.S. 375, 390-91, n.30 (1983).  Management may violate Section 10(b) by making a material misstatement in, or omitting material information from, periodic reports and proxy statements filed with the Commission.  *See Basic, Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988).

Information is considered material when there is a substantial likelihood that a reasonable investor would consider it important in determining whether to buy or sell stock.  *Basic*, 485 U.S.

at 231-32; *TSC Indus. v. Northway*, 426 U.S. 438, 449 (1976).  The Supreme Court has

"explained the role of the materiality requirement of Rule 10b-5, with respect to contingent or

speculative information or events."  *Basic*, 485 U.S. at 238.  Under such circumstances,

materiality "will depend at any given time upon a balancing of both the indicated probability that

the event will occur and the anticipated magnitude of the event in light of the totality of the

company activity."  *Id.* (quoting *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 849 (2nd Cir.

1968)).  For omissions, "there must be a substantial likelihood that the disclosure of the omitted

fact would have been viewed by the reasonable investor as having significantly altered the 'total

mix' of information made available."  *TSC Indus.*, 426 U.S. at 439.

> **2.    The Commission Has Sufficiently Pled its Fraud Claims Against Defendants.**

The Amended Complaint, together with the additional facts provided in the Statement of

Facts ("SOF")[3] filed in connection with this Response and the Response to the Motion to Strike,

adequately alleges facts to support the Commission's fraud claim that Defendants made a

misstatement or omission of material fact in connection with the press releases and Commission

filings, and that these misrepresentations were made with scienter.

> **a.    The History Behind PCS's Relationship with Refai and Barron Partners, LP.**

As of December 2006, PCS was struggling financially, had experienced delay after delay

with respect to a major project it had been hoping for in the Kingdom of Saudi Arabia ("Saudi

Arabia"), and was facing looming penalties related to certain EBITDA benchmarks imposed by a

Note Purchase Agreement and related Warrants by its financing partner, Barron Partners, LP

("Barron").

---

[3]      Pursuant to Local Rule 7.1(c), the Commission has filed concurrently herewith a Statement of Facts ("SOF") in Support of the Response to the Motion to Dismiss the SEC's Amended Complaint (and/or for Summary Judgment) by Defendants PCS Edventures!.com, Inc. and Anthony A. Maher (hereinafter "Motion to Dismiss") and the Response to Motion to Strike the SEC's Amended Complaint Submitted by Defendants PCS Edventures!.com, Inc. and Anthony A. Maher (hereinafter "Motion to Strike").  The Commission hereby incorporates those facts into this Response.

On December 29, 2005, Barron and PCS entered into the Note Purchase Agreement ("Agreement").  Under the Agreement, Barron paid $1,000,000 for a Convertible Promissory Note ("Note").  The Note was convertible into 1,666,667 shares of preferred stock or common stock (at a price of $0.60 per share), in accordance with terms outlined in the Agreement and the Note.  *See* SOF ¶ 2 and Exhibit 1, Agreement, Note, and Warrants attached thereto.  Under the Agreement, PCS also issued to Barron two Common Stock Purchase Warrants ("Warrants"), which gave Barron the right to purchase up to an additional 5,000,000 shares of common stock at exercise prices as stated in the Warrants.  *See* SOF ¶ 3, Ex. 1 at p. 42, Common Stock Purchase Warrant "A" ("Warrant A") and at p. 50, Common Stock Purchase Warrant "B" ("Warrant B"). The Agreement contained a penalty provision if PCS did not meet certain earning goals. Specifically, section 6.15 provided that if PCS did not reach EBITDA (earnings before interest, taxes, depreciation and amortization) of $4.5 million for the fiscal year ended March 31, 2007, the number of shares of stock into which the Note was convertible would be increased *pro rata* by the percentage decline in EBITDA.  Barron would be eligible for up to five million additional shares of stock if the EBITDA goal was not met by the March 31, 2007 deadline.  *See* SOF ¶ 2, Ex. 1 at p. 15, Section 6.15 of Agreement.

Under the terms of the two Warrants, Barron had the right to purchase up to 5,000,000 shares of PCS stock at exercise prices of $1.20 or $1.80 per share respectively.  *See* SOF ¶ 3, Ex. 1 at p. 42, Warrant A and at p. 50, Warrant B.  Both Warrant A and Warrant B contained a penalty provision similar to the Note in which the exercise prices of the warrants would be reduced if PCS did not reach $4.5 million EBITDA by March 31, 2007.  Like the penalty provision in the Note, the exercise prices of the Warrants would be reduced *pro rata* based on the

percentage decline in EBITDA, down to a minimum exercise price of $0.15 per share.  *See* SOF ¶ 3, Ex. 1 at p. 45, Section 7(d) of Warrant A and at p. 53, Section 7(d) of Warrant B.

      Recognizing the looming deadline to meet the EBITDA benchmark, PCS was becoming increasingly desperate for avenues that would bring revenue into the company.  One particular avenue that the company had pursued for over three years at that point was Mohammed Refai and his company Global Techniques d/b/a PCS Middle East ("PCS Middle East").  The three year relationship between PCS and Refai was troubled at the very least.  On October 20, 2006, Maher provided Robert Grover, PCS's Executive Vice President at the time and its current President, with a candid assessment of their dealings with Refai: "It is entirely possible that we have been duped by ali Babba [Refai].  He is acting like a guy who has milked us for what he needs and is now simply waiting for us to go broke so he can do the KSA [Kingdom of Saudi Arabia] and ECE [Early Childhood Education in Egypt] project for himself."  *See* SOF ¶ 4, Ex. 2, 10/20/2006 Email from Maher to Grover.  By December 2006, Maher expressed his frustrations directly to Refai:

> I have to tell you this KSA project is becoming as frustrating for PCS as the ECE project which is now moving into its third year from the time we first supplied price quotations for it.
>
> I cannot tell you what a distraction this project has become for PCS and our people.  And we keep being told "next week" we will see a contract.  At some point, Refai, we will no longer be interested in working with you on projects in the Middle East . . . .

*See* SOF ¶ 4, Ex. 3, 12/9/2006 Email from Maher to Refai.  Later that week, Maher once again expressed his frustrations with Refai to Grover and Joe Egusquiza, a PCS sales employee:

> We simply cannot drag these things out, it affects our credibility to all those we all answer to.  We have been told since August that this thing was going to happen "next week", that was four months ago and we don't have one single shred of evidence to tell us this is going to happen at all, other than Refai's phone calls. . . .  So, the decision is that unless we have something concrete, like a contract from the KSA by December 31, we will no longer be involved in the

Saudi project.  It is time to either do the project or to remove the distraction and ourselves from it and move on.

*See* SOF ¶ 4, Ex. 4, 12/16/2006 Email from Maher to Grover and Egusquiza.

On December 29, 2006, only two days from the self-imposed deadline of December 31, Maher sent an email to the members of the PCS Board of Directors informing them of the continuing challenges with the Saudi Arabia project and of his concerns that PCS would not be able to hit the EBITDA requirements:

It doesn't appear we are going to be receiving anything from the Saudi's to look at, in terms of a contract, this calendar year since they are now in the middle of Hadjj which doesn't conclude until January 6.  Although Refai continues to insist it is going to happen, those of us here and I am sure you all too, are getting pretty frustrated with the seemingly never ending delays.

We have been supplied by several pieces of information in Arabic under the banners of the Ministry of Education and Ministry of Finance providing guidance to the contracting Department relating to some of the terms and conditions of a contract.  And Refai continues to insist the project is in the Contracting Department and that once there, it is a 100% sure thing that it is going to happen. The big question is of course, when. . . .

We are getting late enough into our fiscal year that I am now getting concerned about hitting our ebitda goals of $4.3 M to comply with the terms of the contract we did with Baron Partners.  If we can start early enough in January we can still do it, but if we don't get started until mid-February we will have to spend enormous amounts of money on freight in order to reach that goal.  In order to reach the $4.3 goal, we will need about $13.0M in revenue and it is getting tight.

SOF ¶ 5, Ex. 5, 12/29/2006 Email from Maher to C. Andrus, D. Farley, and M. McMurray.

The "pieces of information in Arabic" referred to by Maher included what is now Exhibit L to PCS's and Maher's Motion to Dismiss, the Deputy Minister's letter that PCS allegedly relied on because, as Grover testified, it "was the one that confirmed, yes, we'd be doing this project, because it was essentially a statement that they reviewed the project, please implement." Brief in Support of Motion to Dismiss at p. 6.  The operative, and only partially quoted paragraph from the Minister's letter, however actually provides: "Recommends that he [sic]

Contracting department move forward and explore cost associated with this proposal *and if it is appropriate.*"[4]  *See* Exhibit L to Affidavit of Briane Nelson Mitchell in Support of the (1) Motion to Strike, and (2) Motion to Dismiss (and/or Summary Judgment) Submitted by PCS Edventures!.com, Inc. and Anthony A. Maher ("Mitchell Aff.") (*emphasis added*).

      Maher had a different opinion of the Deputy Minister's letter at the time it was circulated, however, and one that was a more honest assessment of its message and one that he expressed both to the PCS Board (cited above) and more directly to Refai on the previous day:

> Looks like it is directing the contracting department to review the program and the costs involved and to move forward if they find it appropriate.  Sounds like it is a long way away yet.

SOF ¶ 7, Ex. 6, 12/28/2006 Email from Maher to Refai.[5]

      By February 2007, consistent with the practice for years before this time, nothing had materialized on the Saudi Arabia deal and Maher continued to fret about the upcoming EBITDA deadline.  In another letter to the members of the PCS Board in connection with PCS's Q3 review, Maher stated:

> Apparently the Q requirements are such that we are required to talk about the KSA project and further to discuss the chances of it happening in this quarter and specifically if it does happen what are the chances of us meeting our ebitda goals as outlined in the Barron transaction.  As you may recall, that goal is $4.2M in ebitda.  The choices as presented to me by the auditors were various verbiage outlining our feelings of MISSING that goal: (1) remotely possible (2) reasonably

---

[4]      In discussing what is referred to as the "Deputy Minister's letter," the Brief in Support of the Motion to Dismiss provides: "The Deputy Minister concluded with his recommendation 'that [t]he Contracting Department move forward.' At his SEC Deposition, Mr. Grover explained that the Deputy Minister's letter 'was the one that confirmed, yes, we'd be doing this project, because it was essentially a statement that they reviewed the project, please implement." *See* Brief in Support at p. 6.  In reviewing the full text of the purported letter, it is obvious both that the letter does not direct the implementation of any project, and also that Defendants provided only a partial quote of the text, stopping mid-sentence, in an apparent attempt to make the letter appear far more authoritative than it really was.  A reasonable interpretation of the letter, and an interpretation that Maher apparently held at the time, is that, at best, the letter directs that additional review of the PCS project take place "to explore cost associated with this proposal and if it is appropriate."

[5]      This correct interpretation of the supposed Saudi Arabia letter is a far cry from the one Grover expressed in his testimony and one that Defendants repeat in their Brief in Support, that "the Deputy Minister's letter 'was the one that confirmed, yes, we'd be doing this project, because it was essentially a statement that they reviewed the project, please implement.'" Brief in Support at p. 6.

possible (3) possible.  If remotely possible no write-off against additional stock
we might have to issue  If reasonably possible, then we have to write off about
half of it and if possible we are required to write it all off.

The total possible write-off is $700K +.

Because it is now February 2 and we have not yet seen a contract on this project,
it appears our chances are getting dimmer every day to meet the ebitda goal.  If
we don't have something firm from the KSA by the 15th of February, I have to tell
you that we have almost no chance of booking much revenue from that project by
March 31.

Clearly I am very frustrated by the continuous delays coming out of the KSA, but
I think we are approaching a drop dead date where we will have to face reality
about meeting those ebitda goals.

SOF ¶ 8, Ex. 7, 2/2/2007 Email from Maher to C. Andrus, D. Farley, and M. McMurray.

**b.      PCS Developed Renewed Hope that a Deal With Saudi Arabia Was Still
Possible by March 31, 2007.**

Later in February, Refai once again informed PCS that he was on the cusp of obtaining

the contract with Saudi Arabia, which caused PCS to contact its auditor to determine what would

be necessary to book revenue stemming from the contract ahead of the March 31, 2007 deadline.

As reported by Maher to the Board on February 23, 2007:

In anticipation of getting the contract, we have been working on booking revenue
from the project and have had several discussions with our auditors on their
recommended ways of doing that.  It appears at this point, if we can get the KSA
contract before the end of the fiscal year that we can book revenue from the
license revenues over the term of the contract.  At least that is what the auditors
are telling us is consistent with our past revenue booking practices.

SOF ¶ 9, Ex. 8, 2/23/2007 Email from Maher to C. Andrus, D. Farley, and M. McMurray.  This

email was followed with another one from Maher reporting further discussions with the auditor

regarding PCS's ability "to book revenue in an adequate amount to meet our ebitda goal."  *See*

SOF ¶ 9, Ex. 9, 3/3/2007 Email from Maher to C. Andrus, D. Farley, and M. McMurray.

Clearly, meeting the EBITDA requirements of the Barron Partners Note remained a motivating

force for Maher and PCS at that time.  For her part, Stith reported her conclusions based on

research related to the requirements necessary to recognize the Saudi Arabia revenue:

> We can recognize the license fee so long as it's
>
> - Persuasive evidence of an arrangement exists. – i.e. a contract
>
> - Delivery has occurred. – once we send the curriculum to Refai to print
>
> - Vendor's fee is fixed or determinable. – the fixed fee amount is written
> in the contract.
>
> - Collectibility [sic] is probable. – because of the ME [Middle East] we
> need to have collection prior to recognition given the turmoil in the ME
> and uncertainty of collection.

SOF ¶ 9, Ex. 9, 3/3/2007 Email from Stith (then Wilson) to Maher and Grover.  According to

Stith's research, only after a contract had been secured with Saudi Arabia, delivery of the

product had occurred, and the revenue had been collected could the revenue be recognized.

With time growing short and the EBITDA deadline rapidly approaching, Maher began to

put things in place in an effort to meet the EBITDA goal.  On March 8, 2007, he sent a draft

license agreement to Refai with the following explanation:

> Attached locate the license agreement that we discussed recently.  As we have
> discussed, this agreement provides us with opportunity to "book" revenue prior to
> the end of our fiscal year which is March 31.  It does not affect any of the other
> agreements we have and is not in addition to any of the prices you have been
> quoted, the sum in the license agreement will be subtracted from the funds that
> PCS is owed for the project.  I need you to sign it and fax it back to the office, but
> do not date it in the event the contract with the Kingdom does not come through
> or is delayed.  *If the KSA contract does not happen for one reason or another this
> license agreement does not become effective*.  Again, it is for us to book revenue
> ahead of the larger contract, *assuming that happens*.
>
> We do not expect payment until we know we have a contract with the Saudi's and
> you have the cash advance from them.  It does us no good to "book" this if the
> funds are not there, we will simply have to reverse it *so we will wait until we
> know for sure the KSA thing is for sure and PCS ME has the cash from the
> Saudis*.

SOF ¶ 10, Ex. 10, 3/8/2007 Email from Maher to Refai (*emphasis added*).  Maher informed Refai that although Refai was signing the license agreement, the agreement would not be enforced, and the revenue would not be booked, if the contract with Saudi Arabia was not executed.

      **c.**    **PCS Decides to Move Forward with the License Agreement, Issue the Press Release and File the Form 8-K, Even Without a Contract with Saudi Arabia.**

Three weeks passed and, as had been the case for so many months and years before, the Saudi Arabia deal did not materialize.  By March 26, Maher was getting desperate.  As a result of this desperation, and with the EBITDA deadline only five days away, PCS and Maher decided to take an eleventh hour calculated gamble.  Notwithstanding the years of representations from Refai, which were the subject of continued frustration at PCS because a deal was constantly going to be done "next week," and notwithstanding the fact that there was still no evidence that Saudi Arabia had executed any contract or had any intent to do so, PCS and Maher decided to move ahead, execute the license agreement with Refai, and announce the revenue prior to the EBITDA deadline.  Clearly the gamble was done with the hope that the revenue actually would materialize.  The gamble did not pay off, however, and the money never arrived.

Maher was painfully aware of the risk he was undertaking in choosing to announce the license agreement and $7.15 million in illusory revenue.  On March 26, 2007, only hours before the license agreement was executed, Maher confirmed that PCS was rolling the dice by booking this revenue and that there were negative repercussions if it did not work out:

> Not sure whether we are going to have a Kings' Order in our fat little hands before the end of the month or not.  Decision we jointly need to make, *except that I will suffer the consequences of whatever decision we make if its [sic] wrong*, is whether we have enough information yet to invoice Refai for the License Agreement.

SOF ¶ 12, Ex. 11, 3/26/2007 Email from Maher to Stith (then Wilson), Grover, and Egusquiza (*emphasis added*).

Stith responded to this email less than two hours later by recommending that PCS *not book the revenue* until each of the factors had been met, advising Maher that the company would be obligated to issue a press release and 8-K as soon as the revenue was booked and warning Maher that PCS could face legal action if the revenue never materialized:

> We cannot book the amount without 1) a contract with Refai (done); 2) a contract between Refai (or PCS) and the KSA MoE (not done); and (3) collection of funds (not done).  I was willing to book the $7.15M in revenue should we have 1 and 2, as long as 3 was going to be in our hands by the end of April (or before the auditors arrive).  As soon as I put the amount on the books, we have to release information to the shareholders (through an 8K and PR).  Since we do not have any contract with MoE [Saudi Arabian Ministry of Education] or reason to believe that Refai could pay us the $7.15M if he doesn't obtain 2 above, I am not comfortable booking this as revenue.  I do not want to have to deal with lawsuits should we release information of our booking of revenue and then have to retract our statement.  *I say no booking of revenue until we have contracts.*

*Id.*, 3/26/2007 Email from Stith (then Wilson) to Maher, Grover, and Egusquiza (*emphasis added*).  Recognizing the precarious position he and PCS were in regarding the EBITDA deadlines and the uncertainty around the Saudi Arabian contract, on that same day Maher reached out again to Refai.  In the first of several emails that day, Maher inquired:

> I also understand from Robert and Joe that the contract will take "two weeks".  We just need the Kings Order, and not some transcript of it, so we can invoice PCS Middle East for the License Agreement before March 31.  If we aren't able to get that by then, we will have to review the relationship.  I know you are working hard, no criticism of you, just a statement of fact.

SOF ¶ 15, Ex. 12, 3/26/2007 Email from Maher to Refai.  After not receiving a satisfactory response from Refai, Maher followed up shortly thereafter:

> Are you in a position to say whether you will have the King's Order in your hand before March 31st?  Or is there some doubt about you being able to get that by then?  We need the King's Order, not someone's written summary of it.  We don't necessarily need the contract done by March 31, just the King's Order.  Is that still possible or do we think that will be difficult to get by then?

SOF ¶ 16, Ex. 12, 3/26/2007 Email from Maher to Refai.  Still failing to receive a response,

Maher made one final attempt that day to pin Refai down on the issue of whether the Saudi

Arabia deal would be done by March 31:

> You haven't answered whether you think you will have the Royal Order by
> March 31, do you think they will get it for you.  Or do you think this thing is
> going to be delayed into April or May, or perhaps not happen at all?  Please
> advise.  Thanks.

SOF ¶ 17, Ex. 13, 3/26/2007 Email from Maher to Refai.

Failing to get Refai to respond with anything concrete, Maher was forced to decide

whether to book the revenue at the risk of not having the contract come through, or not book the

revenue and fail to meet the EBITDA benchmarks.  Against the advice of his CFO and without

evidence confirming that the underlying contract with Saudi Arabia had been executed or would

be by March 31, Maher made the decision to obtain the purchase order from Refai and move

forward with booking the revenue, issuing the press release, and filing the Form 8-K.  The

purchase order was dated March 26, 2007 and allegedly documented the order of $7.15 million

worth of PCS's Bricklab products.  SOF ¶ 18, Ex. 14, 3/26/2007 Purchase Order.

Obtaining the purchase order triggered a domino effect, requiring PCS to draft and issue

the press release and file a Form 8-K.  On March 27, 2007, Maher instructed Stith to obtain a

copy of the press release from Grover and get it issued.  On March 28, 2007, after not seeing the

press release issued, Maher inquired of Grover why it hadn't been issued.  *See* SOF ¶ 19, Ex. 15,

3/28/2007 Email from Grover to Maher.  Growing anxious to get the press release issued, and

recognizing that the longer they waited to issue the press release the clearer it would be that they

were attempting to beat the deadline, Maher complained to Grover:

> The longer we wait to get that release out, the more it looks like we are doing it
> last minute.  The more last minute it looks, the more Andrew at Barrons will look
> at it.  Get it out of there.

SOF ¶ 20, Ex. 16, 3/28/2007 Email from Maher to Stith (then Wilson), Grover, and Egusquiza. Just three days prior to the March 31, 2007 deadline, Maher documents that he remained worried about, and clearly motivated by, the desire to meet the EBITDA benchmarks and avoid the penalties set forth in the Agreement.

Following the direction given by Maher, Stith had the press release issued and filed the Form 8-K, announcing the license agreement with PCS Middle East and the expected payment of $7.15 million.  *See* SOF ¶ 22, Ex. 17, 3/28/2007 Press Release; Ex. 18, 3/28/2007 Form 8-K. Importantly, neither the Form 8-K nor the press release disclosed the fact that PCS Middle East had not executed the contract with Saudi Arabia, or that PCS had agreed not to enforce the license agreement absent such a contract.  In other words, neither the press release nor Form 8-K announced that the revenue was illusory absent the occurrence of certain material contingencies.

The impact of the announcement in the days and weeks following the press release was dramatic, as chronicled in the Amended Complaint, and demonstrates the materiality of the misrepresentations and omissions in the press release.  The stock price, which in the days leading up to the press release had been trading in the $.65 range, shot up to $3.34, a 400% increase. The trading volume likewise spiked, moving from a range of approximately 335,000 shares per day to a high of 2,429,800 shares, over a 600% increase.

### d.     PCS Issues Its Materially False and Misleading Form 8-K/A.

After it issued the press release and Form 8-K, for the next six weeks PCS waited and hoped that the contract with Saudi Arabia would be executed.  On April 14, 2007, Maher inquired of Grover: "I haven't heard anything today so I guess we can assume there are more delays in a contract?  Please advise."  SOF ¶ 25, Ex. 20, 4/14/2007 Email exchange between

Maher and Grover.  Grover responded that "Refai's person is making progress, but no drafts

yet."  *Id*.  On April 20, 2007, Maher took his concerns directly to Refai:

> It was good to speak with you on the phone yesterday and thanks for the update.
>
> I want to make sure we all understand where we are at this point.  I was intrigued by your comment that you didn't want me to "vanish".  I don't plan on vanishing anywhere my good friend, but what is at risk of vanishing is our ability to continue to work with this project.  And your other comment for us to be "patient", I think we have shown extraordinary patience with this project and the ECE, much more than anyone I know.
>
> Robert and Joe convinced me not to abandon our efforts with you in January of this year, but the time is drawing near when we will have no other choice.  If for some reason you are not able to raise the money from somewhere to pay us the License Fee on time, I must tell you, our relationship will be in very serious jeopardy.  Not because we want to walk away, but because we will have no other choice.
>
> I certainly hope we can get to the point where we have something concrete to show for all of your efforts and all of dedication of time and resources, but our credibility with our SEC Auditors is being stretched almost to the limit.  It would be a shame after all this time and effort to not be able to go through with this, but it is a very real possibility.

SOF ¶ 25, Ex. 21, 4/20/2007 Email from Maher to Refai.

During this period, PCS continued to reassure its auditor that it would provide the

evidence necessary to support the booking of the revenue, while at the same time registering

growing frustration as a result of Refai's continued, and fruitless, representations regarding the

certainty of the contract.  *See, e.g.,* SOF ¶ 27, Ex. 23, 5/12/2007 Email from Maher to Refai.

On May 12, 2007, just three days before the deadline by which PCS was supposed to

have been paid, Maher sent another email to Refai:

> Another in a very long line of Saturdays have come and gone with no contract and no clear indication when it might happen, followed by another in a very long line of your "in the next couple of days".  Refai you clearly are a guy who simply cannot deliver what you say you can in any meaningful time frame.  You seem content to simply wait for things to happen.

> We will need to know the other four companies now bidding for the ECE project, one that you assured us was now for over three years, before we spend any more PCS time and resources to craft a presentation for another one of your "projects". Incidentally, the one who is scheduled to work on it, is Teresa who you promised to pay for half of her salary about 10 months ago.
>
> It is clear you are going to miss the deadline of May 15, despite your assurances you wouldn't, at which time Refai you are in default of all agreements with PCS. Also at which time, everyone at PCS will cease working on any of your so-called projects.

SOF ¶ 27, Ex. 23, 5/12/2007 Email from Maher to Refai.

The May 15th deadline came and went. Refai failed to make the required payment and no contract was executed with Saudi Arabia. PCS was faced with the decision of either coming clean by disclosing to the public the true nature of the Saudi Arabia and PCS Middle East deal, or continuing its charade by claiming it was still expecting payment on the license agreement. Unfortunately, PCS once again chose poorly. Notwithstanding the clear opinion that Maher had regarding the defunct nature of the deal, expressed to Refai in the May 12th email, PCS once again chose to mislead the public through a materially false amended Form 8-K/A.

On May 17, 2007, PCS filed its amended Form 8-K/A in which, instead of reporting the true status of the agreement, it reported instead that the payment on the license agreement had simply been delayed:

> Full payment was expected to be received in a single sum payment no later than May 15, 2007. However, PCS ME experienced delays within the Kingdom of Saudi Arabia. These delays caused a postponement in payment to PCS ME, thus causing delays in payment to PCS. These delays stemmed from the uniqueness of the project, wherein the Royal Council and the Ministry of Education held special meetings to discuss, finalize, and assign this project. Upon receipt of payment from PCS ME, the Company will file Amendment 2 to this 8K notifying all persons of receipt of payment.

SOF ¶ 30, Ex. 25, 5/17/2007 Form 8-K/A. Contrary to the representations in the Form 8-K/A, payment from Saudi Arabia to PCS Middle East had not been "delayed." In fact, no payment

had ever been owing.  Furthermore, PCS has provided no evidence that the Royal Council and

Ministry of Education had held special meetings to discuss, finalize, and assign the project.

After issuing the Form 8-K/A, Maher complained to Grover about his exposure in the

event the continued representations in the Form 8-K/A proved once again to be false and

suggested they call Refai to follow up:

> I don't want to be surprised tomorrow with "nothing happened today"  I might
> suggest we call dumb ass and find out if he is still going to make it tomorrow or if
> it will be Saturday and "next week".  My ass is hanging out there with the revised
> 8K we released this morning.

SOF ¶ 32, Ex. 26, 5/17/2007 Email from Maher to Grover and Egusquiza.

### e.  PCS Issues Its Materially False and Misleading Form 10-KSB.

In early June, PCS's auditor informed PCS that it would have to remove the $7.15

million entry from its books before issuing its financial statements.  Nevertheless, PCS continued

to hope that something would materialize at the last minute.  Accordingly, PCS set yet another

deadline of June 20, 2007, of which Maher notified Refai on June 8, 2007:

> Thank you for the phone call recently to update me on your progress with the
> KSA project.  I need to alert you that we must have some concrete documentation
> on the project between the Kingdom and PCS Middle East by June 20th or we
> have to write off the invoice of $7.2M.  The auditors allowed us to extend it from
> May 15th and again on May 21st and 22nd, but June 20 will be the date they require
> us to write it off.  And of course, writing it off creates another set of problems for
> us.

SOF ¶ 35, Ex. 29, 6/8/2007 Email from Maher to Refai.

On June 12, 2007, Maher received confirmation from the U.S. Department of Commerce

that "No firm, firms or individuals were awarded any contracts relevant to King Abdullah Project

for Education, Training and Curriculum Development."  SOF ¶ 36, Ex. 30, 6/12/2007 Email

from Amy Benson to Maher.  With this communication, Maher began to fully appreciate the

position he had placed himself and PCS in as a result of the public misrepresentations, a concern

he expressed to Stith, Grover, and Egusquiza:

> Yep, Refai is still in the "hoping to sell" cycle and clearly has misled us all along.
> Now we have a problem because he misled us, *we have misled the public*.

SOF ¶ 36, Ex. 30, 6/12/2007 Email from Maher to Stith, Grover, and Egusquiza (*emphasis

added*).

Maher sent emails to Refai on June 13, 2007 and June 18, 2007, reminding him of the

June 20 deadline and the need of a contract from Saudi Arabia to satisfy PCS's auditor.  Once

again the deadline came and went, and on June 23rd Maher emailed his frustration to Grover and

Egusquiza: "I have no voice mail on my phone and apparently no email in my in-basket saying

Refai has a contract and Saturday is now officially over.  Guess we are waiting for the new 'next

week' and new 'Saturday' July 3."  SOF ¶ 37, Ex. 31, 6/23/2007 Email from Maher to Egusquiza

and Grover.

On June 28, 2007, PCS issued another press release in connection with the filing of its

Form 10-KSB.  *See* SOF ¶ 40, Ex. 33, 6/28/2007 Press Release.  The press release simply, and

misleadingly, informed the public that PCS had elected to postpone recognition of the revenue

because of delays in Saudi Arabia, which "resulted in a postponement in payment to PCS Middle

East, thereby causing delays in payments to PCS Edventures! By PCS Middle East."  *Id.*  These

same misrepresentations, perpetuations of the previous misrepresentations from the Form 8-K/A,

were set forth in PCS's 10-KSB, certified by both Maher and Stith.  *See* SOF ¶ 40, Ex. 34,

excerpts and certifications from PCS's 2007 Form 10-KSB.

None of PCS's March 28, 2007 Form 8-K, its March 28, 2007 press release, its May 17,

2007 Form 8-K/A, its June 28, 2007 press release, or its Form 10-KSB disclosed the true nature

of the license agreement – that PCS had agreed not to enforce the license agreement absent PCS

19

Middle East securing a contract with Saudi Arabia, or that no contract with Saudi Arabia had ever been executed.  As such, all of these public announcements and filings misrepresented a material fact, clearly implying that payment was owing in the first place.  In fact, because of the side agreement between PCS and PCS Middle East that no payment would be owing absent a contract with Saudi Arabia, no payment at all was owing to PCS when it issued any of these announcements.

     f.     **PCS's and Maher's Actions Satisfy the Elements of a Rule 10(b) Fraud Cause of Action.**

The Amended Complaint establishes the elements necessary to support its fraud claim.  First, the March 28, 2007 press release and Form 8-K contained the misrepresentation that PCS had entered into a contract that entitled it to collect $7.15 million when in fact there was no such entitlement.  PCS had agreed that it would not enforce the license agreement absent a contract with Saudi Arabia, and PCS knew that no contract had been executed at the time of the announcement.  These same misrepresentations and omissions were repeated in the subsequently filed Form 8-K/A and Form 10-KSB, wherein PCS failed to disclose the true contingent, speculative nature of the agreement and instead continued to insist it was entitled to the payment, that the payment would be made, but that it had been temporarily delayed.

Second, the Amended Complaint establishes the materiality of PCS's misrepresentations and omissions, chronicling the impact of the announcement in the days and weeks following the press release with the stock price jumping 400% and the trading volume spiking 600%.  Moreover, as PCS itself chose to file a Form 8-K on these matters, clearly the materiality has been conceded.

Third, the Amended Complaint sufficiently pleads scienter.  Under Rule 9(b), scienter may be averred generally. [6]  Fed. R. Civ. P. 9(b); *See, e.g., Ethanol Capital Mgmt., LLC v. DeWeese BioFuels*, 2006 WL 3780409 at *7 (D. Neb. Dec. 20, 2006) (Like other averments concerning 'condition of mind,' scienter need not be pled with particularity).  The Commission has alleged sufficient facts to show that Maher and PCS had knowledge of, and participated in, preparing and publishing the misrepresentations and omissions contained in the press releases, Form 8-K, Form 8-K/A, and Form 10-KSB.  Because the evidence supports the allegation that PCS and Maher knew of the misrepresentations contained in the press release and reports filed with the Commission, these allegations are sufficient to meet the pleading standards of scienter in a Rule 10(b) action.

Based on these facts, supported by overwhelming documentary evidence derived from PCS's own correspondence and records, the Commission has adequately pled the particularities necessary to support a claim of fraud against PCS and Maher.  The facts support the allegation that Maher and PCS knowingly made material misrepresentations and omissions in the press releases, the Form 8-K and Form 8-K/A, and in PCS's Form 10-KSB.

**C.     Second Claim for Relief: The Commission Has Properly Alleged its Claim for False Filings with the Commission and Aiding and Abetting False Filings with the Commission**

For its Second Claim, the Commission has alleged that PCS violated, and that Maher aided and abetted PCS's violations of, Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13 thereunder by filing a materially false and misleading Form 8-K, Form 8-K/A, and Form 10-KSB.

Section 13(a) of the Exchange Act and Rules 13a-1 and 13a-13 thereunder require issuers

---

[6]     The cases upon which Defendants principally rely address the "strong inference" requirement of the Private Securities Litigation Reform Act of 1995 and thus do not apply to actions brought by the Commission.

of securities to file with the Commission accurate and timely annual and quarterly reports.  15

U.S.C. §§ 78m(a) and 17 C.F.R. §§ 240.13a-1 and 240.13a-13.  An issuer violates these

provisions if it files a report that contains materially false or misleading information.  *SEC v.*

*Savoy Indus., Inc.*, 587 F.2d 1149, 1165 (D.C. Cir. 1978).  Rule 12b-20 under the Exchange Act

similarly requires that these reports contain any material information necessary to make the

required statements made in the reports not misleading.  17 C.F.R. § 240.12b-20.

      To establish aiding and abetting liability, the following four requirements must be shown:

(1) a primary violation of the securities laws by another; (2) knowledge of the primary violation

by the aider and abettor; (3) and substantial assistance by the aider and abettor in achieving the

primary violation.  *Anixter v. Home-Stake Proc. Co.*, 77 F.3d 1215, 1225 (10th Cir. 1996).

      The Amended Complaint alleges facts sufficient to support PCS's primary violations of

Section 13(a) and the related rules.  As explained in detail above, PCS's Forms 8-K, 8-K/A, and

10-KSB, materially misrepresented the license agreement, its entitlement to collect the $7.15

million revenue, and the then-current state of the transaction.  These allegations are sufficient to

support a primary violation of Section 13(a) and the associated rules.  In addition, the Amended

Complaint further alleges that Maher knowingly and substantially assisted in the filing of these

reports, sufficiently pleading aiding and abetting liability.  Accordingly, the Commission has

properly pled these violations and the Defendants' Motion to Dismiss the Commission's Second

Claim for Relief should be denied.

**D.**      **Third Claim for Relief:  The Commission Has Properly Alleged its Claim for
Maher's False Certification**

      In the Third Claim for Relief, the Commission alleged that Maher falsely certified PCS's

2007 Form 10-KSB pursuant to Exchange Act Rule 13a-14.  17 C.F.R. § 240.13a-14.  Rule 13a-

14 requires an issuer's principal executive officer to certify to the best of his or her knowledge

that there are no untrue statements of material fact or omissions of a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading in reports filed by PCS under Section 13(a) of the Exchange Act. *See id.* Section 13(a) requires the filing of annual and quarterly reports. The Commission alleges that Maher reviewed, signed, and certified PCS's Form 10-KSB.

As described above, PCS's Form 10-KSB perpetuated the material misrepresentation that PCS had entered into an enforceable license agreement and was entitled to collect $7.15 million as a result, but that the payment had been "delayed." As has been amply supported above, this statement was not true, and Maher knew the statement was not true at the time he certified the Form 10-KSB. Accordingly, Maher certified PCS's annual report knowing that it contained untrue or misleading statements and omissions. As a result, the Commission has adequately pled violations of Rule 13a-14, and PCS's and Maher's Motion to Dismiss this claim should be denied.[7]

**E.    PCS's and Maher's Request to Dismiss the Commission's Claims for Relief are without Merit and Premature**

Finally, PCS's and Maher's request to dismiss the Commission's requests for relief are premature. As explained above, the Commission has adequately pled and supported its

---

[7]       Maher opportunistically relies on *SEC v. Black* and two inapplicable private securities litigation cases to support his argument that there is no independent cause of action for falsely certifying reports filed with the Commission under Exchange Act Rule 13a-14. *See* Memo in Support of Motion to Dismiss at p. 14, n.55. Courts in this and other circuits have recognized a separate cause of action under Rule 13a-14. *See SEC v. Indigenous Global Dev. Corp.* 673 F. Supp. 2d 1108, 1143-44 (S.D. Cal. 2009); *SEC v. Mozilo*, 2009 WL 3807124, at *16 (C.D. Cal. Nov. 3, 2009) ("Because there are no appellate decisions addressing the [independent claim] issue . . . [the Court will re-raise] . . . this issue during the course of litigation."); *see generally SEC. v. Stanard*, 2009 WL 196023, at *28 (S.D.N.Y. Jan. 27, 2009) (allowed the Rule 13a-14 claim, but did not specifically identify it as an independent claim.). Moreover, Section 21(d) of the Exchange Act clearly authorizes the Commission to bring civil injunctive actions "whenever it shall appear that any person is engaging or is about to engage in acts or practices constituting a violation of any provision of this chapter, [or] the rule or regulations thereunder . . . ." 15 U.S.C. §§ 78u(d). Given the recent case law from other jurisdictions and express statutory authority entitling the Commission to bring a claim for violations of Rule 13a-14, Maher's and PCS's Motion to Dismiss the Commission's Rule 13a-14 claim against him is without merit and should be denied.

allegations of Maher's and PCS's violations of the securities laws.  In connection with obtaining judgment on these causes of action, the Commission will also demonstrate the proper relief it has requested, including an injunction against violation of future securities laws, penalties, and an officer and director bar against Maher.

Maher and PCS improperly claim that the Commission has the burden, even before the pleading stage has been concluded, of demonstrating it is entitled to the relief that is requested.  To force the Commission to demonstrate the appropriateness of the relief before obtaining judgment on the claims asserted would be entirely premature and improper under the rules.  *See, e.g., Boggess v. Hogan*, 238 F. Supp. 1048, 1054 (N.D. Ill. 1971) ("This is not the proper time to determine the appropriate form of remedy, should the plaintiffs prove their case.  This court has broad powers of discretion in fashioning suitable relief in securities fraud cases, and to limit the court's alternatives at this stage of the litigation (motion to dismiss the complaint) would be premature and unwise.").

If the Court grants judgment on the claims asserted, it can then determine whether the relief requested is appropriate.  Because this claim is premature, the Court should deny Maher's and PCS's Motion to Dismiss the Commission's requests for relief at this time.

## CONCLUSION

For the foregoing reasons, the Commission respectfully requests that the Court deny the Motion to Dismiss the SEC's Amended Complaint (and/or for Summary Judgment) by Defendants PCS Edventures!.com, Inc. and Anthony A. Maher.

Dated this 30th day of December, 2010.

Respectfully submitted,

/s/ Daniel J. Wadley
Daniel J. Wadley
Thomas M. Melton
Cheryl M. Mori
Attorneys for Plaintiff
Securities and Exchange Commission
15 West South Temple, Suite 1800
Salt Lake City, Utah 84101

## CERTIFICATE OF SERVICE

I hereby certify that on the 30th day of December, 2010, I caused to be electronically filed the foregoing with the U.S. District Court.  Notice will automatically be electronically mailed to the following individuals who are registered with the U.S. District Court CM/ECF System:

Briane Nelson Mitchell
nels@maukburgoyne.com
Mauk & Burgoyne
515 South 6th Street
Post Office Box 1743
Boise, Idaho 83701
*Attorneys for Defendants PCS Edventures!.com, Inc. and Anthony A. Maher*

Erik F. Stidham
efstidham@hollandhart.com
Brian Wonderlich
bcwonderlich@hollandhart.com
Holland & Hart LLP
Suite 1400, U.S. Bank Plaza
101 South Capitol Boulevard
P.O. Box 2527
Boise, Idaho 83701

Holly Stein Sollod
hsteinsollod@hollandhart.com
Holland & Hart LLP
555 Seventeenth Street, Suite 3200
Post Office Box 8749
Denver, Colorado 80201
*Attorneys for Defendant Shannon M. Stith*

/s/ Misty Reiter