Daniel J. Wadley (Utah State Bar No. 10358)
wadleyd@sec.gov
Thomas M. Melton (Utah State Bar No. 4999)
meltont@sec.gov
Cheryl M. Mori (Utah State Bar No. 8887)
moric@sec.gov
Attorneys for Plaintiff
Securities & Exchange Commission
15 West South Temple, Suite 1800
Salt Lake City, Utah 84101
Telephone:  801-524-5796
Facsimile: 801-524-5262

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) |
| PLAINTIFF, | ) ) ) |
| v. | ) ) ) |
| PCS EDVENTURES!.COM, INC., an Idaho Corporation, ANTHONY A. MAHER, an individual, and SHANNON M. STITH, an individual, | ) ) ) ) ) |
| DEFENDANTS. | ) ) |

**RESPONSE TO MOTION TO STRIKE THE SEC'S AMENDED COMPLAINT SUBMITTED BY DEFENDANT PCS EDVENTURES!.COM, INC. AND ANTHONY A. MAHER**

Case No: 1:10-cv-00433

Judge B. Lynn Winmill

Plaintiff, Securities and Exchange Commission (the "Commission"), submits this Response ("Response") to Motion to Strike the SEC's Amended Complaint Submitted by Defendant PCS Edventures!.com, Inc. ("PCS") and Anthony A. Maher ("Maher") (hereinafter "Motion to Strike").  In the Motion to Strike and accompanying Brief in Support ("Brief in Support"), PCS and Maher (together "Defendants") allege numerous improprieties on the part of the Commission in initiating this action, charging that the allegations in the Commission's

Amended Complaint are demonstrably "false, misleading, immaterial, and/or impertinent."  The Defendants in essence accuse the Commission of perpetrating a fraud on the Court.

Contrary to the claims of the Defendants, the overwhelming evidence in this matter supports the allegations in the Amended Complaint and establishes a compelling case as to the liability of the Defendants.  For their part, when stripped of the superfluous and irrelevant references contained in the Motion to Strike and Brief in Support, the objective "evidence" relied on by the Defendants really amounts to self-serving descriptions drawn from the testimony of two of PCS's executives – Maher, a defendant here, and Grover, PCS's current President.  This self-serving testimony, far from objective and far from conclusively establishing that the Commission's allegations are "false, misleading, immaterial, and/or impertinent," is actually in direct conflict with the actual evidence in this matter, including the unrefuted statements drawn from the correspondence from these same individuals at the time the fraudulent events occurred.

Because the allegations are well founded in the evidence available, including correspondence, contracts, and testimony of third parties, the Defendants' Motion to Strike should be denied.

## <u>ARGUMENT</u>

**A.      The Standard Necessary to Prevail on a Motion to Strike.**

In moving to strike portions of the Amended Complaint, the Defendants invoke "the Court's inherent power, Rule 11, and Rule 12(f)."  *See* Brief in Support, p. 2.  Contrary to the Defendants' claims, none of the pleadings contained in the Amended Complaint can or should be stricken.

Defendants reliance on F.R.C.P. 11 in their Motion to Strike is procedurally improper.  "Rule 11 requires the imposition of sanctions when a motion is frivolous, legally unreasonable, or without factual foundation, or is brought for an improper purpose."  *Conn v. CSO Borjorquez,*

967 F.2d 1418, 1420 (9th Cir. 1992) (citing *Operating Engineers Pension Trust v. A-C Company*, 859 F.2d 1336, 1344 (9th Cir. 1988)).  Moreover, "[t]he standard for determining the propriety of Rule 11 sanctions is one of objective reasonableness for determinations of frivolousness as well as of improper purpose. . . .  The key question in assessing frivolousness is whether a complaint states an arguable claim – not whether the pleader is correct in his perception of the law." *Conn v. Borjorquez*, 967 F.2d at 1421 (*internal citations omitted*).  Rule 11 is a vehicle for obtaining sanctions against an offending party and is "an extraordinary remedy, one to be exercised with extreme caution." *Id.*  Rule 11 is not, as the Defendants contend here, a basis upon which a court can strike pleadings.

The Defendants' request to strike portions of the Amended Complaint under Rule 12(f) likewise is procedurally improper, and furthermore is without merit.  Rule 12(f) of the Federal Rules of Civil Procedure states that a "district court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f). "The function of a Rule 12(f) motion to strike is to avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with those issues prior to trial." *Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 973 (9th Cir. 2010).  In *Whittlestone*, the court denied the defendant's request to strike the claim for lost profits and consequential damages from the complaint, concluding that

> It is quite clear that none of the five categories covers the allegations in the pleading sought to be stricken by HandiCraft.  First, the claim for damages clearly is not an insufficient defense; nobody has suggested otherwise.  Second, the claim for damages could not be redundant, as it does not appear anywhere else in the complaint.  Third, the claim for damages is not immaterial, because whether these damages are recoverable relates directly to the plaintiff's underlying claim for relief.  Fourth, the claim for damages is not impertinent, because whether these damages are recoverable pertains directly to the harm being alleged. ("Impertinent matter consists of statements that do not pertain, and are not

necessary, to the issues in question.")  Finally, a claim for damages is not scandalous, and HandiCraft has not alleged as much.

*Id.* at 974.  In that case, the court observed that it was clear the "12(f) motion was really an attempt to have certain portions of Whittlestone's complaint dismissed or to obtain summary judgment against Whittlestone as to those portions of the suit – actions better suited for a Rule 12(b)(6) motion or a Rule 56 motion, not a Rule 12(f) motion."  *Id.*  "Were we to read Rule 12(f) in a manner that allowed litigants to use it as a means to dismiss some or all of a pleading (as Handi-Craft would have us do here), we would be creating redundancies within the Federal Rules of Civil Procedure, because a Rule 12(b)(6) motion (or a motion for summary judgment at a later stage in the proceedings) already serves such a purpose."  *Id.*  As a result, the court concluded that "Rule 12(f) does not authorize district courts to strike claims for damages on the ground that such claims are precluded as a matter of law."  *Id.* at 974-75.

In this case, the allegations of the Amended Complaint, especially when viewed in the light of all the factual evidentiary support, cannot be considered remotely frivolous, and as such cannot be a violation of F.R.C.P. 11.  Nor, it should be added, have the Defendants sought the proper relief (*e.g.*, sanctions) for such a violation.  Likewise, the Defendants are improperly seeking to use 12(f) as a means of obtaining the dismissal, on substantive grounds, of part or all of the Commission's Amended Complaint.  Such relief is the purpose of Rule 12(b)(6) or summary judgment, not the role of Rule 12(f).  In any event, the allegations of the Amended Complaint cannot reasonably be considered redundant, immaterial, impertinent, or scandalous, as all of the allegations relate directly to the claim of securities fraud that has been levied against the Defendants in this matter.  Because the Defendants' Motion to Strike is procedurally improper and is without merit, it should be denied.

**B.**     **The Topics that are the Focus of the Defendants Ire.**

The Defendants request that the Court strike the allegedly "false and misleading"

allegations contained in the Amended Complaint, including but not limited to:

- Paragraph 61 and its allegation relating to the disclosure of information to the outside auditors;

- Paragraphs 56-61 and its allegations relating to the auditor's role in proposing an adjustment to PCS' internal journal entry for the License Agreement with Global Techniques (dba PCS Middle East).

- Paragraphs 30-45 and its allegations relating to the recording, reporting, booking and recognition of revenue.

- Paragraphs 25-29, 36, 46 and 47 and its allegations relating to the Barron Partners Note that was cancelled on October 17, 2006.

- Paragraphs 3, 22, 24 and 50 and its allegations relating to the evidence that PCS and its management relied upon when the March 28, 2007 Form 8-K and press release made the announcement regarding the License Agreement with Global Techniques (dba PCS Middle East).

*See* Motion to Strike at p. 2.

Contrary to the strenuous assertions of the Defendants, the allegations in the Amended

Complaint, including those which the Defendants seek to have stricken, are supported by the

evidence available in this matter.

**C.**     **PCS Failed to Inform Its Auditor of the True Nature of the PCS Middle East License Agreement, and its Auditor Required PCS to Remove the $7.15 Million Entry Upon Learning it was Unsupported.**

PCS attempted to conceal the true nature of the license agreement from its auditor just as

it had from the investing public.  After its auditor learned that there was no support for the $7.15

million entry, and after giving PCS an opportunity to provide evidence of payment, its auditor

required that PCS remove the entry from its books prior to filing the Form 10-KSB.  Because

there is ample evidence supporting these allegations, the Defendants' Motion to Strike these

paragraphs from the Amended Complaint should be denied.

Throughout April and into May 2007, PCS was beginning to face mounting pressure from its auditor to provide evidence in the form of a contract with Saudi Arabia to justify booking the $7.15 million.  On April 19, 2007, Greg Bleazard, one of the auditors, asked Stith to provide him with a copy of the sales agreement with Saudi Arabia documenting the $7.15 sale he noticed in the audit documents.  *See* Statement of Facts In Support of the Response to Motion to Dismiss the SEC's Amended Complaint (and/or for Summary Judgment) by Defendants PCS Edventures!.com, Inc. and Anthony A. Maher and the Response to Motion to Strike the SEC's Amended Complaint Submitted by Defendant PCS Edventures!.com, Inc. and Anthony A. Maher ("SOF") ¶ 26, Ex. 22, 4/19/2007 Email exchange between Bleazard and Stith (then Wilson).  Stith responded to the email by informing Bleazard that the $7.15 million entry "is the $7.15 already included in our financial statements.  We do not have an agreement with KSA, but rather Global Techniques dba PCS Middle East.  You have all documents available."  *Id.*  In other words, far from explaining the true nature of the transaction, Stith obfuscated the situation by implying that the auditor had misunderstood the transaction, that it wasn't Saudi Arabia that was the pertinent contracting party, but rather PCS Middle East.

Unsatisfied with this response and clearly needing more information on this issue than PCS was providing, Bleazard responded with further questions:

> How much cash has been paid on this contract so far (through today)?  When do you expect to receive the balance of the cash?  How much has been shipped on this contract from your warehouse or PCS' consigners warehouses?

*Id.*  In response, Stith provided yet another inadequate and misleading response, a response which was consistent with the misleading nature of the press release and Form 8-K:

> If you read our 8K, you will see that a lump sum payment will be made to PCS no later than May 15, 2007.  The contract is for license of 5 of our curriculum modules.  We have already forwarded the files to PCS Middle East to be utilized

> by them.  No hard goods were part of this contract.  Also, no cost of goods is
> associated with this contract as it is all electronically delivered.

*Id.*  Not only did Stith fail to disclose the contingent nature of the payment – that payment would

not be made unless and until PCS Middle East secured an actual contract with Saudi Arabia, and

that such a contract had yet to be executed – but Stith went further by suggesting that PCS had

already shipped and provided the product underlying the contract.

In addition, after PCS Middle East missed the internally-imposed payment deadline of

May 15, 2007, PCS chose to disguise the failed payment by describing it in the Form 8-K/A as

PCS Middle East having "experienced delays within the Kingdom of Saudi Arabia":

> Full payment was expected to be received in a single sum payment no later than
> May 15, 2007.  However, PCS ME experienced delays within the Kingdom of
> Saudi Arabia.  These delays caused a postponement in payment to PCS ME, thus
> causing delays in payment to PCS.  These delays stemmed from the uniqueness of
> the project, wherein the Royal Council and the Ministry of Education held special
> meetings to discuss, finalize, and assign this project.  Upon receipt of payment
> from PCS ME, the Company will file Amendment 2 to this 8K notifying all
> persons of receipt of payment.

SOF ¶ 30, Ex. 25, 5/17/2007 Form 8-K/A.

Contrary to the representations in the Form 8-K/A, payment from Saudi Arabia to PCS

Middle East had not been "delayed."  In fact, no payment had ever been owing.  Furthermore,

PCS has provided no evidence that the Royal Council and Ministry of Education had held special

meetings to discuss, finalize, and assign the project.  This representation appears to have been

fabricated wholly in an effort to placate an unhappy shareholder base.

Finally, and contrary to the claims of PCS, the evidence shows that it was in fact PCS's

outside auditor that required the reversal of the $7.15 entry.  On June 7, 2007, PCS's auditor

provided PCS with preliminary adjusting journal entries, which included an adjustment for the

$7.15 million PCS Middle East contract.  *See* SOF ¶ 34, Ex. 28, 6/7/2007 Email exchange

between Bleazard and Stith (then Wilson).  Concerning the PCS Middle East contract which had

been included on his adjusted journal entries, the auditor stated: "Although we were hoping additional evidence would have been available by now, it does not appear that this sale should be recognized at 3/31/07." *Id.* Stith responded by raising concerns about reversing the $7.15 million entry: "I have to point out that *if you are requiring us to removed [sic] the $7.15M now*, we would also have to remove the commissions associated therewith (approximately $775k)." *Id.* (*emphasis added*).

In his testimony, Franklin Hunt, PCS's lead auditor, described Maher as unhappy with the auditor's position that the revenue could not be recognized. He testified:

> A:    Pretty much it was Tony. I know McMurray was also unhappy with us, come to think of it. He was not happy with our conclusion regarding this significant transaction that we've already mentioned. But basically it was Tony. Especially during the period of time that we, I guess you'd call it field work, there were – we had given the company what I felt was time to substantiate this transaction and Tony felt like that they had provided clarification and substantiation for their position, and was not happy with us not accepting it or agreeing with it.

> Q.    So he wanted to be able to recognize the revenue from the transaction?

> A.    Definitely in the beginning, and pretty much through towards the end, he did. He felt very strongly that it was a recognizable transaction.

*See* SOF ¶ 38, Ex. 19, 7/10/2009 Testimony of Franklin Hunt, p. 34. Clearly it was PCS's auditor that was driving PCS to reverse the $7.15 million.

Upon concluding the audit, on June 15, 2007 PCS's auditor sent PCS's Audit Committee, Board of Directors, and Management a letter documenting, among other things, significant deficiencies in PCS's controls. Among the significant deficiencies noted was that related to the $7.15 million entry and PCS's decision to publish the revenue before there was any certainty regarding its collection:

> The most significant issue addressed during the March 31, 2007 audit was in relation to a sale executed with PCS Middle East (PCS ME). A very large sale

was executed near year end with PCS ME.  Questions arose about the ability to
recognize the PCS ME sale in 2007.  During audit planning, and during fieldwork
in Boise, we were informed that additional documentation would be provided
supporting management's assertion that this sale should be recognized during
2007.  *The completion of the audit was delayed substantially to allow time for
such documentation to arrive.  In the end, no documentation was provided which
supported the recognition of the large sale.  With potential sales of this
magnitude, whose recognition is in question, we recommend that management
consult with the Board of Directors, Audit Committee, and other outside advisors
prior to making formal announcements and recognizing the sale.*

SOF ¶ 39, Ex. 32, 6/15/2007 Letter from HJ & Associates to the PCS Audit Committee, Board of

Directors, and Management (*emphasis added*).

        Not only is there sufficient evidence to demonstrate that the allegations in the Amended

Complaint regarding PCS's auditor are not false, immaterial, impertinent, or scandalous, as the

Defendants claim, but the evidence actually demonstrates compellingly that the auditor was kept

in the dark, mislead, and, ultimately, upon learning the truth, the driving force behind PCS's

reversal of the $7.15 million entry.  Because the evidence supports these allegations, the

Defendants' Motion to Strike these allegations should be denied.

**D.      PCS Booked, Recorded, Reported, and Would have Recognized the $7.15 Million in
          Revenue but for the Auditor's Insistence that the Revenue Entry be Reversed.**

        In what has to be the most perplexing section of the Brief in Support, the Defendants

claim that the Commission is intentionally confusing the "important accounting concepts"

relating to recording revenue, reporting revenue, booking revenue, and recognizing revenue.  Not

only is the Commission not attempting to confuse these terms, but in fact the terms are used

appropriately in the Amended Complaint and are consistent with PCS's auditor's own

description of the events at issue in this case.

        The Defendants fail to cite a single authority for their elaborate description as to the

meaning of each of these accounting terms, claiming in the end that "PCS never reported the

$7.15 million as revenue on its quarterly or annual financial statements with the SEC.  That is,

PCS never booked or recognized any of that revenue."  Brief in Support, p. 9.  PCS's own

auditor, however, testified that the revenue was booked and recorded:

> Q. Can you recall during the 3/31/07 audit what significant items came up that would cause you to go to Tony, Mr. Maher?
>
> A. Well, obviously the one that I think has risen to the surface as the most significant one was the company towards the end of their fiscal year ending March 31st, '07 *recorded revenue*, a receivable of approximately seven million dollars.

*     *     *     *     *

> Q. As far as PCS is concerned, did the license sale get booked into revenue?
>
> A. *They did book a transaction* into revenue and accounts receivable towards the end of March of '07.
>
> Q. Did they contact you before they booked it in?
>
> A. I don't recall.  I don't think so.

*     *     *     *     *

> Q. . . . Do you recall specifically discussions with Shannon or anyone at PCS about they should have the money in the bank before they can record the revenue?
>
> A. I, I know it was something that we had discussed.  And I think subsequently that's why we emphasized so strongly that we had to have the collection in.  Whether it had to happen before the recognition, any recognition on the financials, I think we had indicated that collection was essential to them.  *And so after they had booked it*, again we emphasized to them that we need the collection.  Collection will help substantiate that this is is a completed transaction.

*     *     *     *     *

> Q. Okay.  And why was that listed as an internal control problem?
>
> A. I guess the reason we listed it as such is because we didn't feel that the company had sufficient evidence and documentation to book the entry, that they should have had that information *before they booked it*.

10

SOF ¶ 24, Ex. 19, 7/10/2009 Testimony of Franklin Hunt, pp. 25-26, 60-61, 73, 106 (*emphasis added*).  Whatever else PCS may have thought it was doing with the revenue, clearly its auditor believes that the revenue was recorded and booked.

In addition, it strains credulity to assert that announcing the $7.15 million in a press release and in a Form 8-K filed with the Commission does not constitute "reporting" the revenue. To claim that reporting is somehow limited to an unreasonably narrow definition exclusively encompassing including the information in a Form 10-K does not comport with reality.  In fact the revenue was reported to the public and to the Commission.  This Court should have no patience for this incongruous deconstruction of otherwise straightforward accounting concepts, which were fairly and accurately portrayed in the Amended Complaint.

PCS recorded the $7.15 million amount on its books, it reported the revenue in its press release and Form 8-K, and, but for the insistence of its auditor, it would have included the amount in the Form 10-KSB.  None of the paragraphs in the Amended Complaint are incorrect, and certainly they do not rise to the level of immaterial, impertinent, or scandalous.  As a result, Defendants' Motion to Strike these paragraphs should be denied.

**E.    PCS Continued to Face the EBITDA Penalties Notwithstanding Barron Partners, LP's Conversion of the Payment Obligations under the Convertible Promissory Note into Preferred Stock.**

It is uncontested that in October 2006 Barron Partners, LP ("Barron") exercised its right to convert the payment obligations under the Convertible Promissory Note ("Note") into preferred stock.  This was specifically provided for by the terms of the Note.  *See* SOF ¶ 2, Ex. 1 at p. 15, Section 6.15 of Agreement and at p. 24, Section 2.1 of Note.  It is not correct, however, to claim that this conversion somehow eliminated the EBITDA penalties under the Note, as evidenced by Maher's own correspondence in the days and weeks leading up to the March 31, 2007 deadline.  The EBITDA penalties continued to apply at least as to certain warrants provided

for under the Note Purchase Agreement ("Agreement), and possibly still applied to the potential

conversion of the preferred stock into common stock, again as provided for under the

Agreement.

On December 29, 2005, Barron and PCS entered into the Agreement.  Under the

Agreement, Barron paid $1,000,000 for a convertible promissory note.  The Note was

convertible into 1,666,667 shares of preferred stock or common stock (at a price of $0.60 per

share), in accordance with terms outlined in the Agreement and the Note.  Under the Agreement,

PCS also issued to Barron two Common Stock Purchase Warrants ("Warrants"), which gave

Barron the right to purchase up to an additional 5,000,000 shares of common stock at exercise

prices as stated in the Warrants.  *See* SOF ¶ 3, Ex. 1 at p. 42, Common Stock Purchase Warrant

"A" ("Warrant A") and at p. 50, Common Stock Purchase Warrant "B" ("Warrant B"). The

Agreement contained a penalty provision if PCS did not meet certain earning goals.  Specifically,

section 6.15 provided that if PCS did not reach EBITDA (earnings before interest, taxes,

depreciation and amortization) of $4.5 million for the fiscal year ended March 31, 2007, the

number of shares of stock into which the Note was convertible would be increased *pro rata* by

the percentage decline in EBITDA.  Barron would be eligible for up to five million additional

shares of stock if the EBITDA goal was not met by the March 31, 2007 deadline.  *See* SOF ¶ 2,

Ex. 1 at p. 15, Section 6.15 of Agreement.

Under the terms of the two Warrants, Barron had the right to purchase up to 5,000,000

shares of PCS stock at exercise prices of $1.20 or $1.80 per share.  *See* SOF ¶ 3, Ex. 1 at p. 42,

Common Stock Purchase Warrant "A" ("Warrant A") and at p. 50, Common Stock Purchase

Warrant "B" ("Warrant B").  Both Warrant A and Warrant B contained a penalty provision

similar to the Note in which the exercise prices of the warrants would be reduced if PCS did not

reach $4.5 million EBITDA by March 31, 2007. Like the penalty provision in the Note, the exercise prices of the Warrants would be reduced *pro rata* based on the percentage decline in EBITDA, down to a minimum exercise price of $0.15 per share. *See* SOF ¶ 3, Ex. 1 at p. 45, Section 7(d) of Warrant A and at pp. 53-54, Section 7(d) of Warrant B.

As pointed out by the Defendants, Barron exercised its conversion rights in October 2006, which provided Barron with 1.6 million shares of *preferred stock*. However, the Defendants fail to acknowledge that under the terms of the Agreement, the preferred stock was then subsequently convertible into common stock, which conversion remained subject to the EBITDA penalties regarding the number of shares of common stock into which the preferred stock could be converted.[1] *See* SOF, Ex. 1 at p. 24, Section 2.1 of Note; p. 28, Certificate of Designations of Preferences, Rights, and Limitations of Series A Convertible Preferred Stock ("Certificate"); pp. 32-33, Section 6(a) of Certificate; and at p. 38, Section 7(f) of Certificate.

On December 29, 2006, two months *after* Barron had exercised its conversion rights and obtained the preferred stock, Maher sent an email to the members of the PCS Board of Directors informing them of the continuing challenges with the Saudi Arabia project and of his concerns that PCS would not be able to hit the EBITDA requirements:

> It doesn't appear we are going to be receiving anything from the Saudi's to look at, in terms of a contract, this calendar year since they are now in the middle of Hadjj which doesn't conclude until January 6. Although Refai continues to insist it is going to happen, those of us here and I am sure you all too, are getting pretty frustrated with the seemingly never ending delays.
>
> We have been supplied by several pieces of information in Arabic under the banners of the Ministry of Education and Ministry of Finance providing guidance

---

[1]  Barron began converting its preferred stock into common stock in February 2007 and completed its conversion by the end of March 2007. It is uncertain under the contract whether the EBITDA penalties would continue to apply after this conversion took place, which could potentially have entitled Barron to receive millions of additional shares of PCS stock. As Barron sold its stock on the market and its warrants to Burlingame in April 2007, which warrants continued to be subject to the EBITDA penalties, this issue of the impact of missing the EBITDA benchmarks on the common stock conversion remains unresolved.

to the contracting Department relating to some of the terms and conditions of a contract.  And Refai continues to insist the project is in the Contracting Department and that once there, it is a 100% sure thing that it is going to happen. The big question is of course, when. . . .

*We are getting late enough into our fiscal year that I am now getting concerned about hitting our ebitda goals of $4.3 M to comply with the terms of the contract we did with Baron Partners*.  If we can start early enough in January we can still do it, but if we don't get started until mid-February we will have to spend enormous amounts of money on freight in order to reach that goal.  In order to reach the $4.3 goal, we will need about $13.0M in revenue and it is getting tight.

SOF ¶ 5, Ex. 5, 12/29/2006 Email from Maher to C. Andrus, D. Farley, and M. McMurray

(*emphasis added*).

By February 2007, consistent with the practice for years before this time, nothing had

materialized on the Saudi Arabia deal and Maher continued to fret about the upcoming EBITDA

deadline.  In another letter to the members of the PCS Board in connection with PCS's Q3

review, Maher stated:

Apparently the Q requirements are such that we are required to talk about the KSA project and further to discuss the chances of it happening in this quarter and specifically if it does happen what are the chances of us meeting our ebitda goals as outlined in the Barron transaction.  As you may recall, that goal is $4.2M in ebitda.  The choices as presented to me by the auditors were various verbiage outlining our feelings of MISSING that goal: (1) remotely possible (2) reasonably possible (3) possible.  If remotely possible no write-off against additional stock we might have to issue  If reasonably possible, then we have to write off about half of it and if possible we are required to write it all off.

The total possible write-off is $700K +.

Because it is now February 2 and we have not yet seen a contract on this project, it appears our chances are getting dimmer every day to meet the ebitda goal.  If we don't have something firm from the KSA by the 15th of February, I have to tell you that we have almost no chance of booking much revenue from that project by March 31.

Clearly I am very frustrated by the continuous delays coming out of the KSA, but *I think we are approaching a drop dead date where we will have to face reality about meeting those ebitda goals.*

SOF ¶ 8, Ex. 7, 2/2/2007 Email from Maher to C. Andrus, D. Farley, and M. McMurray (*emphasis added*).  This email was followed with another one from Maher one month later reporting further discussions with the auditor regarding PCS's ability "to book revenue in an adequate amount to meet our ebitda goal."  *See* SOF ¶ 9, Ex. 9, 3/3/2007 Email from Maher to C. Andrus, D. Farley, and M. McMurray.  Clearly, meeting the EBITDA requirements of the Barron Partners Note remained a motivating force for Maher and PCS at that time.

Even on the day the press release was issued, Maher once again expressed his concerns regarding the EBITDA deadline.  On March 28, 2007, Maher was very anxious to get the press release issued announcing the $7.15 million in revenue.  Recognizing that the longer they waited to issue the press release the clearer it would be that they were attempting to beat the EBITDA deadline, Maher emailed Grover:

> The longer we wait to get that release out, the more it looks like we are doing it last minute.  The more last minute it looks, the more Andrew at Barrons will look at it.  Get it out of there.

SOF ¶ 20, Ex. 16, 3/28/2007 Email from Maher to Stith (then Wilson), Grover, and Egusquiza.  Three days prior to the March 31, 2007 deadline, Maher documents that he remained worried about, and clearly motivated by, the desire to meet the EBITDA benchmarks and avoid the penalties set forth in the Agreement.

On May 31, 2007, two months following the issuance of the press release, PCS took advantage of the uncertainty regarding the status of the $7.15 million in revenue by renegotiating the terms of the nearly five million warrants originally held by Barron and subsequently purchased by Burlingame Asset Management ("Burlingame").  *See* SOF ¶ 33, Ex. 27, Declaration of Blair E. Sanford ("Sanford Dec."), ¶ 9 and Ex. B attached thereto (5/31/2007 Warrant Amendment Agreement).  Burlingame purchased the warrants from Barron in April 2007 when it was believed that the EBITDA benchmarks had been met.  *See* SOF ¶ 33, Ex. 27,

Sanford Dec., ¶¶ 6-7 and Ex. A attached thereto (4/2/2007 Letter Agreement between Burlingame Asset Management and Barron Partners, LP).  In May, when it became clear that the revenue would not be recognized and that the EBITDA penalties under the warrants might be triggered, PCS approached Burlingame and proposed amending the warrant agreements by reducing the exercise price of the warrants in exchange for eliminating the EBITDA penalties. *See* SOF ¶ 33, Ex. 27, Sanford Dec., ¶¶ 8-9.  Burlingame agreed to the arrangement, and as a result the EBITDA penalties were eliminated in exchange for the exercise prices being reduced to $0.68 per share for the A Warrants and $0.97 for the B Warrants.  *See id.* at ¶ 9.

If, as the Defendants now claim, the EBITDA penalties had been retired with the October 2006 conversion, why then would it be such a prominent matter on the mind of PCS's President and Chief Executive Officer in the days leading up to the March 31, 2007 deadline, and why would the warrants need to be amended to eliminate the penalty?  The simple and obvious answer is that the EBITDA penalties, or at least some of them pertaining to the warrants and the right to purchase nearly five million shares continued to apply to PCS's financial performance.  Recognizing the hardship that incurring the penalties might cause, PCS was extremely motivated to book sufficient revenue to avoid them.

Because there is ample evidence, from PCS's own correspondence, that the EBITDA penalties continued to apply notwithstanding the conversion of the payment obligation to preferred stock, PCS's Motion to Strike these allegations should be denied.

**F.     PCS and Maher Knew at the Time the Press Release was Issued and the Form 8-K was Filed that PCS Middle East had Not Obtained a Contract with Saudi Arabia.**

It is well documented that even on the date that the decision was made to book the $7.15 million in revenue, no one at PCS had received confirmation that the Saudi Arabia contract had been executed.  *See* SOF ¶ 13, Ex. 11, 3/26/2007 Email from Stith (then Wilson) to Maher.

Because of this lack of confirmation, PCS's own CFO advised Maher: "I say no booking of revenue until we have contracts." *Id.*

Maher was painfully aware of the risk he was undertaking in choosing to announce the license agreement and $7.15 million in illusory revenue. On March 26, 2007, only hours before the license agreement was executed, Maher confirmed that PCS was rolling the dice by booking this revenue and that there were negative repercussions if it did not work out:

> Not sure whether we are going to have a Kings' Order in our fat little hands before the end of the month or not. Decision we jointly need to make, *except that I will suffer the consequences of whatever decision we make if its [sic] wrong*, is whether enough information yet to invoice Refai for the License Agreement.

SOF ¶ 12, Ex. 11, 3/26/2007 Email from Maher to Stith (then Wilson), Grover, and Egusquiza (*emphasis added*).

Stith responded to this email less than two hours later by recommending that PCS *not book the revenue* until each of the factors has been met, advising Maher that the company would be obligated to issue a press release and 8-K as soon as the revenue was booked and warning Maher that PCS could face legal action if the revenue never materialized:

> We cannot book the amount without 1) a contract with Refai (done); 2) a contract between Refai (or PCS) and the KSA MoE (not done); and (3) collection of funds (not done). I was willing to book the $7.15M in revenue should we have 1 and 2, as long as 3 was going to be in our hands by the end of April (or before the auditors arrive). As soon as I put the amount on the books, we have to release information to the shareholders (through an 8K and PR). Since we do not have any contract with MoE [Saudi Arabian Ministry of Education] or reason to believe that Refai could pay us the $7.15M if he doesn't obtain 2 above, I am not comfortable booking this as revenue. I do not want to have to deal with lawsuits should we release information of our booking of revenue and then have to retract our statement. *I say no booking of revenue until we have contracts*.

SOF ¶ 13, Ex. 11, 3/26/2007 Email from Stith (then Wilson) to Maher, Grover, and Egusquiza (*emphasis added*).

Notwithstanding the counsel provided to him by his CFO and the fact that PCS did not have confirmation that PCS Middle East had executed a contract with Saudi Arabia, Maher concluded the risk was worth taking:

> You and I don't know if #2 is done or not, apparently there is a Royal Order floating around somewhere which is as much a legally binding document as a contract.  And # 3 does not need to be collected, but it certainly needs to be "collectable" such as 30 day terms.

SOF ¶ 14, Ex. 11, 3/26/2007 Email from Maher to Stith (then Wilson), Grover, and Egusquiza.

On that same day, March 26, 2007, Maher attempted to reach out again to Refai.  In one of several emails that day, Maher inquired:

> I also understand from Robert and Joe that the contract will take "two weeks". We just need the Kings Order, and not some transcript of it, so we can invoice PCS Middle East for the License Agreement before March 31.  If we aren't able to get that by then, we will have to review the relationship.  I know you are working hard, no criticism of you, just a statement of fact.

SOF ¶ 15, Ex. 12, 3/26/2007 Email from Maher to Refai.

After not receiving an acceptable response from Refai, Maher followed up shortly thereafter:

> Are you in a position to say whether you will have the King's Order in your hand before March 31st?  Or is there some doubt about you being able to get that by then?  We need the King's Order, not someone's written summary of it.  We don't necessarily need the contract done by March 31, just the King's Order.  Is that still possible or do we think that will be difficult to get by then?

SOF ¶ 16, Ex. 12, 3/26/2007 Email from Maher to Refai.

Still failing to receive a response, Maher made one final attempt that day to pin Refai down on the issue of whether the Saudi Arabia deal would be done by March 31:

> You haven't answered whether you think you will have the Royal Order by March 31, do you think they will get it for you.  Or do you think this thing is going to be delayed into April or May, or perhaps not happen at all?  Please advise.  Thanks.

SOF ¶ 17, Ex. 13, 3/26/2007 Email from Maher to Refai.  Apparently Maher still failed to get Refai to respond with anything concrete.  As a result, Maher was in a position of having to decide whether to book the revenue at the risk of not having the contract come through, or not book the revenue and fail to meet the EBITDA benchmarks.  Against the advice of his CFO and without evidence confirming that the underlying contract with Saudi Arabia had been executed or would be by March 31, Maher made the unwise decision to gamble that Refai would ultimately come through.  As a result, PCS obtained the purchase order from Refai and moved forward with booking the revenue, issuing the press release, and filing the Form 8-K.

    With this irrefutable evidence from Maher's own correspondence before the Court, none of the rest of the superfluous evidence cited by the Defendants in an attempt to blunt the effect of Maher's own words is of any moment.  This is especially true as to the hearsay relied upon by Defendants regarding what Refai was allegedly telling them in telephone calls.  But even as to this hearsay evidence, liberally relied on by the Defendants notwithstanding its inadmissible nature, nothing that is cited stands for the proposition that Refai ever *confirmed* that a contract had been executed.  Rather, each of the statements relied on in the Defendants' Brief in Support at best conveys Refai's belief that a contract would be executed in the near future.  These references include statements such as "there was no doubt," "felt strongly that he had the contract," and "was very confident that the money was coming."  Brief in Support, p. 12.

    Neither these statements, nor the assertions regarding the King Abdullah project, the photos allegedly of Refai demonstrating the product, or the news articles discussing the educational initiatives, are sufficient to relieve Defendants of their responsibilities in this matter.  None of them bear directly on the Defendants' knowledge at the time the press release was issued, and none of them are sufficient therefore to contradict the Defendants' own statements

contained in correspondence at the time.  Certainly these materials are not sufficient to demonstrate that the allegations contained in the Amended Complaint are immaterial, impertinent, or scandalous.  Because the allegations in the Amended Complaint are adequately supported, the Defendants' Motion to Strike these allegations should be denied.

## G.     Neither Rule 11 Nor Rule 12(f) Have Been Violated in this Matter.

In light of the overwhelming evidence provided in this Response and in the accompanying Statement of Facts in Support of this Response and the Response to the Motion to Dismiss, it cannot reasonably be contended that the Commission has not set forth adequately supported allegations in the Amended Complaint.

As has been clearly and amply demonstrated, each of the allegations, including those which form the subject of the Defendants' Motion to Strike, have clear, cogent, and persuasive evidentiary support.  There is evidence that PCS was not forthright with its auditor concerning the nature of the license agreement and the lack of an underlying contract with Saudi Arabia.  There is evidence that upon learning that the $7.15 million entry did not have evidentiary support, it was the auditor that pushed to have the entry reversed.  There is evidentiary support for the claim that PCS recorded, booked, and published its $7.15 million in revenue, as testified to by its own auditor.  Further, there is overwhelming evidence that the EBITDA benchmarks remained in force as to the warrants and, perhaps, as to the conversion of the preferred stock into common stock.  And finally, there is compelling evidence confirming that the Defendants knew at the time they issued the press release that no contract had been executed with Saudi Arabia.

Because there is evidence for each of these allegations, nothing in the Amended Complaint can reasonably be considered immaterial, impertinent, scandalous, or false.  As a result, Defendants' Motion to Strike is without merit and should be denied.

**CONCLUSION**

For the foregoing reasons, the Commission respectfully requests that the Court deny the

Motion to Strike the SEC's Amended Complaint submitted by Defendants PCS

Edventures!.com, Inc. and Anthony A. Maher.

Dated this 30th day of December, 2010.

Respectfully submitted,

/s/ Daniel J. Wadley
Daniel J. Wadley
Thomas M. Melton
Cheryl M. Mori
Attorneys for Plaintiff
Securities and Exchange Commission
15 West South Temple, Suite 1800
Salt Lake City, Utah 84101

## CERTIFICATE OF SERVICE

I hereby certify that on the 30th day of December, 2010, I caused to be electronically filed the foregoing with the U.S. District Court.  Notice will automatically be electronically mailed to the following individuals who are registered with the U.S. District Court CM/ECF System:

Briane Nelson Mitchell
nels@maukburgoyne.com
Mauk & Burgoyne
515 South 6th Street
Post Office Box 1743
Boise, Idaho 83701
*Attorneys for Defendants PCS Edventures!.com, Inc. and Anthony A. Maher*

Erik F. Stidham
efstidham@hollandhart.com
Brian Wonderlich
bcwonderlich@hollandhart.com
Holland & Hart LLP
Suite 1400, U.S. Bank Plaza
101 South Capitol Boulevard
P.O. Box 2527
Boise, Idaho 83701

Holly Stein Sollod
hsteinsollod@hollandhart.com
Holland & Hart LLP
555 Seventeenth Street, Suite 3200
Post Office Box 8749
Denver, Colorado 80201
*Attorneys for Defendant Shannon M. Stith*

/s/ Misty Reiter